**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| RADIOLOGIX, INC., a Delaware corporation; and RADIOLOGY AND NUCLEAR MEDICINE IMAGING PARTNERS, INC., a Delaware corporation, <br><br> Plaintiffs, <br><br> v. <br><br> RADIOLOGY AND NUCLEAR MEDICINE, LLC, a Kansas limited liability company; and DAVID L. SMITH; an individual; and DR. TIMOTHY ALLEN, DR. STEPHEN COON, DR. MARLIN FUGATE, DR. RUSSELL GREENE, DR. CLAY HARVEY, DR. THOMAS HELLING, DR. ARIN KATZER, DR. PATRICK LANDES, DR. MATTHEW MALMSTROM, DR. DANIEL MARICHAL, DR. BRET MEGGISON, DR. RAMIN MIDIA, DR. KYLE MILLER, DR. OLUFOLAJIMI OBEMBE, DR. JAMES OWEN, DR. HARISH PANICKER,    DR. R. MARC SCHWORM, DR. CHRISTOPHER SHELDON, DR. FRANK YACKOVICH, all individuals. <br><br> Defendants. | Case No. 15-04927-DDC-KGS <br><br><br> **PLAINTIFFS' RESPONSE TO DEFENDANT SMITH'S MOTION FOR SUMMARY JUDGMENT** |

<u>**PLAINTIFFS' RESPONSE TO DEFENDANT SMITH 'S
MOTION FOR SUMMARY JUDGMENT**</u>

COME NOW Plaintiffs, Radiologix, Inc. and Radiology and Nuclear Medicine Imaging

Partners, Inc. (collectively "Plaintiffs"), and in response to Defendant Smith's Motion for

Summary Judgment (Doc. 237) states:

## I.    INTRODUCTION

Defendant David Smith was employed by Plaintiffs from 2000 until his position was eliminated effective October 1, 2010.  Smith's duties while employed by Plaintiffs included administering the 2002 Service Agreement that is at the center of this dispute.  After he was terminated by Plaintiffs, Smith became an independent consultant for various clients, and while so engaged, was a key player in bringing about Defendant RNM's unilateral termination of the 2002 Service Agreement.

At issue in Defendant David Smith's motion for summary judgment on Plaintiffs' tortious interference with contract claim against him is whether there are genuine issues of material fact that preclude judgment as a matter of law.  As Plaintiffs demonstrate below, there are significant disputes about the facts that cannot be determined on a motion for summary judgment and require that Defendant Smith's motion be denied.

## II.    SUMMARY OF ARGUMENT

Smith's argument that he is protected because he was acting as an "agent" for RNM fails because he was at all relevant times acting as an independent consultant with multiple clients. He was not an officer or employee for RNM.  Similarly, he is not protected from an interference claim by the Engagement Agreement he signed with his counsel, who is also counsel for all other Defendants, because the contract clearly expresses that he is not an employee.  Moreover, Smith's improper conduct went far beyond the narrow scope of services spelled out there.

Smith's position that he did not "induce" RNM's termination of the Service Agreement could be sustained only if the court were to ignore the mountain of evidence of his active involvement in the termination both before and after the purported termination "vote" in

September 2014. Smith was so instrumental that, in the words of one of the physicians, RNM would not have been able to "pull this off" without him.

Finally, the issue of Smith's motive and the presence or absence of malice is a question for the jury.  Smith actively concealed from Plaintiffs that he was sabotaging the Plaintiffs' long-term contract with RNM, a contract that he had previously administered for Plaintiffs, and moreover, Smith severely undermined the contract at the same time he was submitting invoices to Plaintiffs on the consulting work he was doing for RNM.  The uncontroverted facts include ample evidence from which a reasonable jury could conclude that Smith's conduct was intentional and malicious.

### III.    ISSUES PRESENTED

Smith's motion presents the following issues:

1.    Does Smith's status as an independent contractor for RNM and/or Defendants' counsel provide him cover from a tortious interference with contract claim?

2.    Were Smith's actions of sufficient importance that they could be said to have brought about, or directly contributed to, RNM's termination of the Service Agreement?

3.    Is there any evidence from which a reasonable jury could conclude Smith's conduct was intentional or malicious?

### IV.    RESPONSE TO DAVID SMITH'S
### STATEMENT OF UNCONTROVERTED FACTS

1.    Plaintiff RNMIP employed Smith from 2000 until October 1, 2010.  [Exhibit 1, Deposition of David Smith ("Smith Dep.") at 27:12-20].

**ANSWER:    Uncontroverted.**

2.    During his employment with RNMIP, Smith performed the duties of Practice Administrator for RNM in Topeka, Kansas.  (Ex. 1, Smith Dep. at 27:21-24).

**ANSWER:   Controverted in part.  Smith's employer was Radiology and Nuclear Medicine Imaging Partners, Inc. ("RNMIP"), a wholly owned subsidiary of Radiologix, Inc.; his duties were to be performed at RNMIP's administrative offices in Topeka; and he was to report to the Company's Regional Director of Operations-Central Region.  [Ex. 10, Depo. Ex. 84].**

3.      RNMIP eliminated Smith's position as Practice Administrator for RNM effective October 1, 2010.  [Ex. 1, Smith Dep. at 37:7-10; Exhibit 2, Smith termination letter].

**ANSWER:   Controverted in part. Smith's termination letter states that his "position [had] been eliminated by R&NM Imaging Partners, Inc." [Ex. 6, Depo. Ex. 43].**

4.      Following the elimination of his position with RNMIP, Smith became an independent business consultant in the area of physician practice management.  [Ex. 1, Smith Dep. at 174:1-176:4].

**ANSWER:   Uncontroverted, although the deposition testimony cited by Defendant does not support this statement.  Smith's resume indicates that he was self-employed in 2010-2011, and then acted as an "Executive & Advisor" from 2013 to the present. [Ex. 9, Depo. Ex. 80].**

5.      Plaintiffs thereafter hired Smith as an independent consultant to complete projects which he had been working on prior to the elimination of his position with RNMIP and to help transition work to other RNMIP employees.  [Ex. 1, Smith Dep. at 173:17-174:21; Exhibit  3, Deposition of Jayne Rarrick ("Rarrick Dep.") at 173:7-173:22].

**ANSWER:   Controverted in part.  Radiology and Nuclear Medicine Imaging Partners, Inc. ("RNMIP") used Smith on a contract labor basis for a period of time**

**to try to continue to do some of the work the he had been doing as an employee of RNMIP. [Ex. 39, Rarrick Aff., Doc. 245-1 at ¶ 34].  Smith testified as follows:**

> **Q:     Do you – so there was kind of a consulting position that you had for a little while after --**
>
> **A:     No.  As I recall, it was more in the vein of 'We've got these few things that need to be wrapped up and can you help us do that?'  And so not exactly what I would characterize as consulting, but…" [Ex. 42, Smith Depo. at 174:1-8].**

**This included some issues related to the website and loose ends relating to the winding up of the MRI of Kansas Partnership. [Ex. 42, Smith Depo. at 174:14-21].  Plaintiffs also retained Smith on a consulting basis in April or May 2014 to prepare an analysis on whether RNM should attempt to participate in EHR Technology/Meaningful Use.  [Ex. 42, Smith Depo. at 263:5 – 264:22].**

6.      RNM also retained Smith on several occasions to provide consulting services and to assist with specific projects.  [Ex. 1, Smith Dep. at 175:1-176:4, 263:5-264:22].

**ANSWER: Uncontroverted.**

7.      On or about November 26, 2010, RNM sent a written notice of default to Plaintiffs advising them that RNMIP's termination of Smith's position in Topeka, Kansas, had produced a loss of local management expertise and support that had a continuing negative impact on RNM's practice and constituted a material default in performance under the Amended Service Agreement.  [Exhibit 4, 30(b)(6) Deposition of James Owen ("Owen Dep.") at 269:1-275:18; Exhibit 5, November 26, 2010, default letter].

**ANSWER:   Controverted in part.   The 2010 letter does not state that Smith's termination constituted a "material default."  [Ex. 4, Depo. Ex. 32].   Moreover, Dr. Allen's draft of this letter enumerated 14 "ongoing issues in our practice that need to be addressed with your help"; his draft letter did not state or suggest that RNM considered "RadNet" to presently be in "default" or "breach" of the Service Agreement. [Ex. 30, Depo Ex. 221].   According to Dr. Allen, the ongoing "issues" were "not necessarily failings of Jayne [Rarrick]" or defaults, but merely "ongoing concerns for our practice, things that needed to be dealt with that we had concerns about but were not going to be dealt with effectively without some significant help from RadNet." [Ex. 41, Allen Depo. at 53:11-18]. RNM's 30(b)(6) corporate designee, Dr. Owen, agreed that these "ongoing issues" were not intended to delineate specific defaults. [Ex. 46, Owen 30(b)(6) Depo. at 373:16 – 374:8].**

8.     In early 2011, with Plaintiffs' knowledge and consent, RNM retained Smith as a consultant to provide business advice and assistance in evaluating a possible "buy out" of the Amended Service Agreement between RNM and Plaintiffs.  [Ex. 1, Smith Dep. at 62:22-63:5, 175:1-176:4; Ex. 4, Owen Dep. at 290:20-293:4].

**ANSWER:   Uncontroverted.   Owen testified that RNM hired Smith to "put together potential scenarios for exiting from our relationship with Radiologix," specifically a potential buyout of the remainder of the Service Agreement as opposed to grounds for termination of the Service Agreement.   Owen testified that Smith was not addressing grounds for termination, but rather a buyout.  [Ex. 46, Owen 30(b)(6) Depo. at 290:13 – 291:13].**

6

9.      In 2013 and 2014, Plaintiffs again retained Smith as a business consultant to assist them with various projects, including the preparation of a standard hospital contract that could be used in future contract negotiations and implementation of an Electronic Health Records Incentives Program established by the Centers for Medicare and Medicaid Services ("CMS"). [Ex. 1, Smith Dep. at 263:5-264:22; Ex. 4, Owen Dep. at 272:20-273:15].

> **ANSWER:   Controverted in part.   The pages cited by Defendant do not support this statement.   Plaintiffs retained Smith in April or May 2014 to prepare an analysis of whether RNM should participate in the CMS's EHR Technology/Meaningful Use incentives.   [Ex. 8, Excerpt of PDC minutes, from Depo. Ex. 63 at P0661898; Ex. 42, Smith Depo. at 263:5 – 264:22].**

10.     In late 2013, RNM began a process to determine whether sufficient grounds existed for terminating the Amended Service Agreement.   [Ex. 4, Owen Dep. at 218:21-219:25; Exhibit 6, Deposition of Brett Meggison, M.D. ("Meggison Dep.") at 258:19-260:7; Exhibit 7, December 2013 e-mail chain regarding separation].

> **ANSWER:   Controverted.   Meggison testified that he did not recall when the effort began to explore the possibility of the RadNet extraction.   [Ex. 43, Meggison Depo. at 259:2-7].   In December 2013, RNM was unsure of the next step and was just beginning to compare costs and collection rates.   [Ex. 24, Depo. Ex. 188; Ex. 25, Depo. Ex. 189; Ex. 26, Depo. Ex. 190; Ex. 27, Depo. Ex. 191].**

11.     As part of this process, RNM obtained a written legal opinion from a lawyer with a firm other than RNM's current legal counsel [Ex. 6, Meggison Dep. at 290:3-291:13; Exhibit 8, May 29, 2014, e-mail chain] and identified possible vendors.   [Ex. 6, Meggison Dep. at 263:11-24, 266:14-267:19].

**ANSWER:** **Uncontroverted, but immaterial and irrelevant.**

12.     On June 10, 2014, members of the RNM management committee requested a meeting with Smith to discuss RNM's relationship with Plaintiffs.  [Ex. 1, Smith Dep. at 65:6-67:25].

> **ANSWER:** **Controverted in part. The group of physicians with whom Defendant Smith met the evening of June 10, 2014 – Brett Meggison, James Owen, Tim Allen, and Olufolajimi Obembe – did not constitute the Management Committee.  All four had been put on an *ad hoc* committee to discuss Meaningful Use, and three of the four were members of the Practice Development Committee who had formed a "RadNet extraction task force." [Ex. 15, Depo. Ex. 104; Ex. 29, Depo. Ex. 208, at pp. 9-10; Ex. 31, Depo. Ex. 232].**

13.     During that June 10, 2014 meeting, RNM requested that Smith provide business consulting services relating to the Amended Service Agreement and RNM's relationship with Plaintiffs.  [Ex. 1, Smith Dep. at 19:6-17, 21:1-22:17, 65:6-67:25, 266:18-267:14].

> **ANSWER:** **Controverted in part.  Smith testified that he was approached by one of the physicians to attend a meeting to "discuss the relationship between Radiology and Nuclear Medicine and RadNet" and was "asked if [he] would help facilitate --" [Ex. 42, Smith Depo. at 65:10 – 66:2].  In an email dated June 11, 2014, Smith advised the physicians at the previous night's meeting that he "proposed to work for an hourly fee of $250" and that he did not "feel the need to draw up a formal agreement regarding this matter."  [Ex. 15, Depo. Ex. 104].  Smith's engagement letter with defendants' counsel, Spencer Fane, which was not produced until Mr. Smith's deposition, was purportedly signed on July 17, 2014.  [Ex. 12, Depo. Ex. 87].**

8

14.     Smith agreed to assist RNM and on June 11, 2014, sent an e-mail to members of the RNM management committee confirming his agreement.  [Ex. 1, Smith Dep. at 266:18-267:6; Exhibit 9, June 11, 2014, e-mail from David Smith].

>        **ANSWER:     Controverted in part.  Smith's June 11, 2014, email was not addressed to members of the RNM management committee, but rather included some members of the Practice Development Committee – the self-proclaimed "RadNet extraction task force."  [Ex. 15, Depo. Ex. 104; Ex. 29, Depo. Ex. 208, at pp. 9-10].**

15.     On or about July 17, 2014, RNM's current legal counsel formally retained Smith as a consultant to provide advice and expertise in connection with RNM's ultimate decision to terminate the Amended Service Agreement.  [Ex. 1, Smith Dep. at 118:3-10; Exhibit 10, Smith Engagement Agreement].

>        **ANSWER:     Controverted in part.  The Engagement Agreement purports to have been signed on July 17, 2014, and specifies the following services: "analysis of the financial impact of terminating the Service Agreement, and any proposed settlement," "business and operational planning," and "advice" concerning negotiating tactics and settlement terms and conditions." [Ex. 12, Depo. Ex. 87, at ¶ 1].**

16.     Smith's Engagement Agreement with RNM's current legal counsel described the scope of his services as follows:

>    Services.     Upon request, and at mutually agreeable times and places, Advisor shall provide the following Services to SFBB on behalf of RNM:
>
>    a.     Analysis of the financial impact of terminating the Service Agreement, and any proposed or contemplated settlement.
>    b.     Engage in business and operational planning to ensure business continuity in the event of termination of the Service Agreement.
>    c.     Render advice concerning negotiating tactics and settlement terms and conditions.

[Ex. 10, Smith Engagement Agreement, § 1].

**ANSWER:    Uncontroverted.**

17.    On or about September 10, 2014, the physician members of RNM voted in favor of terminating RNM's Amended Service Agreement with Plaintiffs.  [Exhibit 11, RNM member resolution].

**ANSWER:    Controverted in part.  RNM "didn't keep track of individual votes" and "did not keep a roll of who voted yes and who voted no on" the September 2014 resolution or whether to terminate the Service Agreement.  [Ex. 46, Owen 30(b)(6) Depo. at 133:1 – 134:23].  There are no minutes, voting records, or even attendance records for the September 2014 meetings referenced in the September 2014 resolution.  [Ex. 46, Owen 30(b)(6) Depo. at 133:1 – 134:23, 260:13 – 261:2, 262:19 – 263:10; Ex. 44, Owen Depo. at 75:13 – 76:23; Ex. 43, Meggison Depo. at 252:16 – 258:4; Ex. 41, Allen Depo. at 296:15 - 297:19; Ex. 42, Smith Depo. at 295:18 – 296:1]. In his deposition as RNM's 30(b)(6) corporate designee, Dr. Owen testified that RNM's September 2014 resolution was actually a vote for RNM to negotiate its way out of the contract.  [Ex. 46, Owen 30(b)(6) Depo. at 225:1-4, 227:6-14].  As late as September 21, 2014, there still seemed to be a question as to whether RNM had sufficient votes.  [Ex. 23, Depo. Ex. 186].**

18.    On or about October 6, 2014, RNM, through its legal counsel, sent a written notice of termination to Plaintiffs' corporate parent, RadNet, Inc., citing Plaintiffs' material uncorrected defaults in performance under the Amended Service Agreement and illegality under controlling Kansas law.  [Exhibit 12, Oct. 6, 2014, Notice of Termination].

**ANSWER:    Controverted in part. It is uncontroverted that RNM's counsel's October 6, 2014 letter purported to be a Notice of Termination, but it is controverted that**

10

those alleged issues identified in the letter, many of which were not included in Dr. Tim Allen's November 26, 2010 letter, were "defaults," "material," or "uncorrected," or otherwise legitimate grounds for termination. [Ex. 3, Depo. Ex. 30; Ex. 4, Depo. Ex. 32].

19.    Following RNM's termination of the Amended Service Agreement, and pursuant to his Engagement Agreement with RNM's legal counsel, Smith assisted RNM in transitioning its billing, collection and other business operations to alternative vendors and taking back control of its bank deposit account.  [Ex. 1, Smith Dep. at 280:10-282:18, 301:18-302:18].

**ANSWER:    Controverted in part.  Smith's activities exceeded the scope of services set out in the Engagement Agreement with Spencer Fane.  Among other things, Smith negotiated an agreement with McKesson, set up a new account at a separate bank for deposits of charges billed by RNM, instructed Capital City Bank to stop the daily sweeps, intercepted mail that had previously gone to RadNet, and instructed hospitals to stop the flow of information to Plaintiffs.  [Ex. 19, Depo. Ex. 114; Ex. 21, Depo. Ex. 117; Ex. 42, Smith Depo. at 302:3-18; Ex. 7, Depo. Ex. 59]. Smith kept these activities secret from Plaintiffs and Plaintiffs' employees in Topeka until some of those activities were inadvertently discovered on August 26, 2015, just before this suit was filed.  [Ex. 39, Rarrick Aff., Doc. 245-1 at ¶ 66; Ex. 38, Supplemental Affidavit of Rita Jayne Rarrick ("Supplemental Rarrick Aff.") at ¶ 5].**

20.    Smith had no interest in serving as RNM's long-term practice administrator and agreed to fill the position only until a permanent practice administrator could be hired.  [Ex. 1, Smith Dep. at 313:12-315:7].

**ANSWER:   Controverted in part.   In a December 30, 2015 email, Smith stated that his "original agreement [with RNM] was designed to get RNM through the transition away from Radnet (sic)" and he attached a proposed Executive Services Agreement for a period of one year. [Ex. 22, Depo. Ex. 118; Ex. 42, Smith Depo. at 313:12 – 315:7].**

21.     RNM retained a permanent practice administrator in February 2017, at which time Smith took a new position with a different medical practice in Kansas City.  [Ex. 1, Smith Dep. at 120:6-120:20].

**ANSWER:   Controverted in part. RNM did not recruit a practice administrator until after Smith notified the group he was not interested in continuing. [Ex. 42, Smith Depo. at 123:3-19].**

22.     Plaintiffs assert that Smith tortiuously interfered with the 2002 Amended and Restated Service Agreement between Plaintiffs and RNM ("Amended Service Agreement") by (1) participating in a "task force" secretly formed by RNM and its legal counsel for the purpose of "extracting" RNM from its relationship with Plaintiffs, (2) signing the engagement agreement with RNM's legal counsel, and (3) assisting RNM in contracting with alternative service providers and revoking a "transfer order" at Capital City Bank that permitted RNMIP to make daily transfers of funds out of RNM's deposit account at that bank.   [Exhibit 13, 30(b)(6) Deposition of Jayne Rarrick at 80:4-18; Pretrial Order, Doc. #227 at pp. 11-12 ¶¶ 37-40].

**ANSWER:   Uncontroverted, but incomplete.   *See* Plaintiffs' Statement of Additional Uncontroverted Facts, below.**

## V.  PLAINTIFFS' STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS

23.  Defendant David Smith was employed by Plaintiffs from April 1, 2000 until October 1, 2010.  [Pretrial Order, Stipulations, Doc. 227 at p. 3].

24.  At the commencement of his employment, Smith signed a Confidentiality, Proprietary Information and Inventions Agreement ("Confidentiality Agreement").  The Confidentiality Agreement required Smith not to disclose "confidential information," as defined in the Agreement, for a period of three years following termination of his employment, and to never disclose Plaintiffs' "trade secrets," also defined in the Agreement.  The Confidentiality also contained restrictive covenants prohibiting him from raiding employees and interfering with Plaintiffs' contracts for a period of one year following termination of his employment.  [Confidentiality Agreement, Ex. 11, Depo. Ex. 85, at ¶¶ 1, and 2A through 2C].

25.  When Smith joined Plaintiffs in 2000, RNM and the Plaintiffs were not quite three years into the 40-year term of the original service agreement that was part of the 1997 transaction.  [Ex. 1, Depo. Ex. 5, 1997 APPI-RNMPA Agreement, at Ex. F;  Ex. 46, Owen 30(b)(6) Depo. at 71:3 – 74:1].

26.  In July 2002, two years after Smith joined Plaintiffs, RNM and the Plaintiffs entered into a new Service Agreement called the "Amended and Restated Service Agreement" (hereinafter "Service Agreement").  [Pretrial Order, Stipulations, Doc. 227 at p. 3].

27.  In his resume, Smith describes his responsibilities during his roughly 10-year stint with Plaintiffs as being "responsible for executive leadership of Radiology and Nuclear Imaging Partners, Inc., a subsidiary of RadNet, Inc. a large publicly traded radiology services firm."  In addition, Smith represented that while employed by Plaintiffs, he had "built a strong

13

management team, continually improved reimbursement through negotiation of more favorable payer contracts and enhanced billing operations, focused and improved sales and marketing, and consistently led the company in patient satisfaction and service quality metrics." [Ex. 9, Depo. Ex. 80; Ex. 42, Smith Depo. at 27:12 – 29:7].

28.     In his position with Plaintiffs, Smith was among those primarily responsible for administering the Service Agreement, was in a position of influence with respect to the RNM physicians, and gained critical and confidential information concerning RNM, Plaintiffs, and the relationship between RNM and Plaintiffs.  [Ex. 40, Forthuber Aff., Doc. 245-2, at ¶ 28].

29.     Smith worked closely with Jayne Rarrick from the date he began his employment with RNMIP in 2000 until he left the Company on about October 1, 2010.  Smith and Ms. Rarrick also had conversations and were in meetings together after he left the Company's employment.  At no time did Smith ever say anything to Ms. Rarrick to state or imply that he believed the 2002 Service Agreement was unlawful, or that RNMIP had done anything to breach the Agreement or give RNM grounds to terminate it. [Ex. 38, Supplemental Rarrick Aff. at ¶¶ 2-4].

30.     On or about November 22, 2010, Dr. Timothy Allen, chairman of RNM's Management Committee, drafted a letter to Radiologix's Steve Forthuber regarding the elimination of Smith's position and the need for the administrative support of  Ms. Jayne Rarrick, as the remaining key, senior employee.  [Ex. 30, Depo. Ex. 221].

31.     On December 9, 2010, Smith told a third party that "in the wake of [his] termination [his] old group (RNM) is going to attempt to negotiate their way out of their agreement with RadNet, and they've asked [him] to look at billing alternatives." [Ex. 42, Smith Depo. at 241:12 – 242:8; Ex. 13, Depo. Ex. 101].

32.     In an email exchange with Dr. Tim Allen in February 2011, regarding whether there would be a financial benefit for RNM to negotiate its way out of the Service Agreement, Smith recognized the cash income that RadNet would be giving up, the amount it would be looking for in a negotiated exit, and the amount RNM might expect in additional profits by entering into a different agreement with McKesson as the service provider for billing and coding services only.  [Ex. 5, Depo. Ex. 34; Ex. 42, Smith Depo. at 252:22 – 254:6].

33.     By August 2011, however, Smith informed a third party that his engagement with RNM "[had] pretty much wrapped up" and "the group [was] still with RadNet [and] they were not able to reach agreement on financial terms for an early termination of the existing management agreement, which runs through 2038 (*sic*)." [Ex. 42, Smith Depo. at 254:17 – 256:16; Ex. 14,  Depo. Ex. 102].

34.     From 2012 to 2013, Smith was employed by Integrated Medical Partners, LLC, a company unrelated to the parties in this case.  During that time, Smith had no involvement with the parties except for an "occasional offhand conversation with Jayne [Rarrick]" or attendance at "a holiday party" that former administrators and retired physicians attend.  [Ex. 42, Smith Depo. at 63:6 – 64:8; Ex. 9, Depo. Ex. 80].

35.     After the elimination of his position at Integrated Medical Partners in 2013, Smith took consulting engagements as a self-described "Executive and Advisor" to "radiology group practices, imaging centers, and others in the healthcare industry," including a three-year stint from 2013 to 2016 as part-time executive director of Wichita Radiology Group. [Ex. 42, Smith Depo. at 120:21 – 122:23; Ex. 9, Depo. Ex. 80].  Smith's position with Wichita Radiology came about as a result of Smith making Dr. Owen aware that he was looking for opportunities.  [Ex. 42, Smith Depo. at 258:1-24].

36.     In December 2013, RNM secretly formed a "task force" "spearheaded" by one of the vocal younger doctors, Dr. Brett Meggison, and began debating the possibilities of a buyout from RNM's Service Agreement with Plaintiffs, noting that David Smith had told that group that billing companies were willing to negotiate on costs, that there "would likely be some pretty significant tax benefits, and that Smith had checked with one bank on interest rates and financing." [Exs. 25 and 27, Depo. Exs. 189 and 191].

37.     In this internal discussion, one of the doctors observed that "the contract [Service Agreement] is pretty ironclad.  If you want out by virtue of a breach, you have to formally notify Radnet (*sic*) in writing of a potential breach at which time they have 30 days to correct it.  The breaches are pretty loose in interpretation."  [Ex. 27, Depo. Ex. 191].

38.     During 2014, the five members of RNM's RadNet extraction "task force" included Drs. Meggison, Owen and Allen, along with RNMIP's former employee David Smith and RNM's new attorney Blane Markley, who had replaced Jeff Ellis and whom Dr. Owen described as "more aggressive."  [Exs. 26 & 27, Depo. Exs. 190 & 191].  Brett Meggison testified that the RadNet Extraction Committee met with Blane Markley and David Smith.  [Ex. 43, Meggison Depo. at 91:4-22].

39.     On June 10, 2014, David Smith met with Drs. Meggison, Owen, Allen, and Obembe and Blane Markley to discuss the "Radnet project" after an earlier meeting on May 29, 2014, that was to be half MU ("Meaningful Use") and half "radnet extraction" had been cancelled. [Ex. 15, Depo. Ex. 104; Ex. 28, Depo. Ex. 200].

40.     In a secret executive session immediately following the June 10, 2014, discussion of the Meaningful Use analysis, Drs. Brett Meggison, Owen, and Obembe, attorney Blane

Markley, and Defendant David Smith discussed "extracting ourselves from RadNet."  [Ex. 32, Depo. Ex. 243].

41.    The June 10, 2014, meeting is the first time that Smith had heard any concerns raised about the corporate practice of medicine and illegal fee splitting.  [Ex. 42, Smith Depo. at 266:18 – 267:19; Ex. 15, Depo. Ex. 104].

42.    The day after this discussion, June 11, 2014, Smith emailed Drs. Meggison, Owen, Allen, and Obembe proposing to work on the "Radnet project" for $250 per hour.  Smith added that he didn't feel a need to draw up a formal agreement.  [Ex. 42, Smith Depo. at 266:18 - 267:6; Ex. 15, Depo. Ex. 104].

43.    Shortly after this meeting, Smith began communicating with McKesson regarding proposals to migrate billing from Plaintiffs to McKesson.  At that time, the physicians still had not reached a consensus about what they wanted to do.  [Ex. 42, Smith Depo. at 281:6 – 284:14; Ex. 16, Depo. Ex. 108].

44.    At about the same time, June 17, 2014, Smith appeared in his capacity as Executive Director of Wichita Radiology at an RNM Practice Development Committee Meeting with Dr. John Lohnes of Wichita Radiology, and Blane Markley, to discuss a possible regional alliance between Wichita Radiology and RNM.  Jayne Rarrick also attended the meeting.  Smith did not disclose at that meeting that he had secretly met the week before with RNM physicians concerning extraction from the Service Agreement with Plaintiffs.  [Ex. 8, PDC Minutes, June 17, 2014, excerpt of Depo. Ex. 63, at P0661902].

45.    A month later, on July 17, 2014, Smith entered a confidential consulting agreement with Spencer Fane Britt & Browne on behalf of RNM purportedly subject to the attorney-client privilege. The recitals identify Smith as being "engaged in the business of

providing executive leadership and business advisory services focused in the radiology and medical imaging industry."  [Ex. 42, Smith Depo. at 117:19 – 118:5; Ex. 12, Depo. Ex. 87].

46.    The scope of Smith's services under his consulting agreement with Spencer Fane is set forth in Defendant Smith's Statement of Uncontroverted Facts, ¶ 16, above.  Smith's Engagement Agreement expressly states that:

     a.   He is an independent contractor (¶ 5);

     b.   The Agreement does not create an employment relationship (¶ 5);

     c.   Smith has other executive services clients (¶ 4);

     d.   The Agreement is not exclusive (¶ 5);

     e.   Smith is not eligible to participate in any employee benefit plans of either Spencer Fane or RNM (¶ 5);

     f.   RNM will pay Smith $250 per hour and reimburse expenses (¶¶ 6 and 7);

     g.   Smith agrees to invoice RNM and RNM agrees to pay the invoices (¶ 6); and

     h.   Smith will provide his own general business equipment and supplies (¶ 8).

[Ex. 12, Depo. Ex. 87].

47.    The Engagement Agreement does not authorize Smith to bind RNM or Spencer Fane, nor does it contain any indicia of an employer-employee relationship.  [Ex. 12, Depo. Ex. 87].  Smith testified that it was a consulting relationship. [Ex. 42, Smith Depo. at 120:21 – 122:23].

48.    Arrangements were made for the *ad hoc* committee to meet again on July 23, 2014.  The day before the meeting, Smith told Jayne Rarrick that "[he didn't] think tomorrow evenings (*sic*) meeting will have much to do with Meaningful Use, so probably no reason for you or Lisa Spangler to attend.  Ms. Rarrick noted in her reply that "[she was] not privy to the

conversations you plan to hold."  And Smith did not disclose the purpose of his meeting with the physicians.  [Ex. 31, Depo. Ex. 232].  Smith never disclosed to Ms. Rarrick that he had been retained as a consultant by RNM or its attorneys regarding unilateral "extraction" from RNMIP.  [Ex. 38, Supplemental Rarrick Aff. at ¶ 5].

49.     On August 23, 2014, Smith transmitted his preliminary financial analysis and projection to the doctors and Blane Markley indicating that terminating the Service Agreement with Plaintiffs would add approximately $760,000 per year to the bottom line.  [Ex. 42, Smith Depo. at 288:25 – 289:22; Ex. 17, Depo. Ex. 110].

50.     Dr. Allen notified the members of the LLC on August 29, 2014, that there would be a special meeting with David Smith and Blane Markley on September 9, 2014, without supporting staff, to discuss the "future direction of [the] relationship with RadNet and potential development of a regional Radiology alliance."  [Ex. 42, Smith Depo. at 291:13 – 292:11; Ex. 18, Depo. Ex. 111].

51.     Thereafter, Dr. Allen signed a Resolution of Members Pursuant to Special Meeting, purportedly noticed and held on September 9, 2014, and continued on September 16, 2014.  The resolution purported to authorize RNM's Management Committee to issue a notice of termination to Plaintiffs and negotiate a termination and/or settlement fee with Plaintiffs not to exceed $4,000,000.  [Ex. 2, Depo. Ex. 28; Ex. 46, Owen 30(b)(6) Depo. at 227:3-14].

52.     RNM's counsel's October 6, 2014 letter purportedly terminating the Service Agreement followed.  [Ex. 3, Depo. Ex. 30].

53.     On April 8, 2015, Smith asked McKesson to provide a proposal "to take over RCM [revenue cycle management] functions from Radnet, and then proceed with negotiating an agreement."  Smith advised McKesson that while a "negotiated settlement with Radnet is not

completely out of the question, the group is pushing forward with plans to act unilaterally…" Smith's email signature block identifies himself as "Executive Director, Wichita Radiological Group, PA."  [Ex. 47, Pingston 30(b)(6) Depo. at 29:2-19; Ex. 33, Depo. Ex. 506].  Smith and McKesson's Howard Pingston had multiple discussions regarding the structure on which RNM was looking to have a proposal presented.  [Ex. 47, Pingston 30(b)(6) Depo. at 39:2-16].

54.     At all times, Smith knew and stated to others that the Service Agreement would not terminate until the end of the 40-year term. [Ex. 42, Smith Depo. at 254:17 – 256:16; Ex. 14, Depo. Ex. 102].

55.     Smith or RNM physicians told McKesson's Howard Pingston that RNM "was roughly in the middle of a 40-year service agreement."  [Ex. 47, Pingston 30(b)(6) Depo. at 29:13-16].

56.     In June 2015, Smith sent emails to Drs. Owen, Allen and Meggison and representatives of the Capital City Bank regarding what would be necessary to stop the daily sweeps of the account to RadNet.  Smith then worked with the doctors and Capital City Bank to stop the daily sweeps of the account.  [Ex. 42, Smith Depo. at 302:10 – 303:25; Ex. 7, Depo. Ex. 59].

57.     Smith had extensive discussions with RNM physicians and McKesson about which entity – RNM or McKesson – would ultimately employ the administrator, and whether the administrator would be Jayne Rarrick or David Smith.  In the course of an email conversation involving Smith, Dr. Owen and Dr. Brett Meggison, one of the physicians noted that "while we do need David to pull this off, in the long run we MUST have Jayne to keep from missing critical things."  [Ex. 42, Smith Depo. at 308:5 – 309:9; Ex. 19, Depo. Ex. 114, at pp. 2-3].

58.     Thereafter, RNM secretly entered into a Master Services Agreement with PST Services, Inc., a wholly-owned subsidiary of McKesson Corporation ("McKesson"), dated August 16, 2015, transferring its billing and coding services to McKesson.     [Ex. 39, Rarrick Aff., Doc. 245-1, at ¶ 66; Ex. 20, Depo. Ex. 115; Ex. 45, Bartkoski 30(b)(6) Depo. at 17:18 – 19:17; Ex. 34, Depo. Ex. 532].  Almost immediately after August 17, 2015, RNM and McKesson began to implement the take-over, including gaining access to the McKesson-hosted billing system that Plaintiffs had been using for RNM. [Ex. 35, Depo. Ex. 534; Ex. 45, Bartkoski 30(b)(6) Depo. at 46:4 – 47:14; 158:11 – 159:1].

59.     On August 26, 2015, Jayne Rarrick "received an email that appeared to have been inadvertently sent to [her] and revealed RNM was moving its billing and coding services to McKesson and moving ahead with the separation from Plaintiffs without honoring the 'Dispute Resolution' procedures outlined in Article XI of the Service Agreement." [Ex. 39, Rarrick Aff., Doc. 245-1, at ¶ 66].

60.     On September 16, 2015, this Court granted Plaintiffs' request for a Temporary Restraining Order ("TRO").  [Doc. 17 and 20].

61.     On September 23, 2015 – after the TRO was granted and the day before the Court vacated it — David Smith communicated with McKesson's Julie Bartkoski, who reminded him that "per your legal counsel, we are not supposed to be in communication" due to the TRO. [Ex. 45, Bartkoski 30(b)(6) Depo. at 66:17 – 67:9; Ex. 36, Depo. Ex. 536].

62.     On September 24, 2015, the Court vacated the TRO on irreparable harm grounds, even though the Court found Plaintiffs had established they were likely to succeed on the merits. [Doc. 26].

63.     Despite the Court's findings, on September 24, 2015, the very day the Court vacated the temporary restraining order, Smith asked McKesson whether they could "cut off the flow of electronic files to Radnet (*sic*) without losing anything."   [Ex. 45, Bartkoski 30(b)(6) Depo. at 70:1 – 72:15; Ex. 37, Depo. Ex. 537].

64.     On September 25, 2015, the day after the Court vacated the temporary restraining order on irreparable harm grounds, David Smith and RNM physician Jim Owen hand-delivered a letter to RNMIP employee Jayne Rarrick stating, among other things, that RNM had "instructed Medicare and other contracted payors to submit payments to RNM's new bank and lockbox," and had "instructed Capital City Bank to limit RadNet employee access to RNM accounts to inquiry only." This resulted in the revocation of the aforementioned required "Transfer Order" for daily transfers of monies attributable to accounts receivables purchased by RNMIP from the Deposit Account to the Administrator Account.   [Ex. 21, Depo. Ex. 117; Ex. 39, Rarrick Aff., Doc. 245-1, at ¶ 67].

65.     In late December 2015 or early 2016, Smith entered a one year independent contractor agreement with RNM under which he acted as "Executive Director" of RNM for a fee of $10,000 per month.  [Ex. 42, Smith Depo. 313:12 – 315:7; Ex. 22, Depo. Ex. 118].

66.     Smith continued to act in that capacity for RNM until January 2017.  [Ex. 42, Smith Depo. at 122:19 – 123:19].

## VI.     ARGUMENT AND AUTHORITIES

### A.     Genuine issues of material fact preclude summary judgment for Defendant David Smith on Plaintiffs' tortious interference with contract claim.

In considering a motion for summary judgment, the court must view the evidence and draw inferences in the light most favorable to the non-moving party. *Kalebaugh v. Berman &*

*Rabin, P.A.*, 43 F. Supp. 3d 1215, 1218 (D. Kan. 2014) citing *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).   Summary judgment should not be granted if there is a genuine issue as to any fact that is material to the conclusive issues in the case.   *Burcham v. Unison Bancorp, Inc*., 276 Kan. 393, 404, 425, 77 P.3d 130 (2003).   "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."   *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Anderson v. Liberty  Lobby, Inc*., 477 U.S. 242, 248 (1986)).   "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."   *Id*. (quoting *Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

Kansas law spells out the following five elements of a tortious interference with contract claim:

1.      the existence of a contract;

2.      the defendant's knowledge of the contract;

3.      the defendant's intentionally bringing about of its breach;

4.      the absence of justification; and

5.      damages resulting therefrom.

PIK Civ. 4th 124.91.

There is no question as to the first and second elements, notwithstanding Defendant Smith's blanket claim that none of the elements exist.   It is uncontroverted that Plaintiffs and RNM were parties to a long-term Service Agreement; Smith knew about it, and in fact, as a former employee of RNMIP, was among those primarily responsible for administering it; Smith has not affirmatively pled that he had a justification for interfering with the contract; and Plaintiffs were clearly damaged.   Smith relies solely on the arguments that: 1) as an agent of

RNM, he could not be held liable for interfering with RNM's contract; 2) he did not "induce" RNM's breach; and 3) his conduct was not malicious. Because there are genuine issues of material fact as to each of these elements, however, Smith is not entitled to summary judgment.

**B.     At all relevant times, Smith was a stranger to the Service Agreement and his status as an independent consultant does not provide him cover from a tortious interference with contract claim.**

David Smith was never a party to the 2002 Service Agreement between Plaintiffs and Defendant RNM. Although Smith had been employed *by Plaintiffs* for many years and was responsible for administering the Agreement, he was never an officer, director or employee of RNM. He was never employed by the lawyers currently defending him and RNM.

Smith's attempt to bootstrap himself into an "agent" of RNM is disingenuous. Smith's relationship with RNM and/or Defense Counsel has none of the indicia of employment or agency. He had no authority to bind either RNM or the law firm. He was not entitled to any benefits. He was an independent consultant who was paid $250 per hour and reimbursement of expenses. In short, David Smith was an independent contractor who was working for himself. He is, therefore, a stranger to the Service Agreement and is completely capable of interfering with it.

As a result, none of the cases relied upon by Smith help his cause. In each case, the individuals alleged to have interfered with a corporation's contract were officers or employees of that corporation. In *May v. Santa Fe Trail Transp. Co.*, 189 Kan. 419, 370 P.2d 390 (1962), the plaintiff sued Santa Fe (his former employer), the foreman of the body shop where plaintiff had worked, the shop superintendent, and a Santa Fe division manager for wrongful discharge. 189 Kan. at 419–21. The claims against the individuals were dismissed because officials of the corporation, acting within their official capacities on behalf of the corporate defendant, rather

than for their individual advantage, could not be liable for inducing the corporation to do something it could lawfully undertake. *Id.* at 424–25. Their conduct, the court said, was privileged. *Id.* at 425.

The same result was reached in *Diederich v. Yarnevich,* 40 Kan. App. 2d 801, 196 P.3d 411 (Kan. Ct. App. 2008). After he was fired, Diederich sued the stockholders of his former law firm on several theories, including tortious interference with contract. 40. Kan App. 2d at 802. Because the individual defendants were stockholders and directors of the law firm, and were acting within the scope of their duties when they terminated Diederich for cause, the interference claims did not survive. *Id.* at 802–03.

The tortious interference claims survived dismissal, however, in *Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1266 (D. Kan. 2012). After his employment was terminated, Garcia sued Tyson as well as a supervisor. *Garcia*, 890 F. Supp. 2d at 1268. Garcia alleged that the supervisor had told the personnel director that Garcia had hit a "member of management." *Id.* at 1271. Garcia's intentional interference with contract claim was not dismissed because the court found he had sufficiently alleged that the supervisor acted outside the scope of his employment. *Id.* at 1272.

Under Kansas law, whether a person is an "employee" or an "independent contractor" turns primarily on "whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished." *Craig v. FedEx Ground Package Sys. Inc.*, 300 Kan. 788, 794, 335 P.3d 66 (2014) (citing *Jones v. City of Dodge City*, 194 Kan. 777, 780, 402 P.2d 108 (1965)). Under the "right to control" test, and the other factors spelled out by the Kansas Supreme Court, Smith was an independent contractor, and not an employee of either

Case 5:15-cv-04927-DDC   Document 259   Filed 05/10/17   Page 26 of 31

RNM or its counsel. The July 17, 2014, Engagement Agreement between Defendants' counsel and Smith expressly provides that he was an "independent contractor" and not an employee, and that the manner in which his services were to be rendered were "within [Smith's] sole control and discretion." [Ex. 12, Depo. Ex. 87, at ¶ 5].

Although Kansas courts do not appear to have considered whether an independent contractor can interfere with a contract, at least one court has concluded that an independent consultant can be held liable for interference.[1] *See e.g., Simon v Kyrejko*, No. 156277/2014, 2015 N.Y. Misc. LEXIS 2918, at *16 (N.Y. Sup. Ct. Aug. 7, 2015). (Although employees of a company who do not act outside the scope of their authority cannot be held liable for interference with the company's contracts, an independent consultant is not a company's agent, or an employee under the company's control.) Further, the *Simon* court noted that the issue of whether defendant Andrew Kyrejko was an employee was an issue of fact. *Id.*

At all times relevant to Smith's improper conduct *vis-à-vis* the Service Agreement, he was an independent business man, serving multiple clients. At about the same time in the spring and summer of 2014 that Smith began secretly meeting with some of the physicians about RNM's relationship with Plaintiffs, he was also fulfilling an engagement *with Plaintiffs* to analyze and report on Meaningful Use incentives. *See* SOF at ¶¶ 38-44, above. Moreover, he was at the same time engaged by yet another entity, the Wichita Radiology Group, as its "Executive Director." And in his role for Wichita Radiology, Smith met with RNM's Practice Development Committee on June 17, 2014, to discuss a possible strategic alliance between RNM

---

[1] In *Rodriquez v. ECRI Shared Servs.*, 984 F. Supp. 1363 (D. Kan. 1997), the court dismissed a tortious interference claim alleging that a contract had been terminated because of a consultant's report. The dismissal, however, was based on the fact that the contract had been lawfully terminated under a 90-day no fault clause in the agreement, and not because of the consultant's report. 984 F. Supp. at 1367.

and Wichita Radiology.  The fact that Smith was working for multiple parties with conflicting interests is totally inconsistent with the notion that he was working for RNM within the scope of his authority.  Smith should not be allowed to assert that he is an "agent" for RNM when he deems it useful but to claim at other times that he is an independent consultant.  He cannot have his cake and eat it, too.

Finally, Smith's activities far exceeded the scope of this authority under the Engagement Agreement with defense counsel, which contained a very specific scope of services.  Smith agreed to analyze the financial impact of termination or settlement, help in business and operational planning, and render advice concerning negotiating tactics and settlement terms and conditions.  Smith was instrumental, however, in bringing about the termination, meeting with the doctors and their lawyers, taking over bank accounts, cutting off Plaintiffs' access to data and funds, and delivering the final letter to Jayne Rarrick, his former co-worker, on September 25, 2015.

**C.      Smith's actions were of sufficient importance to have induced, brought about, or directly contributed to, RNM's termination of the Service Agreement.**

As part of its tortious interference claim against Defendant Smith, Plaintiffs must prove "the defendant's intentional bringing about of [the contract's] breach."  PIK Civ. 4th 124.91; *Turner v. Halliburton Co.*, 240 Kan. 1, 12, 722 P.2d 1106 (1986) ("[A] party who, without justification, induces or causes a breach of contract will be answerable for damages caused thereby.") (citations omitted).

According to the Restatement, a person "induces" another to breach a contract when the latter is persuaded to choose one course of action over another:

> *h. Inducing or otherwise causing.* The word "inducing" refers to the situations in which A causes B to choose one course of conduct rather than another. Whether A causes the choice by persuasion or by intimidation, B is free to choose the other

course if he is willing to suffer the consequences. Inducement operates on the mind of the person induced.

Restatement (Second) of Torts, § 766 cmt. h. (1979).

"Induce" has also been defined as "to move by persuasion or influence; to call forth or bring about by influence or stimulation; to cause the formation of; or to produce. . . ." Induce, Merriam-Webster Online Dictionary (May 8, 2017), http://www.merriam-webster.com/dictionary/induce.

Smith asserts three arguments indicating that RNM decided on its own to terminate the Service Agreement without any inducement. First, he relies on the purported "notice of material default" RNM sent in November 2010. But that certainly does not mean that RNM made a decision to terminate in 2010. Smith's role in early 2011 was to gather scenarios for RNM to potentially buy its way out of the remainder of the Service Agreement. Plaintiffs' Response to SOF ¶ 8, above. After the parties were not able to reach agreement on the financial terms for an early termination, RNM made the decision to continue under the Service Agreement for another four or five years. RNM did not begin to move towards termination until 2014 at the earliest, long after the non-interference restrictive covenant in Smith's employment agreement with RNMIP had expired. *See* Plaintiffs' Additional SOF ¶ 24, above.

Second, Smith argues that RNM began evaluating termination in late 2013, before he signed the Engagement Agreement with Defendants' counsel. In December 2013, however, the *ad hoc* "extraction task force" was just beginning to compare costs and collection rates, and was unsure of the next steps. Plaintiffs' Response to SOF ¶ 10, above. There was no agreement within RNM about what they wanted to do. David Smith then re-entered the picture.

Third, Smith says RNM first approached him. This is immaterial to the inducement or causation issue. When Smith began meeting with RNM in 2014, there was no consensus among

the doctors about what they were going to do.  *See* Plaintiffs' Additional SOF at ¶ 43, above. After Smith became involved, and with his active and forceful involvement, RNM moved inexorably toward termination. Smith negotiated with McKesson to take over billing and coding from Plaintiffs; Smith told the doctors that they could add $760,000 annually to their bottom line by terminating the Service Agreement with Plaintiffs;  Smith implemented the cut-off of the flow of electronic files to RadNet that were needed for billing;  Smith orchestrated numerous other activities that included advising Medicare and other payors to submit payments to RNM's new bank and lockbox; and Smith instructed Capital City Bank to limit RadNet access to RNM accounts to inquiry only.

As noted in the Restatement comment above, inducement operates in the mind of persons induced.  And in the mind of at least one of the physicians, RNM needed David Smith to "pull this off."  *See* SOF at ¶ 57, above.  Smith's conduct caused the termination. *See T.S.I. Holdings v. Jenkins*, 260 Kan. 703, 725, 924 P.2d 1239 (1996).

**D.      There is evidence from which a reasonable jury could conclude that Smith's conduct was intentional and malicious.**

Malice, under Kansas law, is the intention to do harm without any reasonable justification or excuse.  PIK Civ. 4th 103.05.  The presence or absence of malice is a question for the jury. *Burcham*, 276 Kan. at 425.  Smith carries the burden of affirmatively pleading and proving that his conduct was justified, and he has not done so.  *See Burrowwood Assocs., Inc. v. Safelite Glass Corp.*, 18 Kan. App. 2d 396, 401, 853 P.2 1175 (Kan. Ct. App. 1993).

There is ample evidence here from which a reasonable jury could conclude that Smith's conduct was intentional and malicious.  The Kansas Supreme Court has identified the following seven factors that may be considered in determining whether a defendant's conduct has been improper:

29

1.     The nature of the defendant's conduct;

2.     the defendant's motive;

3.     the interests of the other with which the defendant's conduct interferes;

4.     the interests sought to be advanced by the defendant;

5.     the social interests in protecting the freedom of action of the defendant and the contractual interests of the other;

6.     the proximity or remoteness of the defendant's conduct to the interference; and

7.     the relations between the parties.

PIK Civ. 4th 124.93;  *Halliburton*, 240 Kan. at 14 (citing Restatement (Second) of Torts § 767 (1979)).

The very purpose and intended result of Smith's activities were RNM's termination of the Service Agreement in about the middle of its 40-year term. He knew about the Service Agreement; he had been charged with administering it while employed by RNMIP; and he intentionally kept his activities secret from his former employer.   Evidence of Smith's concealment of his activities from Plaintiffs is evidence of malice.  *Australian Gold, Inc. v. Hatfield*, 436 F.3d 1228, 1236–37 (10th Cir. 2006) (Defendants' concealment of activities was sufficient evidence of malice or wrongful conduct under Oklahoma law to submit to jury.)

## VII.    CONCLUSION

WHEREFORE, Plaintiffs respectfully request that the court deny Defendant Smith's Motion for Summary Judgment.

FOULSTON SIEFKIN LLP

By:  s/Scott C. Nehrbass
     Scott C. Nehrbass, KS #16285
     32 Corporate Woods, Suite 600

9225 Indian Creek Parkway
Overland Park, KS  66210-2000
(913) 253-2144
(866) 347-1472 FAX
Email:  snehrbass@foulston.com

James M. Armstrong, KS #09271
1551 N. Waterfront Parkway, Suite 100
Wichita, KS  67206-4466
(316) 291-9576
(866) 936-1936 FAX
Email:  jarmstrong@foulston.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of May, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system that will send notice of electronic filing to the following:

Michael F. Saunders
Patrick A. McInerney
Blane Markley
Kathryn Lee
SPENCER FANE BRITT & BROWNE LLP
9401 Indian Creek Parkway, Suite 700
Overland Park, KS  66210
Email:  msaunders@spencerfane.com
Email:  pmcinerney@spencerfane.com
Email:  bmarkley@spencerfane.com
Email:  klee@spencerfane.com

*Attorneys for Defendants*

/s/ Scott C. Nehrbass
Scott C. Nehrbass, KS #16285
*Attorney for Plaintiffs*

31