# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RADIOLOGIX, INC. and RADIOLOGY
AND NUCLEAR MEDICINE IMAGING
PARTNERS, INC.,

        Plaintiffs,

v.

                                      Case No. 15-4927-DDC-KGS

RADIOLOGY AND NUCLEAR
MEDICINE, LLC, et al.,

        Defendants.

_____

## MEMORANDUM AND ORDER

Plaintiffs Radiologix, Inc. ("Radiologix") and Radiology and Nuclear Medicine Imaging Partners, Inc. ("RNMIP") bring this lawsuit against defendants Radiology and Nuclear Medicine, LLC ("RNM") and 19 individual physicians ("the Physician Defendants"). Plaintiff Radiologix is a national provider of imaging services based in California. Defendant RNM is a Kansas limited liability company and physician-owned radiology practice based in northeast Kansas. Since 1997, plaintiff Radiologix or one of its predecessors-in-interest has provided management services to defendant RNM under a long-term management service agreement. This lawsuit arises from defendant RNM's termination of that agreement in 2014.

This matter comes before the court on four motions for summary judgment:

(1) defendant RNM's Motion for Summary Judgment against plaintiffs' breach of contract, conversion, and unjust enrichment claims (Doc. 235); (2) defendant David L. Smith's Motion for Summary Judgment against plaintiffs' tortious interference with a contract claim (Doc. 237); (3) plaintiffs' Motion for Summary Judgment against defendant RNM's counterclaim for breach of contract and against any of defendant RNM's claims or defenses asserting that it had legal

grounds to terminate the parties' contract unilaterally because it was illegal and unenforceable under Kansas law (Doc. 239); and (4) the Physician Defendants' Motion for Summary Judgment against plaintiff Radiologix's claim for breach of their Physician Employment Agreements (Doc. 242).

For reasons explained below, the court grants plaintiffs' Motion for Summary Judgment (Doc. 239) in part and denies it in part. The court concludes that the undisputed facts fail to demonstrate that the parties' various contracts violate Kansas law. The court thus grants summary judgment against defendant RNM's claims and defenses that the contracts are illegal and unenforceable under Kansas law, and thus provide RNM a valid, legal basis for terminating the parties' management service agreement. The court denies plaintiffs' summary judgment motion in all other respects because genuine issues of material fact exist that the trier of fact must decide. The court also denies defendant RNM's Motion for Summary Judgment (Doc. 235) for the same reason—genuine issues of material fact preclude the court from entering summary judgment.

But, the court grants defendant David L. Smith and the Physician Defendants' Motions for Summary Judgment (Docs. 237, 242). The court explains its reasons for these rulings in greater detail below.

## I.      Motion to Strike

Before addressing the pending summary judgment motions, the court considers defendant RNM's Motion to Strike. Doc. 250. RNM asks the court to strike certain portions of two affidavits that plaintiffs submitted to support their summary judgment motion. RNM asserts that the court should strike certain paragraphs from Stephen M. Forthuber and Rita Jayne Rarrick's Affidavits (Docs. 245-1, 245-2) because, RNM contends, those paragraphs' assertions are not

based on affiants' personal knowledge.  RNM thus argues that the factual assertions do not comply with the evidentiary requirements of Rule 56(c)(4) of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").  Plaintiffs respond to the Motion to Strike with two arguments.

First, plaintiffs accuse RNM of attempting to create a "dramatic effect" as opposed to substantiated objections to the summary judgment evidence.  Doc. 266 at 2.  Plaintiffs assert that the affidavits establish Mr. Forthuber and Ms. Rarrick's personal knowledge because one can infer from their job duties and length of employment that they have the requisite personal knowledge to support the facts in their affidavits.  *Id.* at 4 (citing *Stevens v. Water Dist. One of Johnson Cty.*, 561 F. Supp. 2d 1224, 1233 (D. Kan. 2008) ("Personal knowledge of the subject matter attested to can be inferred based on [the affiant's employment] position . . . .")).  So, plaintiffs contend, RNM's reasons for asking the court to strike the affidavits are unsubstantiated.

Second, plaintiffs argue that a motion to strike is not the proper method to exclude this evidence from the summary judgment record.  The Tenth Circuit held almost 50 years ago that an affidavit which fails to meet the requirements of Rule 56 is subject to a motion to strike. *Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir. 1968).  But, more recently, our court has refused to strike affidavits for failing to comply with Rule 56(e).  Instead, our court simply disregards the affidavit's portions that are not based on the affiant's personal knowledge. *See*, *e.g.*, *Murray v. Edwards Cty. Sheriff's Dep't*, 453 F. Supp. 2d 1280, 1284 (D. Kan. 2006) ("Instead of striking an affidavit, the better approach is for the court to consider each affidavit

and, to the extent it may assert a fact which is not admissible evidence, simply exclude the requested fact from the court's ultimate findings."); *Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1200 (D. Kan. 2003) (denying a motion to strike "[b]ecause of the size of the affidavit and its attachments, the task of deciding the motion to strike on its merits would take nearly as much of the court's resources as would deciding the parties' substantive motions" but excluding from the summary judgment record "the inadmissible portions of the challenged affidavit, *i.e.*, all statements that do not comply with Rule 56(e)"); *Maverick Paper Co. v. Omaha Paper Co., Inc.*, 18 F. Supp. 2d 1232, 1235 (D. Kan. 1998) (denying a motion to strike an affidavit and holding that "[i]f the affidavit contains material that is not admissible or relevant, the Court will ignore it.").

The court follows this approach here and denies RNM's Motion to Strike. Instead, the court considers, below, whether the factual assertions in Mr. Forthuber and Ms. Rarrick's affidavits are based on their personal knowledge. Indeed, RNM has controverted many of these particular factual assertions in its Opposition to plaintiffs' Motion for Summary Judgment, claiming they are not based on personal knowledge and thus violate Rule 56(e)(4). *See*, *e.g.*, Doc. 269 at 19, 23–26, 36, 44, 62, 66, 71–73, 84. But, as explained below, the court accepts many of the factual assertions supplied by Mr. Forthuber and Ms. Rarrick's Affidavits because plaintiffs have carried their burden to establish that the witnesses are qualified. *See* Fed. R. Evid. 104(a) (authorizing court to decide a preliminary question of this nature).

## II.    Motions for Summary Judgment

The court now turns to the four pending summary judgment motions.

### A. Uncontroverted Facts

The following facts are either stipulated in the Pretrial Order (Doc. 227), are uncontroverted, or where controverted, stated in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

### *The Parties*

Plaintiffs are two Delaware corporations, each with its principal place of business in California. Plaintiff RNMIP is a wholly owned subsidiary of plaintiff Radiologix. Radiologix is a wholly owned subsidiary of RadNet Management, Inc. ("RadNet Management"). Before its name change in September of 1999, Radiologix was known as American Physician Partners, Inc. ("APPI").

Defendant RNM is a Kansas limited liability company with its principal place of business in Topeka, Kansas. All shareholders of RNM are Kansas licensed physicians who provide radiology or radiation oncology services at hospitals and clinics in northeast Kansas, including Topeka. The 19 Physician Defendants are shareholders and employees of RNM.

In 1997, the physician-members of Radiology and Nuclear Medicine ("RNMPA"), a Kansas professional organization, formed RNM. Also in 1997, the physician-members approved an Agreement and Plan of Reorganization and Merger between RNMPA and APPI (the "1997 APPI-RNMPA Agreement"). Certificate of Mergers were filed with the Kansas Secretary of State and the Delaware Secretary of State.

### *The 1997 APPI-RNMPA Agreement*

Under the 1997 APPI-RNMPA Agreement, the RNMPA physicians agreed to a "Spin-Off Transaction." This transaction required the physicians to form a new Kansas limited liability company (RNM), to "transfer certain of [RNMPA's] assets most of which relate solely to the

practice of medicine" to RNM, and to cause RNM to enter into a long-term "Service Agreement" (attached as an exhibit to the Agreement). Doc. 241-1 at 7. The physicians also agreed to merge the professional association out of existence, form RNM and transfer all medical assets to it, transfer all non-medical assets to APPI, cause RNM to execute and enter into a 40-year service agreement with APPI and its subsidiary (the "Original Service Agreement"), and for each physician to execute a "Physician Employment Agreement" naming APPI as one of its beneficiaries entitled to enforce its restrictive covenants.

More specifically, the 1997 APPI-RNMPA Agreement's Recitals provided that RNMPA would "merge with and into [APPI] upon the terms and conditions set forth herein and in accordance with the laws of the State of Kansas" and "the outstanding shares of [RNMPA] Common Stock shall be converted at such time into cash and shares of common stock, par value $.0001 per share, of [APPI] (the "APP Common Stock") as set forth herein." Doc. 241-1 at 7 (Recitals ¶ D). Section 2.8(a) of the 1997 APPI-RNMPA Agreement provided the manner for converting the shares of RNMPA Common Stock. It read:

> Section 2.8    Conversion of Company Common Stock.    The manner of converting shares of [RNMPA] Common Stock in the Merger shall be as follows:
>
> (a) As a result of the Merger and without any action on the part of the holder thereof, all shares of [RNMPA] Common Stock issued and outstanding at the Effective Time (excluding shares held by [APPI] pursuant to Section 2.8(d) hereof) shall cease to be outstanding and shall be cancelled and retired and shall cease to exist, and each holder of a certificate or certificates representing any such shares of [RNMPA] Common Stock shall thereafter cease to have any rights with respect to such shares of [RNMPA] Common Stock, except the right to receive, without interest, (i) cash and (ii) validly issued, fully paid and nonassessable shares of [APPI] Common Stock, all as determined in accordance with the provisions of Exhibit B attached hereto (the "Merger Consideration").
>
> . . .
>
> (d) At the Effective Time, each share of [APPI] Common Stock issued and outstanding as of the Effective Time shall, by virtue of the Merger and without

any action on the part of the holder thereof, continue unchanged and remain outstanding as a validly issued, fully paid and nonassessable share of [APPI] Common Stock.

Doc. 241-1 at 13.

The Agreement defined the "Effective Time" in this fashion:

Section 2.3    Effective Time.  If all the conditions to the Merger set forth in Articles XI and XII shall have been fulfilled or waived in accordance herewith and this Agreement shall not have been terminated in accordance with Article XVI, the parties hereto shall cause to be properly executed and filed on the Closing Date, Certificates of Merger meeting the requirements of Section 252 and Section 17-6702 of the Kansas General Corporation Code.  The Merger shall become effective at the time of the filing of such documents with the Secretaries of State of the States of Kansas and Delaware, in accordance with such law or at such later time which the parties hereto have theretofore agreed upon and designated in such filings as the effective time of the Merger (the "Effective Time").

Id. at 12.  Section 2.9 of the 1997 APPI-RNMPA Agreement provided:

Section 2.9    Exchange of Certificates Representing Shares of the Company Common Stock.

(a) At or after the Effective Time and at the Closing (i) the Stockholders, as holders of a certificate or certificates which, until the Effective Time, represented shares of [RNMPA's] Common Stock, shall upon surrender of each certificate or certificates (or completion of appropriate affidavit of lost certificate and indemnity) receive such allocation of Merger Consideration as determined in accordance with the provisions of Exhibit B attached hereto . . . .

(b)  Each Stockholder shall deliver to [APPI] at the Closing the certificates representing Company Common Stock owned by him, her or it, duly endorsed in blank by the Stockholder, or accompanied by duly executed stock powers in blank, and with all necessary transfer tax and other revenue stamps, acquired at the Stockholder's expense, affixed and cancelled . . . Upon such delivery (or completion of appropriate affidavit of lost certificate and indemnity), each Stockholder shall receive in exchange therefor the Merger Consideration pursuant to Exhibit B and Section 2.10 hereof, if applicable.

Id. at 13–14.

The parties intended the merger to "qualify as a tax-free transaction under Section 351 of the [Internal Revenue] Code in which [RNMPA] will not recognize gain or loss . . . ." *Id.* at 44 (Section 13.2(a)); *see also id.* at 7 (Recitals ¶ G).

As consideration for entering into the 1997 APPI-RNMPA Agreement, the physician-members and shareholders of RNMPA received "Merger Consideration," as described in Exhibit B to the Agreement. *Id.* at 57. The "Merger Consideration" totaled about $14 million. Stephen M. Forthuber (Radiologix's President and Chief Operating Officer of East Operations) and Rita Jayne Rarrick (RNMIP's Director of Accounting and Finance) know of no RNMPA physician-member who rescinded the 1997 APPI-RNMPA Agreement or returned the consideration received in this transaction.[1]

---

[1]    Defendant RNM challenged this statement of fact because, it claims, the affiants lack personal knowledge to testify to it. *See* Fed. R. Civ. P. 56(c)(4). The court overrules RNM's objection because it misapprehends both the facts asserted by Mr. Forthuber and Ms. Rarrick as well as the Federal Rules of Evidence. The fact challenged by RNM asserted merely that the affiants know of no physician-member who rescinded the 1997 APPI-RNMPA Agreement or attempted to return the consideration received with it. If a witness—here, as an affiant—cannot say what the witness knows and doesn't know, who can? Testimony of this kind is emblematic of the kind of personal knowledge required by our rules.

Mr. Forthuber and Ms. Rarrick's testimony also is relevant on the broader interpretation that RNM seems to give it. Namely, is the affiants' testimony admissible as evidence tending to establish that none of the physician-members rescinded the 1997 APPI-RNMPA Agreement or returned the attendant consideration? Given affiants' job responsibilities, testimony that they did not know of any such rescission or return has a tendency to establish that the two events never occurred. *See* Fed. R. Evid. 401(a) (defining relevant evidence as evidence that "has any tendency to make a fact more or less probable than it would be without the evidence"); *see also City of Shawnee, Kan. v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1177 (D. Kan. 2008) (treating an affidavit of a lead project engineer "as made or at least purporting to be made upon personal knowledge" "[g]iven [the affiant's] level of involvement in the project . . . ."); *Kephart v. Data Sys. Int'l, Inc.*, 243 F. Supp. 2d 1205, 1209 (D. Kan. 2003) (presuming that an affidavit is based on personal knowledge "[t]o the extent that [the affiant's] affidavit relates to his job position and supervisory duties"). RNM's objection is not a persuasive one. And, RNM's failure to adduce any contrary evidence—*i.e.*, evidence that a physician-member rescinded the Agreement or returned the consideration—makes this fact an uncontroverted one.

The court is mindful that defendant RNM has asserted similar objections to other, similar assertions in Ms. Rarrick and Mr. Forthuber's affidavits. To the extent that those assertions are based on personal knowledge and also represent uncontroverted facts, the court overrules RNM's objections and includes them in its statement of the governing summary judgment facts.

The 1997 APPI-RNMPA Agreement was the subject of videotaped meetings with the physicians. The physicians' counsel (Mr. Jeff Ellis, then of the Lathrop & Gage law firm) and its then practice administrator (Mr. Vernon Brown) were present at these meetings. According to the 1997 videos, Mr. Ellis and Mr. Brown accompanied one of the doctors to a meeting in Dallas to spend a day working on the service agreement. During the videos, the physicians commented upon and understood that they were entering into a 40-year commitment.

The RNMPA physicians also "knew the contract specified a service fee percentage," "had an opportunity to review that service agreement," had "[their] attorney, Jeff Ellis, there as well," and all "voted for the deal." Doc. 246-11 (Allen Dep. at 89:15–90:8). An independent investment banking firm, Shattuck Hammond Partners, Inc., found that the 40-year Service Agreement was "commercially reasonable" and that the service fee contemplated in the Agreement was "comparable to payments due under other arms-length management services agreements providing for similar services in independent transactions." Doc. 244-29 at 4.

When the parties executed the 1997 APPI-RNMPA Agreement, RNM never received any legal advice that the Agreement was void under Kansas law and RNM never asked counsel for an opinion about the Agreement's legality.

In the Form 424B1 that APPI filed with the SEC in 1997, APPI acknowledged: "There can be no assurance that regulatory authorities or other parties will not assert that [APPI] is engaged in the corporate practice of medicine . . . or that the payment of service fees to [APPI] by [RNM] pursuant to the service Agreements constitutes fee-splitting or the corporate practice of medicine." Doc. 270-11 at 11, 41. But, the Form 424B1 also explained that APPI attempted "to structure its relationship with the Affiliated Practices (including the purchase of assets and the provision of services under the Service Agreements) to keep [APPI] from engaging in the

practice of medicine or exercising control over the medical judgments or decisions of the Affiliated Practices or their physicians." *Id.* at 11.

The Form 424B1 also explained that the shares of APPI stock issued to the former shareholders of RNMPA were "being valued at the historical cost of the nonmonetary assets acquired net of liabilities assumed." *Id.* at 27. And, "[t]he cash consideration will be reflected as a dividend by APPI to the owners of the Founding Affiliated Practices." *Id.* The cash dividend received by the former shareholders of RNMPA totaled $4,473,216. *Id.* at 54.

*2002 Amended Service Agreement*

On July 1, 2002, plaintiffs and defendant RNM entered into an Amended and Restated Service Agreement ("2002 Amended Service Agreement"). The 2002 Amended Service Agreement "reflect[ed] a modification of the financial structure contained in" the parties' amended and restated service agreement dated November 7, 1997. Doc. 270-10 at 6. The 2002 Amended Service Agreement also "supercede[d] all prior agreements and understandings, both written and oral, among the parties, or any of them, with respect to the subject matter hereof." *Id.* at 50.

The parties agreed that the 2002 Amended Service Agreement expired on November 26, 2037. *Id.* at 41. Also, the parties agreed that plaintiff RNMIP would serve as "the exclusive manager and administrator of non-medical business services relating to the operation of [RNM], subject to matters reserved for [RNM] or referred to the Joint Planning Board as herein contemplated" and "[e]xcept as provided in Exhibit 3.2(a)[.]" *Id.* at 13. And, the 2002 Amended Service Agreement prohibited RNM from "enter[ing] into any other management or administrative services agreement or other arrangement with any other person or entity (other

than with [RNMIP]) for purposes of obtaining management, administrative or other support

services." *Id.* at 29–30.

Under the 2002 Amended Service Agreement, the parties agreed that RNM and RNMIP

"intend[ed] to act and perform as independent contractors, and the provisions hereof are not

intended to create any partnership, joint venture, agency or employment relationship between the

parties." *Id.* at 11.  The 2002 Amended Service Agreement reserved to RNM "exclusive

authority to direct the medical, professional, and ethical aspects of its medical practice." *Id.* at

11.  The parties agreed that plaintiffs "shall neither exercise control or direction over the medical

methods, procedures or decisions nor interfere with the physician-patient relationships" of RNM.

*Id.*  The parties also agreed that plaintiffs were not authorized to engage in any activity that "may

be construed or deemed to constitute the practice of medicine and that nothing herein shall be

construed as the practice of medicine" by plaintiffs.  *Id.* at 12.  The parties' Agreement gave

plaintiffs "no authority, directly or indirectly, to perform, and shall not perform, any professional

medical function." *Id.* at 13.  The parties agreed that RNM "shall be solely and exclusively in

control of all aspects of the practice of medicine" and that "all professional medical services,

including, but not limited to, diagnosis, treatment, therapy, the prescription of medicine and

drugs, and the supervision and preparation of medical reports shall be the sole responsibility" of

RNM.  *Id.* at 23.  And, the 2002 Amended Service Agreement released plaintiffs from

performing any act or service constituting the corporate practice of medicine.  *Id.* at 12.

The 2002 Amended Service Agreement applied both to "Technical Operations" and

"Professional Operations."  Technical Operations consisted of the imaging centers and other

facilities that RNMIP owned or managed and generated "Technical Revenues." *Id.* at 11.

"Technical Revenues" were those "fees and income of [RNM] or [RNMIP], as determined

pursuant to GAAP applied on a consistent basis, that [were] recorded each month (net of Adjustments) by or on behalf of [RNM] or [RNMIP], for the use of [RNMIP's] facilities and equipment, and net of any Professional Revenues." *Id.* "Professional Operations" consisted of the "business and operations conducted by [RNM] including, without limitation, the provision of professional medical services to patients" by the physicians and their employees (but "excluding Technical Operations"). *Id.* at 10. "Professional Revenues" were those "fees and income of [RNM] . . . generated by the Professional Operations." *Id.*

Article III of the 2002 Amended Service Agreement required RNMIP to "provide or arrange for" certain administrative services for RNM. *Id.* at 12. The administrative services required under the Agreement included: billing and collection services; accounting services and cash management; clerical, purchasing, payroll, legal, bookkeeping, computer services, information management, print, postage and duplication, and medical transcribing services; recordkeeping; providing an office facility and supplies; recruiting assistance; financial planning and budgeting; providing non-physician professional support employees; negotiating provider and payor contracts; and advertising and public relations. *Id.* at 13–21. The Agreement also prohibited RNM from "act[ing] in a manner which would prevent [RNMIP] from performing its duties hereunder." *Id.* at 12. And, the Agreement required RNM to "provide such information and assistance to [RNMIP] as is reasonably required by [RNMIP] to perform its services hereunder." *Id.*

Section 3.2(b) required RNMIP to "bill and collect [directly] from patients, insurance companies, Managed Care Payors, and other third-party payors for professional supervision and interpretation fee charges and technical fee charges incurred in connection with services rendered . . . ." *Id.* at 13–14. This section also authorized RNMIP to "deposit all collections . . . directly

into the Deposit Account [an RNM bank account] . . . ." *Id.* at 14. Section 3.2(b)(iii) prohibited RNM from "materially interfer[ing]" with RNMIP's billing, collection, and deposit account transfer activities as described in that section. *Id.* Section 3.2(d) authorized RNMIP to transfer "the cash and cash equivalents of [RNM] and [RNMIP]" "to the account of [RNMIP] and to use such cash for purposes that [RNMIP] deems appropriate, subject to and consistent with the terms and provisions of this Agreement." *Id.* at 16. Section 3.2(e) authorized RNMIP to "purchase accounts receivable of [RNM] arising during the day or days just ended" for "an amount equal to the aggregate face amount of the accounts receivable being sold less contractual adjustments and estimated allowances for bad debt as determined from time to time based on recent historical collection experience of one year or less." *Id.*

In Section 3.3 of the 2002 Amended Service Agreement, RNMIP agreed to "make available" "Premises" for use by RNM and to "provide [RNM] with the use of the equipment, furniture, fixtures, furnishings and other personal property acquired in the Acquisition or any replacements thereto, together with such other equipment, furniture, fixtures, furnishings and other personal property necessary or appropriate for the efficient operation of the Technical Operations acquired by [RNMIP] or [Radiologix] . . . ." *Id.* at 17–18. Section 8.1 of the Agreement provided that "[a]ll records relating in any way to the operation of the Professional Operations and the Technical Operations (other than [RNM] Records), shall . . . at all times be the property of [RNMIP] as set forth in Section 3.2(g)." *Id.* at 38–39.

Section 3.7 authorized RNMIP to "negotiat[e], establish[ ] and supervis[e] all contracts and relationships . . . with all managed care, institutional health care providers and payors, health maintenance organizations, preferred provider organizations, exclusive provider organizations, Medicare, Medicaid, insurance companies, and other similar persons or entities . . . related to the

Professional Operations and Technical Operations." *Id.* at 20. "[A]ny approval, disapproval, termination or amendment of" payor contracts "shall be the responsibility and obligation of the Joint Planning Board." *Id.*

The 2002 Amended Service Agreement required payment of a Service Fee to plaintiff RNMIP. *Id.* at 57. The Service Fee consisted of 100% of Technical Revenues and a certain percentage, adjusted over time, of Professional Revenues. *Id.* The 2002 Amended Service Agreement's Recitals clause explicitly provided that the parties had "determined a fair market value for the services to be rendered by [RNMIP], and based on this fair market value, have developed a procedure for compensation of [RNMIP]." *Id.* at 6. The parties also agreed that the "Service Fee" was "negotiated at arms' length" and "fair, reasonable and consistent with fair market value" in view of the "substantial commitment and effort" by RNMIP to enter the Agreement. *Id.* at 37. The 2002 Amended Service Agreement provided that the "Service Fee is not intended to and shall not be interpreted or implied as permitting [RNMIP] to share in [RNM's] fees for medical services but is acknowledged as the negotiated fair market value compensation to [RNMIP] considering the scope of services and the business risks assumed by [RNMIP]." *Id.*

Section 3.1(b)(i) allowed RNM to acquire replacement administrative services on a temporary basis if plaintiffs failed to provide services that were "reasonably consistent with commercially available services offered by third party providers of physician practice management services of the type and scope offered by [APPI]." *Id.* at 13. This section provided:

(b)     Alternative Management Arrangements.

(i) If [APPI] fails to perform, provide or arrange for the services set forth in this Article III in a manner reasonably consistent with commercially available services offered by third party providers of physician practice management services of the type and scope offered by [APPI], then [RNM] shall provide

14

written notice of such event to [APPI], Parent or their Affiliates, including reasonable evidence of such commercially available services. [APPI] shall deliver to [RNM] within thirty (30) days after receipt by [APPI] of such written notice a written plan detailing the methods and procedures [APPI], Parent or their Affiliates shall utilize to restore the level of service contemplated by this Agreement. In the event [APPI] fails to restore the level of service contemplated by this Agreement in accordance with such plan submitted or in any event within ninety (90) days, [RNM] shall be entitled to reimbursement by [APPI] for the reasonable costs and expenses of obtaining such service on a temporary basis until such time [APPI] demonstrates its ability to perform such service at the level contemplated by this Agreement. Nothing contained in this subsection (b)(i) shall be construed to limit [RNM's] ability to provide notice of a Material Administrator Default pursuant to Section 10.3(b) of this Agreement.

*Id.*

Section 4.1 gave RNM "complete control of and responsibility for the hiring, compensation, supervision, training, evaluation and termination of its Physician Employees" except as set forth in Article V. *Id.* at 22. Section 4.1 also required RNM to "deliver to [RNMIP] copies of all executed employment agreements with [RNM's] Physician Employees" and that these employment agreements comply "with all applicable terms and conditions contained in this Agreement." *Id.*

Section 4.2 required RNM to "provide professional supervision and interpretation services to its patients in compliance at all times with ethical standards, laws, rules and regulations applicable to the operations of the Professional Operations, the Physician Employees, and the Physician Extender Employees." *Id.* at 23. The Agreement also obligated RNM to ensure that all of its physician employees have "all required licenses, credentials, approvals or other certifications to perform his or her duties" and to inform RNMIP promptly of any disciplinary or medical malpractice actions initiated against any of its physician employees. *Id.* Section 4.5 permitted RNM to use its corporate name only "on a non-exclusive and non-transferable basis for the term of this Agreement . . . as may be necessary or appropriate in the

performance of [RNM's] services and obligations hereunder." *Id.* at 24. Section 4.9 prohibited RNM from "enter[ing] into or offer[ing] any Physician Employee or other employee of [RNM] or [RNMIP] any 'employee benefit plan' (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) without express written consent of [RNMIP], which consent shall not be unreasonably withheld." *Id.* at 25.

Section 6.1(a)(ii) prohibited RNM from "enter[ing] into any other management or administrative services agreement or other arrangement with any other person or entity (other than [RNMIP]) for purposes of obtaining management, administrative or other support services . . . ." *Id.* at 30. Section 6.1(b) prohibited RNM from taking any action that would "disrupt, damage, impair or interfere with the business of any member of [plaintiffs.]" *Id.* at 30. Section 6.2 required RNM to "obtain and enforce formal agreements" with each of its licensed physicians that "each contain certain restrictive covenants thereof pertaining to covenants not to compete and/or solicit with and not to divulge the Confidential and Proprietary Information of [plaintiffs or RNM] ("Restrictive Covenants")." *Id.* at 33. Section 6.5 also prohibited RNM from releasing any of its physician employees from the Restrictive Covenants in their employment agreements unless it satisfied certain conditions precedent including obtaining RNMIP's consent to do so and obtaining a formal agreement requiring the physician to hire RNMIP if the physician provided any professional service within 15 miles of any RNM practice site for a period of two years following termination of the employment agreement. *Id.* at 34–35. Section 7.4 of the 2002 Amended Service Agreement required RNM to "execute a Security Agreement . . . [that] grants a security interest in all of RNM's accounts receivable" to RNMIP. *Id.* at 38.

Article V of the 2002 Amended Service Agreement governed formation, operation, duties, and responsibilities of a Joint Planning Board. *Id.* at 26–29. The Agreement required the parties to "establish" a Joint Planning Board who was "responsible for developing long-term strategic planning objectives and management policies for the overall operation of the Technical Operations" and would "facilitate communication and interaction between [RNMIP] and [RNM]." *Id.* at 26. One duty of the Joint Planning Board required it to "advise [RNM]" on various matters. These included capital improvements and expansion, annual budgets, advertising, patient fees, ancillary services and fees, provider and payor relationships, strategic planning, capital expenditures, provider hiring, and nonphysician personnel. *Id.* at 27–28.

The Joint Planning Board consisted of two RNMIP representatives and up to four RNM representatives. *Id.* at 26. Each of RNMIP's representatives had one vote, and RNM's representatives had two votes collectively. *Id.* Section 5.3 of the 2002 Amended Service Agreement prohibited RNM from taking any action or implementing any decision that would "(ii) have a material adverse effect on the amount of [RNMIP's] management fee under Article VII; or (iii) otherwise have a material adverse effect on [RNMIP]'s financial interests under this Agreement" without the approval of both members of the Joint Planning Board appointed by RNMIP. *Id.* at 28. The Agreement also provided that, in the event of a tie vote among members of the Joint Planning Board, either Radiologix's Board of Directors or a committee designated by Radiologix's Board of Directors and containing at least one RNM representative would make the final decision for the Board. *Id.*

Section 12.11 of the 2002 Amended Service Agreement included a "No Waiver" provision. It provided:

> No party shall by any act (except by written instrument pursuant to Section 12.3 hereof), delay, indulgence, omission or otherwise be deemed to have waived any

right or remedy hereunder or to have acquiesced in any default in or breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of any party hereto, any right, power or privilege hereunder shall operate as a waiver thereof.

*Id.* at 51.

The 2002 Amended Service Agreement also contained provisions addressing the legality of the Agreement. Section 10.3(c) authorized defendant RNM to terminate the Agreement if:

An independent law firm with nationally recognized expertise in health care law and acceptable to the parties hereto renders an opinion to the parties hereto that (i) a material provision of this Agreement is in violation of applicable law or any court or regulatory agency enters an order finding a material provision of this Agreement is in violation of applicable law and (ii) this Agreement can not be amended pursuant to [Section 12.6] hereof to cure such violation.

*Id.* at 42.[2] Also, Sections 12.6 and 12.9 allowed the parties to modify or sever any provisions of the contract that are deemed illegal, invalid, or unenforceable. *Id.* at 50. Section 12.6 stated:

Section 12.6    Contract Modifications for Prospective Legal Events.    In the event any state or federal laws or regulations, now existing or enacted or promulgated after the date hereof, are interpreted by judicial decision, a regulatory agency or independent legal counsel in such a manner as to indicate that this Agreement or any provision hereof may be in violation of such laws or regulations, [RNM] and [RNMIP] shall amend this Agreement as necessary to preserve the underlying economic and financial arrangements between [RNM] and [RNMIP] and without substantial economic detriment to either party. If this Agreement cannot be so amended, the terms of Section 10.3(c) and 10.4(b) shall apply. To the extent any act or service required of [RNMIP] in this Agreement should be construed or deemed, by any governmental authority, agency or court to constitute the practice of medicine, the performance of said act or service by [RNMIP] shall be deemed waived and forever unenforceable and the provisions of this Section 12.6 shall be applicable. Neither party shall claim or assert illegality as a defense to the enforcement of this Agreement or any provision hereof; instead, any such purported illegality shall be resolved pursuant to the terms of this Section 12.6 and Section 12.9.

*Id.* Section 12.9 provided:

---

[2]    Section 10.3(c) appears to contain a typographical error. The Agreement refers to amending the contract under Section 11.6. But, the Agreement contains no Section 11.6. Instead, Section 12.6 provides a method to modify or amend the contract if the Agreement or any of its provisions are found to violate any state or federal laws. The court thus concludes that the Agreement's reference to Section 11.6 was a typographical error that should have referenced Section 12.6.

Section 12.9   <u>Severability</u>.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable and this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision never comprised a part hereof; and the remaining provisions hereof shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.  Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as part of this Agreement a provision as similar in its terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

*Id.*

Section 10.3(b) also allowed RNM to terminate the Agreement for another reason.  RNM could terminate the Agreement if:  (1) plaintiffs materially have defaulted on the duties imposed by the agreement and failed to cure their default within 60 days after being notified in writing of the default; and (2) two-thirds of RNM's equity holders have voted to approve the agreement's termination.  *Id.* at 41.

The parties operated under this 2002 Amended Service Agreement until 2015, with defendant RNM paying a Service Fee for plaintiffs' management and administrative services.

### *Amendment No. 1 to the 2002 Amended Service Agreement*

The parties agreed to amend the 2002 Amended Service Agreement by entering into an Amendment No. 1 to the Amended and Restated Service Agreement ("Amendment No. 1") on January 1, 2003.  Doc. 244-18.  With Amendment No. 1, the parties agreed to reduce the Service Fee under the 2002 Amended Service Agreement in exchange for a "lump sum payment" of $4,842,293 by RNM to plaintiffs.  *Id.* at 1.  The Amendment called for a reduction in the Service Fee over time, from 26.6% to 15% of RNM's Professional Revenues.  *Id.* at 2.  This amendment followed RNM "vot[ing] to accept th[e] option to buy the service fee down to 15 percent."  Doc. 246-11 (Allen Dep. 85:9–11).  The parties' execution of Amendment No. 1 was "how [the RNM

physicians] agreed to address" the issues with the Service Fee. *Id.* (Allen Dep. 85:15–18). The RNM physicians "knew that what [they] were getting for [that] 15 percent was whatever the service agreement said [they] were getting for that 15 percent." *Id.* at 64 (Allen Dep. 174:12–21).

Even after the parties executed Amendment No. 1, younger doctors within the RNM practice complained that the 15% Service Fee was exorbitant. In response, Dr. Timothy Allen, who agreed the Service Fee was "high," reminded the younger physicians that plaintiffs "pay for the staff members we rely on, . . . rent on the administrative office, et cetera," which should "count for something." *Id.* at 83 (Allen Dep. 244:13–19). When Dr. Allen provided this response, he believed that a deal "with McKesson [, a competitor of RNMIP,] billing and us paying the administrative cost, et cetera" the cost would still be "around 11 or 12 percent of our net." *Id.* at 244–45 (Allen Dep. 244:20–245:4).

### *Radiologix is Acquired by RadNet Management, Inc.*

In 2006, RadNet Management, Inc., acquired Radiologix as a wholly owned subsidiary. RadNet Management, Inc. is a subsidiary of RadNet, Inc., a publicly traded company that manages many radiology groups and practices around the United States. RadNet, Inc. is the largest owner and operator of fixed-site diagnostic imaging centers in the country. Radiologix has continued to exist since this 2006 acquisition. Plaintiff RNMIP also has continued in existence as Radiologix's wholly owned subsidiary.

### *Physician Employment Agreements*

Consistent with the 2002 Amended Service Agreement, each one of defendant RNM's current physician-owners signed a "Physician Employment Agreement" with defendant RNM

that names plaintiff Radiologix as a third-party beneficiary.  *See* Doc. 243-9 ("the Physician

Employment Agreement").  The Physician Employment Agreement provides, in pertinent part:

        C.        RNM desires to engage Physician to render Specialty services on behalf of RNM.

        . . .

        E.        Physician acknowledges that RNM has entered into an Amended and Restated Service Agreement dated July 1, 2002 with American Physician Partners, Inc., a Delaware corporation ("APPI") (as may be amended from time to time, the "Service Agreement").  APPI changed its name to "Radiologix, Inc." (RDLX), September, 1999.  Physician further acknowledges that in accordance with the provisions of the Service Agreement, [Radiologix] will have third party beneficiary rights to enforce certain provisions of this Agreement.

        . . .

        2.1        <u>Professional Services</u>.   Physician shall render professional Specialty services in accordance with the laws of the State of Kansas as an employee or as a Member of, on behalf of and at the direction of RNM to patients who are assigned to Physician.  In addition, Physician shall have such other duties as may from time to time be reasonably assigned to him or her by the Management Committee of RNM.   Physician shall be committed to the enhancement of RNM's medical practice and shall use his or her best efforts to further the goals of and to promote such practice.

        2.2       <u>Standards of Practice</u>.  Physician . . . shall at all times conduct himself or herself in accordance with the ethical standards of the medical profession, and shall abide by all protocols of treatment and quality care policies as may be established from time to time by RNM . . . .

        . . .

        2.3       <u>Exclusivity</u>.  During the term of this Agreement, Physician shall devote all of Physician's professional time and efforts exclusively to and for the benefit of RNM and shall not, directly or indirectly, render professional, medical, managerial or directive services to any person, whether or not for compensation, except as an employee or Member of RNM, unless Physician obtains the prior written consent of RNM and the Joint Planning Board contemplated in the Service Agreement . . . .

        2.4       <u>Hours</u>.  Physician shall be available to render professional services on behalf of RNM at such times as assigned by RNM . . . .

. . .

2.6    <u>Site(s) for Provision of Services</u>. RNM shall make available, at RNM's expense, all facilities, equipment, supplies, non-physician personnel and office space necessary and appropriate for Physician's performance of professional medical services under this Agreement . . . .

. . .

2.8    <u>RNM's Policies and Procedures</u>. RNM shall have the authority to establish from time to time the professional policies and procedures to be followed by Physician in handling each individual patient of RNM. Physician shall abide by all policies and procedures established by RNM relating to the provision of professional medical services, including policies and procedures set forth in any contracts between RNM and third-party payors, including the Medicare and Medicaid Programs.

2.9    <u>Patients and Patient Medical Records</u> . . . All patient records, case histories, x-ray films, and files of any type concerning patients of RNM, or patients consulted, interviewed, or treated and cared for by Physician, shall belong to and remain the property of RNM, notwithstanding the subsequent termination of this agreement.

2.10    <u>Disclosure of Information</u>. During the term of this Agreement, Physician shall notify RNM immediately in writing of (a) any malpractice claim filed against Physician; (b) any compromise, settlement or judg[ ]ment of such a claim and the terms and conditions thereof; (c) any revocation, suspension, modification, restriction or other change in status of Physician's medical staff privileges at any hospital or other health care facility for a medical disciplinary cause or reason; and (d) any investigation of Physician by any governmental agency or board or any medical association relating to a medical disciplinary cause or reason.

2.11    <u>Confidentiality</u>.

(a)    <u>RNM's Confidential and Proprietary Information</u>. In the course of Physician's performance under this Agreement, Physician will have access to certain confidential and proprietary information relating to the patients and operations of RNM including, without limitation, patient lists and other trade secrets ("RNM's Confidential and Proprietary Information"). Physician shall maintain all of RNM's Confidential and Proprietary Information in the strictest confidence and shall not directly or indirectly use such information during the term of this Agreement or at any time thereafter, or divulge any of RNM's Confidential and Proprietary Information during or after the term of this Agreement to any third parties, other than RNM or other employees and Members of RNM who have need for such information and who have similarly agreed to

hold such information in confidence, without the express prior written consent of RNM, or upon court order to do so . . . .

. . .

2.12  Covenant Not to Compete or Solicit.

(a) Physician acknowledges that, during the term of this Agreement, (i) RNM will introduce Physician to RNM's patients and to the medical community and (ii) Physician will receive substantial direct and indirect benefits from the existence of the Service Agreement, both of which will enable Physician to develop his or her professional reputation in a manner which, if Physician terminates his or her relationship with RNM, could be used to the financial detriment of RNM and [Radiologix].  Accordingly, during the term of this Agreement and for a period of twenty-four (24) months thereafter, Physician covenants as follows:

. . .

(ii) that Physician will not, directly or indirectly, . . . (B) whether for himself or any other person or entity, call upon, solicit, divert or take away, or attempt to solicit, call upon, divert or take away any customers, business or clients of RNM or [Radiologix] (including without limitation, any third party payors); (C) solicit, or induce any party to solicit, any contractors of RNM or [Radiologix] to enter into a contract of the same or a similar type as that to which RNM or [Radiologix] and such contractor are parties; . . . or (E) disrupt, damage[,] impair or interfere with the business of RNM or [Radiologix].

. . .

3.  Compensation.  For the professional services provided under this Agreement, RNM shall compensate Member Physicians as determined by the Management Committee, and shall compensate employee Physicians as stated on Exhibit B . . . .

. . .

4.1  Vacation, Professional Meetings, Inability to Work, and Time Off. Physician shall be entitled to vacation time, time off for attendance at professional meetings, inability to work, and other time off as may be granted in accordance with policies established from time to time by RNM's Management Committee. Such policies shall be subject to review, change and elimination from time to time.

4.2  Professional Liability Insurance.  RNM, on behalf of Physician, shall obtain and maintain at all times during the term of this Agreement

professional liability insurance coverage for errors and omissions resulting, in whole or in part, from the acts of Physician in connection with Physician's practice of medicine in and through RNM . . . .

    4.3    <u>Reimbursement of Expenses</u>.  RNM shall reimburse Physician for Physician's Reasonable and necessary out-of-pocket expenditures incurred on behalf of RNM . . . .

    . . .

    7.2    <u>Entire Agreement</u> . . . Sections 2.3, 2.11, 2.12, 6.5, 7.2, 7.6, 7.13 and 7.14 may not be amended or modified in any respect whatsoever without the written consent of [Radiologix].

    . . .

    7.5    <u>Severability.</u>    Nothing contained in this Agreement shall be construed to require the commission of an act contrary to law, and whenever there is any conflict between any provision of this Agreement and any statute, law, ordinance or regulation, the statute, law, ordinance or regulation shall prevail.  In such event, and in any case in which any provision of this Agreement is determined to be in violation of a statute, law, ordinance or regulation, the affected provision(s) shall be limited only to the extent necessary to bring it within the requirements of the law, and insofar as possible under the circumstances, to carry out the purposes of this Agreement.  The other provisions of this Agreement shall remain in full force and effect, and the invalidity or unenforceability of any provision hereof shall not affect the validity and enforceability of the other provisions of this Agreement.

    7.6    <u>No Waiver</u>.  The waiver by any party to this Agreement of any breach of any term or condition of this Agreement shall not constitute a waiver of subsequent breaches.  No waiver by any party of any provision of this Agreement shall be deemed to constitute a waiver of any other provision.  Notwithstanding any other provision herein, no waiver by RNM of any breach by Physician of any provision of Sections 2.3, 2.11 and 2.12 hereof shall be effective unless also expressly waived in writing by [Radiologix].

    7.14    <u>Obligations to Third Parties</u>. Except for (i) Section 7.2, which requires the consent of [Radiologix] to certain amendments or modifications, and (ii) Sections 2.3, 2.11, 2.12 and 7.13 hereof, for which [Radiologix] shall be deemed a third party beneficiary with full rights to enforce such duties and obligations of Physician thereunder, no duties or obligations of RNM or Physician under this Agreement shall in any way or manner be deemed to create any obligation of RNM or Physician to, or any rights in, any person or entity not a party to this Agreement.

*Id.* at 1–6, 12.

### Changes Develop in the Parties' Relationship

In the years following the parties' execution of the 1997 APPI-RNMPA Agreement, several of RNM's physician-members retired. As this occurred, fewer and fewer of RNM's physician-members had received cash and stock consideration for the 1997 APPI-RNMPA Agreement. By 2010, a substantial majority of RNM's physician-members consisted of doctors who had not received the cash and stock consideration. Also, a substantial majority of RNM's physician-members had not voted to approve the 1997 APPI-RNMPA Agreement and the 40-year service agreement.

Over the years, Radiologix attempted to acquire or establish additional Technical Operations in the Topeka area. Radiologix's Steven Forthuber traveled to Topeka to meet with representatives of two local hospitals—Stormont Vail and St. Francis. Plaintiff RNMIP also secured a contract to manage the joint venture MRI with Stormont Vail and St. Francis.

But, according to David Smith, who was plaintiff RNMIP's Practice Administrator until 2010, RadNet Management Inc. was interested in concentrating on "core markets" after it acquired Radiologix. And, as Mr. Smith testified, RNM's market in Topeka, Kansas, was not a core market. Mr. Smith reached this conclusion based on the lack of communication that he had with RadNet Management, Inc. about the Topeka market. Dr. James Owen testified that, from RNM's perspective, it appeared plaintiffs were unwilling to invest capital in the Topeka market.

In 2010, plaintiffs' area imaging centers closed, management of the joint venture MRI with Stormont Vail and St. Francis ended, and Technical Operations closed. According to Mr. Forthuber, the closures resulted from the referring physicians affiliating with one of the two hospitals in Topeka, the local hospitals building or securing their own imaging center operations,

and the referring physicians increasingly referring patients to facilities operated by the hospitals—and not to plaintiffs' imaging centers.

On May 13, 2010, the RNM Management Committee approved a letter for Dr. Timothy Allen (RNM's Chairperson) to send to the Topeka physician community as soon as possible. The letter, addressing closure of the imaging centers, provided, in part:

> While the closure of our imaging center restricts your options for outpatient imaging, it does not reduce your access to our professional services. In response to rumors, we are not dissolving as a physician practice, nor have we been "sold" or acquired by anyone else. Radiology and Nuclear Medicine has always been, and continues to be, an independent professional corporation, wholly owned and directed by its radiologist members. We continue to be dedicated to providing the highest quality radiology and radiation oncology services to the patients and physicians of Northeast Kansas. To that end, we are welcoming four new radiologists to our practice this summer, including fellowship-trained mammography, interventional, and musculoskeletal specialists. Similarly, Radnet continues as our billing and management agent. Despite the events locally, it remains the largest operator of imaging centers nationally.

Doc. 241-15 at 1. When Dr. Allen sent the letter, he believed it accurately stated that RNM "has always been and continues to be, an independent professional corporation, wholly owned and directed by its radiologist members."

After the imaging centers closed in 2010, Ms. Rarrick recalls having no major discussions about plaintiffs investing in capital improvements or expansion. But, plaintiffs did make certain investments in the Topeka market during this period. They included investing $59,016.11 in furniture, fixtures, and equipment and $36,691.01 in leasehold improvements such as reading rooms for the physicians and new administrative office space for RNMIP staff.

Mr. Forthuber does not recall if plaintiffs considered reducing RNM's Service Fee after the imaging centers closed in 2010. But, when the Technical Operations ended, almost no Technical Revenues were generated. And as outlined above, plaintiffs' Service Fee consisted of 100% of Technical Revenues. So, with no Technical Revenues, plaintiffs earned no Service Fee

on that part of the business.  Plaintiffs continued to collect the Service Fee on the Professional Revenues generated.

### *David Smith's Position is Eliminated; Jayne Rarrick Assumes His Responsibilities*

When Technical Operations ended, plaintiff RNMIP terminated the employment of several employees because it had no work for the employees to perform.  David Smith's position was one of the positions eliminated after the Technical Operations ended.  Plaintiff RNMIP eliminated Mr. Smith's position effective October 1, 2010.  After the Technical Operations ended, the only operations and revenues that remained under the parties' Agreement were Professional Operations, Professional Revenues, and some de minimis Technical Revenues.

Mr. Smith testified that he wasn't surprised when his position was eliminated.  Mr. Smith can think of nothing that plaintiffs could have done or should have done to prevent closure of the Technical Operations.  Plaintiffs seriously considered proposals for a joint venture with St. Francis or Stormont Vail, and for acquiring the MRI of Kansas.  But, instead, the marketplace moved in a different direction, with St. Francis and Stormont Vail employing physicians directly, building their own centers, and referring patients to those centers.

After Mr. Smith's position was eliminated, Jayne Rarrick, RNMIP's Director of Accounting and Finance, assumed Mr. Smith's responsibilities—the ones that still existed after the imaging centers' closure.  Ms. Rarrick located Mr. Smith's "to-do" list and began working through it.  Ms. Rarrick had worked for RNMIP since 1998.  She was 50 years old, a licensed CPA, and, after Mr. Smith's departure, the other remaining senior employee with RNMIP.  Ms. Rarrick had worked closely with Mr. Smith and RNM physicians during her tenure.

Around November 22, 2010, Dr. Allen (RNM's Chairperson) drafted—but never sent—a letter to Radiologix's Steven Forthuber.  The letter discussed the recent elimination of Mr.

Smith's position and the need for administrative support of Ms. Rarrick as the remaining key, senior employee. Dr. Allen wrote the letter because RNM already had concerns about the level of support it was receiving from plaintiffs, and those concerns increased after Mr. Smith's abrupt termination. Dr. Allen wanted to communicate to Mr. Forthuber that RNM had serious concerns about the level of support it was receiving and its ability to continue to maintain its practice. Indeed, Dr. Owen testified that eliminating Mr. Smith's position sent a message that business development and strategic planning were not important to plaintiffs but, instead, they cared only about running a billing office in RNM's market.

On the second page of Dr. Allen's letter, he listed 14 "ongoing issues in our practice that need to be addressed with your help." Doc. 260-30 at 2. The letter closed by stating that RNM expected plaintiffs to "fulfill their contractual obligation to provide adequate administrative support for our practice." *Id.* Dr. Allen's draft letter does not suggest that he considered plaintiffs in default on or breach of the 2002 Amended Service Agreement based on Mr. Smith's termination or any of the other "ongoing issues."

### *RNM Provides Notice of Default*

As explained above, Section 10.3(b) of the 2002 Amended Service Agreement allowed RNM to terminate the Agreement if: (1) plaintiffs materially had defaulted on the duties imposed by the agreement and failed to cure their default within 60 days after being notified in writing of the default; and (2) two-thirds of RNM's equity holders had voted to approve the agreement's termination. Doc. 270-10 at 41. Also, under that Agreement, the parties specifically "agree[d] that good communication between the parties is essential to the successful performance of this Agreement." *Id.* at 51. The parties also "pledge[d] to communicate fully and clearly" with each other. *Id.*

On November 26, 2010, Dr. Allen sent a letter to Steven Forthuber. The final version of the letter differed from the draft described in the above section. The following language was inserted at the end of the final version of the letter in bold-face type: "This letter is official notice of default in performance of material duties and obligations of the administrator pursuant to Section 10.3(b) of our service agreement with [plaintiffs]." Doc. 241-12 at 2. The November 26, 2010 letter never referenced an alleged failure by plaintiffs to fulfill a particular section, duty, or obligation of the 2002 Amended Service Agreement. But, the letter included the same concerns that the draft letter had recited about the lack of administrative support RNM was receiving, especially after elimination of Mr. Smith's position. It read:

> Elimination of our lead administrator position has led to a halt in our immediate plans for the expansion of our practice in the region and communication between our practice and the practice sites we serve has ceased on an administrative level. We believe this lack of administrative support has and continues to have a negative impact on our practice.

*Id.* at 1. The letter also referenced 14 "ongoing issues" and stated that RNM "expect[ed] [plaintiffs] to fulfill their contractual obligation to provide adequate administrative support for our practice." *Id.* at 2.

Steven Forthuber and Jayne Rarrick assert that they began addressing the concerns listed in Dr. Allen's letter immediately and certainly within 60 days of receiving the letter. RNM disagrees. It asserts that plaintiffs never resolved the majority of the issues listed in the November 26, 2010 letter.

On December 8, 2010, Mr. Forthuber had a lengthy conversation with Mr. Smith about Dr. Allen's letter. He also had a conference call with Ms. Rarrick, Todd Skulte (Radiologix's Executive Vice President of Hospital Operations), and Charlie Shaw (Radiologix's Senior VP of Network Strategy & Business Development) about a "list of open issues" and how to divide up

responsibilities for addressing them.  Mr. Forthuber also arranged for periodic status update calls with this team.  Mr. Forthuber sent an email to Dr. Allen on December 23, 2010.  It explained what plaintiffs were doing to address the concerns listed in Dr. Allen's November 26, 2010 letter.  Mr. Forthuber also noted that he was "pulling together . . . information . . . so that [RNM could] assess the possibility of acquiring the operation back from [plaintiffs]."  Doc. 270-29 at 1. Dr. Allen forwarded Mr. Forthuber's email to RNM's Management Committee.

Plaintiffs tried to provide Ms. Rarrick with additional support by hiring and promoting qualified staff in Topeka to serve under her leadership.  Plaintiffs also encouraged Ms. Rarrick to delegate work appropriately.  Plaintiffs continued to get assistance from David Smith, who was working as a self-employed business consultant after his employment with RNMIP had ended. Plaintiffs hired Mr. Smith on a contract labor basis to help with some of this work.

Ms. Rarrick also began providing special administrator reports at the RNM physician group meetings.  These reports described the administrative support Ms. Rarrick was receiving to address the ongoing issues.  On January 4, 2011, Ms. Rarrick gave a report during the group's regular meeting.  She discussed her teleconferences with Mr. Forthuber and others, the administrative support she was receiving to address RNM's issues, the promotion and training of a Topeka-based reimbursement operations employee, and other relevant accomplishments and progress on various matters.

In early 2011, with plaintiffs' knowledge and consent, RNM hired David Smith (plaintiff RNMIP's former Practice Administrator) as a consultant.  He was asked to provide business advice and assistance for evaluating whether RNM could exit the 2002 Amended Service Agreement and its relationship with plaintiffs through a buyout.  On February 12, 2011, Dr. Allen sent an email to the RNM physician-members.  Dr. Allen acknowledged that his letter "has

been met with an effort by [Ms. Rarrick and plaintiffs] to address the issues we raised." Doc. 244-34. But also, he proposed a group meeting "to discuss proceeding with an attempt to exit from [plaintiffs]" through a possible buyout plan. Doc. 244-34. Two days later, Dr. Allen exchanged emails with Mr. Smith about exiting the parties' relationship (including a possible buyout plan), getting a loan to pay for the buyout, and changing services from plaintiffs to McKesson Corporation ("McKesson").

From 2008 to 2015, Ms. Rarrick presented in-person Administrator Reports annually, in PowerPoint or booklet form, at the RNM annual group meetings. In those reports, Ms. Rarrick included specific references to issues she and the other Topeka staff were addressing and the administrative support that plaintiffs were providing to her and the other Topeka-based staff. Ms. Rarrick and other representatives of plaintiffs also regularly attended and participated in meetings of the RNM physicians, the RNM Management Committee, the RNM Finance Committee, the RNM Practice Development Committee, and its other various committees. Ms. Rarrick complied minutes from these meetings from 2008 to 2015.

The Chairperson of the RNM Management Committee also provided an annual report at these meetings. At the March 29, 2011 Annual Meeting of RNM, in the presence of Ms. Rarrick, Dr. Allen gave his "Year End Review 2010-11." Doc. 244-35. Dr. Allen reported that the "issues related to our relationship with [plaintiffs]" needed to be "resolved" "as soon as possible." *Id.* at 2.

On April 28, 2011, Mr. Forthuber and Mr. Skulte traveled to Topeka and personally met with Dr. Allen, Dr. Owen, and RNM's attorney, Jeff Ellis. During that meeting, RNM provided Mr. Forthuber with a list of "talking points" outlining RNM's continued dissatisfaction with

plaintiffs' performance.[3]  As one of its "talking points," RNM expressed concern that "RNM

does not fit the RadNet model as it has evolved over time" and its "distinct perception that RNM

is a stepchild within the RadNet system."  Doc. 270-15 at 1.  Another "talking point" expressed

RNM's complaint about insufficient administrative services because, RNM believed, Ms.

Rarrick was "serv[ing] as a stopgap remedy" and could not "continue providing the support

necessary with the assets available."  *Id.*  RNM also proposed "an amicable separation" of the

parties that included RNM "pay[ing] [plaintiffs] 2.5 times the current EBITDA (the current

standard for imaging center purchases)."  *Id.* at 2.

    After the April 28, 2011 meeting, Mr. Skulte exchanged emails with Dr. Allen.  Dr. Allen

affirmed that he "sense[d] a sincere commitment by Steve [Forthuber] and [Mr. Skulte] to move

forward with support of our practice" and that "we must make the marriage work."  Doc. 244-33

at 1.  Later, Dr. Allen sent a report to his RNM physician colleagues about the April 28, 2011

meeting.  Dr. Allen explained that RNM had offered 2.5 times EBITDA to effect a separation

from plaintiffs, and also indicated a willingness to go as high as 3.5 times EBITDA.  Mr.

Forthuber rejected RNM's proposal and never made a counter offer, but he did state that

plaintiffs thought the Agreement was worth 5.5 times EBITDA and would not offer anything

below that figure.  Dr. Allen also described how Mr. Forthuber gave a "lengthy pitch" about how

plaintiffs could help RNM's practice "with their new focus on hospital practice, acquisition of

Images On Call acquisition teleradiology, acquisition of PACS system, etc."  Doc. 270-30 at 1.

    Dr. Allen recognized:  "There is potential that [plaintiffs] will actually perform for us but

we won't know for a number of months if we can really be a partner with them or just a cash

---

[3]      RNM prepared a "talking points" memo to discuss with Mr. Forthuber at the April 28, 2011
meeting.  Doc. 270-15.  The parties dispute whether RNM actually gave Mr. Forthuber the memo at this
meeting.  Dr. Owen testified that he provided the "talking points" list to Mr. Forthuber at the meeting—
whether that means Dr. Owen provided a hard copy of the memo or an oral presentation is unclear.  Mr.
Forthuber denies that RNM shared a hard copy of the memo with him.

cow as we have been in the past. Since the divorce looks to be too expensive for now I am in favor of keeping an open mind and giving them a chance with pressure from our side to perform." *Id.* Dr. Allen also suggested to his RNM colleagues that RNM make specific, written requests to provide documentation of plaintiffs' shortcomings. Dr. Allen, Dr. Owen (RNM's corporate representative), and other RNM physicians testified that they do not know of any specific requests RNM ever made in writing to plaintiffs. Dr. Allen does not recall having any further communications with plaintiffs about RNM's concerns over administrative support after the April 28, 2011 meeting with Mr. Forthuber and Mr. Skulte.

On April 3, 2012, Ms. Rarrick attended RNM's Annual Meeting and delivered her annual Administrator Report. Her report included a review of the past year's highlights, including a list of some of the administrative support plaintiffs had provided and a review of some of the existing business. At the same meeting, with Ms. Rarrick and other representatives of plaintiffs in attendance, Dr. Allen gave his "Year End Review 2011-12." Doc. 241-20. During his Year End Review, Dr. Allen reported that "Jayne Rarrick [had] transitioned into her new expanded role as administrative head of the group," that "[a]dditional administrative staff" was "added to the accounting department," and that RNM was "moving on within the RadNet affiliation" and "putting this issue to rest." *Id.* at 1. Dr. Allen also noted that "RadNet as a company is focused on their IT business and outpatient imaging center business [on] the East and West coasts with RNM being an anomaly in their business model." *Id.* And, he stated, plaintiffs "seem willing to help us but are also just willing to sit back and collect the management fee without any active effort to figure out how they can help us." *Id.* at 2.

Ms. Rarrick and other representatives of plaintiffs continued to attend and participate in RNM's Group, Management Committee, Finance Committee, Practice Development Committee

and various other committee meetings. But, Dr. Owen recalls that Todd Skulte (Executive Vice President of Hospital Operations) did not attend the Joint Planning Board meetings, even though he was plaintiffs' designated senior management resource for RNM. Indeed, the minutes of the Joint Planning Board reflect that Mr. Skulte attended just one meeting—on March 29, 2012. Also, during this period, the Joint Planning Board held its monthly meetings at the same time as RNM's Management Committee meetings. Sometimes the Management Committee meeting was converted into a Joint Planning Board meeting or held simultaneously with the Joint Planning Board meeting. But, no separate minutes exist for Joint Planning Board meetings in 2010 or 2011. Only one set of minutes exists for a Joint Planning Board meeting in 2012, and only two sets of minutes exist for meetings in 2013.

Ms. Rarrick continued to give her PowerPoint presentations at RNM's annual meetings, including "overviews" about some of the administrative support she and the other Topeka-based staff had received during the preceding year. Ms. Rarrick attended RNM's Annual Meetings on March 19, 2013, March 18, 2014, and March 17, 2015, and she delivered reports at those meetings. Among other things, Ms. Rarrick's reports identified the administrative support that plaintiffs had provided or arranged in the preceding years. Ms. Rarrick believes that plaintiffs provided her the administrative support she needed to perform her job. Neither Ms. Rarrick nor any of the other Topeka-based employees ever told Dr. Allen that they needed additional administrative support. And, Ms. Rarrick testified about the number of other employees of Radiologix and RadNet Management, Inc. who provided supportive services to plaintiff RNMIP. But, Ms. Rarrick also testified that, as time went on, she had fewer and fewer conversations with RadNet Management, Inc.

Todd Skulte never received any complaints about Ms. Rarrick. And, he developed the impression that RNM's concerns over the elimination of David Smith's position and Ms. Rarrick's transition into the management role were "water under the bridge."

In 2013, David Horn was assigned the corporate support liaison for RNM. He communicated and worked with Ms. Rarrick, learned about RNM and the Kansas market, and traveled to Kansas to attend two RNM meetings. On November 22, 2013, Mr. Horn traveled to Topeka with Chief Information Officer Ranjan Jaynathan and other representatives of plaintiffs. Mr. Horn conducted meetings with the RNM physicians (including Drs. Allen and Owen) and Topeka-based staff about a potential teleradiology project. On December 20, 2013, Dr. Horn and others submitted a "Teleradiology and Global Worklist Project Evaluation Report" to RNM. After the visit, Dr. Allen stated in an email that plaintiffs had gone "to considerable effort to have the big guns come to meet with us." Doc. 246-11 at 86–87 (Allen Dep. at 251:21–252:24).

Despite plaintiffs' efforts to address RNM's concerns, RNM believed that plaintiffs still were failing to provide adequate support for strategic planning, marketing, budgeting, practice development, or contract negotiation. Under Section 3.1(b)(i) of the 2002 Amended Service Agreement, RNM could acquire replacement services for administrative services on a temporary basis if plaintiffs failed to provide services that were "reasonably consistent with commercially available services offered by third party providers of physician practice management services of the type and scope offered by [RNMIP]." Doc. 270-10 at 13. RNM never invoked Section 3.1(b)(i) even though it believed plaintiffs were providing inadequate administrative services.

### RNM Takes Steps to Terminate the Parties' Agreement

In December 2013, RNM formed a task force to examine its ongoing relationship with plaintiffs. This task force included Dr. Brett Meggison, Dr. Owen, and Dr. Allen. In email

correspondence among the RNM physicians, Dr. Owen noted that Mr. Smith had told him that billing companies—like McKesson—were "willing to negotiate . . . on costs," that a service agreement likely could have "some pretty substantial tax benefits," and that Mr. Smith "only checked with one bank on interest rates and financing . . . ." Doc. 260-27 at 1. Also, during the following months, the RNM physicians discussed the legality and enforceability of the 2002 Amended Service Agreement in private email exchanges. Some of the physicians expressed their opinions that the Agreement was ironclad and that RNM had a weak case for asserting that plaintiffs had breached the contract.

In February 2014, Dr. Meggison reached out to McKesson to discuss whether it could provide the services that plaintiffs had been providing to RNM under the 2002 Amended Service Agreement. After Dr. Meggison's inquiry, McKesson made a presentation to RNM in mid-March 2014. Also, in June 2014, RNM retained David Smith as an outside consultant to provide advice about the 2002 Amended Service Agreement and to assist RNM with its transition to an alternative billing and collection vendor. On June 10, 2014, Drs. Meggison, Owen, and Olufolajimi Obembe met with RNM's counsel and David Smith to discuss extracting RNM from its relationship with plaintiffs. This meeting was the first time that Mr. Smith had heard any concerns raised about the corporate practice of medicine and illegal fee splitting. The following day, Mr. Smith sent an email to Drs. Meggison, Allen, Owen, and Obembe, proposing to work on the "Radnet project" for $250 per hour. Doc. 260-15 at 1. Mr. Smith added that he didn't feel the need to draw up a formal agreement. *Id.*

But, on July 17, 2014, Mr. Smith entered into a formal consulting agreement through RNM's counsel. The consulting agreement described the services that Mr. Smith was retained to provide. They included: "[a]nalysis of the financial impact of terminating the Service

Agreement, and any proposed or contemplated settlement;" "engage in business and operational planning to ensure business continuity in the event of termination of the Service Agreement;" and "[r]ender advice concerning negotiating tactics and settlement terms and conditions." Doc. 238-11 at 1. The consulting agreement also provides that: Mr. Smith is an independent contractor; the agreement does not create an employment relationship; Mr. Smith has other executive services clients; the agreement is not an exclusive one; Mr. Smith is not eligible to participate in any employee benefit plans of either the Spencer Fane law firm or RNM; RNM will pay Mr. Smith $250 per hour and reimburse expenses; Mr. Smith agrees to invoice RNM and RNM agrees to pay the invoices; and Mr. Smith will provide his own general business equipment and supplies.

Earlier, in April 2014, plaintiff RNMIP had retained Mr. Smith to conduct an analysis of Meaningful Use incentives and to present his findings to the RNM physicians. The day before an RNM ad hoc committee meeting on July 23, 2014, Mr. Smith sent an email to Ms. Rarrick stating that he didn't think the meeting would have much to do with Meaningful Use so Ms. Rarrick didn't need to attend. Mr. Smith never disclosed the meeting's purpose to Ms. Rarrick. Also, Mr. Smith never disclosed to Ms. Rarrick that RNM had retained him as a consultant to help extract RNM from its relationship with plaintiffs.

On August 23, 2014, Mr. Smith sent an email to the RNM physicians and RNM's counsel. It contained his preliminary analysis of the financial impact of terminating the 2002 Amended Service Agreement. Mr. Smith estimated that the long term effect of terminating the Agreement would add about $760,000 per year to RNM's bottom line. On August 29, 2014, Dr. Allen notified RNM's physicians that a "special LLC meeting" would occur on September 9, 2014, "to discuss the future direction of our relationship with RadNet and potential development

of a regional Radiology alliance." Doc. 260-18 at 1. Dr. Allen noted that Mr. Smith and RNM's

counsel would attend this meeting and make presentations about "potential exit strategy from

RadNet, financial implications, and potential for developing a regional radiology alliance . . . ."

*Id.*

### RNM Votes to Terminate the 2002 Amended Service Agreement

As explained above, Section 10.3(b) of the 2002 Amended Service Agreement provides

that terminating the contract requires an affirmative vote of two-thirds of the interests of RNM's

equity holders. In September 2014, Dr. Allen signed a document titled "Resolution of Members

Pursuant to Special Meeting." Doc. 241-9. It resolved that "Members holding no less than two-

thirds of the issued and outstanding interests of" RNM "desired to terminate" the 2002 Amended

Service Agreement. *Id.* at 1. By September 2014, of the original 24 physicians who had

approved the 1997 APPI-RNMPA Agreement, only six physicians still were part of RNM. RNM

did not record the individual votes or keep a roll showing who voted for and who voted against

the Resolution. RNM has no minutes, voting records, or attendance records for the September

2014 meetings referenced in the Resolution.

With this Resolution, Dr. Owen testified RNM had voted to negotiate a termination of the

2002 Amended Service Agreement by paying plaintiffs a settlement fee. Indeed, the Resolution

authorized RNM's Chairperson to "negotiate a termination and/or settlement fee with [plaintiffs]

for an amount not to exceed $4,000,000 in order to fully release Company from any further

obligation under the [2002 Amended Service] Agreement." *Id.* The Resolution also authorized

RNM's Management Committee to "work with [RNM's] legal counsel to execute and deliver" a

"notice of termination" of the 2002 Amended Service Agreement to plaintiffs. *Id.*

### RNM Terminates the 2002 Amended Service Agreement

Nearly four years after Dr. Allen sent his November 26, 2010 letter, RNM's counsel sent plaintiffs a letter on October 6, 2014. Counsel's letter notified plaintiffs that RNM was terminating the 2002 Amended Service Agreement under Section 10.3. RNM's counsel provided a list of "multiple material defaults in contract performance" that had "caused RNM to lose significant revenue, pay for services that it has not received, and become a smaller, hospital-based radiology practice." Doc. 270-16 at 3. RNM's counsel also asserted that the Agreement's "transformation of RNM into a hospital-based radiology practice further justif[ied] termination of the 2002 Amended Service Agreement under Article III, Section 10.3(c)" because "Kansas law . . . prohibits the corporate practice of medicine," and "also prohibits licensed healthcare providers, such as RNM, from directly or indirectly sharing fees with unlicensed individuals, such as [plaintiffs]." *Id.* The letter concluded with a request to "notify [RNM's counsel] within 10 days from the date of this letter" if plaintiffs were "willing to meet at RNM's administrative offices in Topeka, Kansas to discuss these issues." *Id.*

RNM's counsel later explained that this October 6, 2014 letter was a termination notice and not a new notice of default: "My letter dated October 6, 2014, is not an additional notice of default, but a notice that the Agreement . . . is now terminated for cause." Doc. 241-11 at 1–2.

Dr. Allen's November 26, 2010 letter is the only written notice of default on which RNM bases it termination of the Service Agreement. In the four years between Dr. Allen's November 26, 2010 letter and RNM's counsel's October 6, 2014 termination letter, RNM never sent any other notices of default to plaintiffs. And, today, Dr. Allen concedes that he's never gone back to look at the records and other correspondence with plaintiffs to confirm whether plaintiffs addressed the issues identified in his November 26, 2010 letter.

The parties never invoked Section 10.3(c) of the 2002 Amended Service Agreement. That is, they never obtained an opinion from an "independent law firm with nationally recognized expertise in health care law and *acceptable to the parties*" that a provision of the 2002 Amended Service Agreement violated the law. Doc. 270-10 at 42 (emphasis added). Defendant RNM never asked plaintiffs to agree to seek an opinion from an independent law firm about the legality of the 2002 Amended Service Agreement.

The parties also agree that they never attempted to amend the 2002 Amended Service Agreement to address RNM's concerns about the Agreement's legality. But, defendant RNM's corporate representative testified that he told Radiologix's Steve Forthuber that RNM was willing to discuss potential amendments to the Agreement to address the legality issues. According to RNM's corporate representative, plaintiffs never responded to RNM's offer to discuss amending the 2002 Amended Service Agreement.

### Post-Termination Communications

On December 19, 2014, RNMIP's Vice-President and General Counsel, Jeffrey L. Linden, sent a letter to RNM's counsel. Among other things, his letter described the 1997 APPI-RNMPA Agreement as follows:

> You may not realize, but the Agreement that you value so lightly was part of a 1997 acquisition for which [plaintiffs] paid $14,000,000. One of the reasons for the [40-year] term of the Agreement was to allow [plaintiffs] to obtain the value of our money, plus a reasonable return.

Doc. 270-32 at 1. The letter also stated:

> Seventeen years may have passed since [the RNM physician-members] received [the] $14 Million but the fact that they received it is irrefutable. The fact that the Agreement you so cavalierly dismiss was a major part of the assets being gained in the purchase is also irrefutable.

*Id.* at 1.

On March 11, 2015, RNM's counsel replied to Mr. Linden. Among other things, this letter asserted:

> A material dispute now exists between RNM and RNMlP that cannot be resolved under the procedure set forth in Section 11.l of the Agreement. Accordingly, RNM requests a meeting of the parties pursuant to Section 11.2 of the Agreement to discuss and consider dispute resolution procedures other than arbitration.

Doc. 270-33 at 2.

On March 27, 2015, Deborah Saly, plaintiffs' Associate General Counsel, responded to the March 11, 2015 letter from RNM's legal counsel. Ms. Saly demanded that the parties follow the "Dispute Resolution" procedures adopted in the 2002 Amended Service Agreement. And, Ms. Saly disagreed with RNM's counsel that Section 11.1 of the Agreement did not apply. Ms. Saly's letter also asserted, in relevant part:

> While your letter dismisses the first two steps outlined in Section 11.1 of the Agreement because you apparently believe the dispute cannot be resolved by the terms therein, it nevertheless is incumbent upon us to follow the letter of the Agreement. Therefore, this dispute must first be submitted to the Joint Planning Board for hearing and resolution.

Doc. 244-16 at 1. Ms. Saly's letter continued:

> In the event there is not resolution following the hearing of the Joint Planning Board, then, per the terms of Section 11.1, the parties must submit the dispute to either the Board of Directors of RNMIP's parent or to a committee designated by the Board of Directors which contains at least one physician member. If there continues to be no resolution, at that time we can meet pursuant to Section 11.2 to discuss and consider dispute resolution procedures other than arbitration. Only after those discussions fail will we move forward with arbitration as set forth in the Agreement.

*Id.* at 2.

On April 2, 2015, RNM's counsel responded to Ms. Saly's letter. RNM's counsel's letter explained that it had "made a good faith request pursuant to Section 11.2 of the Agreement to discuss and consider dispute resolution procedures other than arbitration." Doc. 244-17 at 2.

The letter noted that plaintiffs had rejected RNM's request. And, it stated, plaintiffs' demand that RNM follow the 2002 Amended Service Agreement's "Dispute Resolutions" procedure was a "meaningless and time consuming serial process." *Id.* The letter described plaintiffs' rejection of RNM's efforts to comply with Section 11.2 as "simply further evidence of your continued refusal to deal with RNM in a reasonable and good faith manner." *Id.*

### *RNM Obtains an Informal Opinion from the Kansas State Board of Healing Arts*

Several months after RNM terminated the 2002 Amended Service Agreement, RNM's counsel wrote a letter to the Kansas State Board of Healing Arts ("KSBHA") on March 11, 2015, seeking an informal opinion whether the 2002 Amended Service Agreement violates Kansas law prohibiting the corporate practice of medicine and/or fee splitting. According to Mr. Forthuber and Ms. Rarrick, RNM never told plaintiffs, until well after its correspondence with the KSBHA, that RNM (or its counsel) was engaging in this exchange with KSBHA's counsel.

On July 13, 2015, Kelli J. Stevens, KSBHA's General Counsel, responded to the inquiry from RNM's counsel. Her correspondence read: "While I cannot speak directly on behalf of the Board itself, the facts you related in your letter about the management service agreement and fee arrangements appear to violate Kansas law." Doc. 270-17 at 1. Ms. Stevens' "first concern is that the management service agreement provisions appear to violate the 'feesplitting' prohibition in [Kan. Stat. Ann. §] 65-2837(b)(19)." *Id.* She also had "additional concern" about some of the Agreement's provisions that "appear to violate the corporate practice of medicine prohibition in Kansas established in case law." *Id.* Ms. Stevens opined that RNM's "continued performance" under the 2002 Amended Service Agreement was "problematic from [her] perspective." *Id.* But, Ms. Stevens again noted, her "letter [was] not being sent at the direction of the Board itself"

and that she "could not make any guarantees with respect to how the Board might act" in response to the information RNM had provided.  *Id.*

Because RNM received the KSBHA letter after it had voted to terminate the 2002 Amended Service Agreement, RNM did not base its decision to terminate the contract on any alleged corporate practice of medicine or illegal fee splitting issues addressed in the KSBHA letter.

The KSBHA's Guidelines for the Imposition of Disciplinary Sanctions provide:

Billing and business transactions with patients includes misconduct such as charging excessive fees for services, fee-splitting, failing to disclose to the patient a financial interest, and entering into business transactions with patients separate from the practice of the healing arts.  Public policy dictates that a practitioner should not charge or collect an excessive fee.  Public policy also prohibits fee splitting because the licensee's decision to provide, or not to provide, services may be influenced by the fact that he must split his fees.  Such arrangements may also cause non-licensed professionals to recommend the services of a particular licensee out of self-interest, rather than the actual competence of the licensee.  It is believed that the public is best served by recommendations that are uninfluenced by financial considerations.

. . .

Kansas case law prohibits the corporate practice of medicine.  The core of that doctrine is that a general business entity may not engage in a learned profession, such as that of physicians, chiropractors, attorneys and dentists, either through employment of or by contract with one of those licensed professionals.

. . .

A business entity organized as an incorporation (Inc.) that engages in the corporate practice of medicine may be found in violation of [Kan. Stat. Ann. §] 65-2867, which prohibits a person other than one who is licensed under the healing arts act from opening and maintaining a location for the practice of the healing arts.  The practitioner that is employed or contracts with an incorporation (Inc.) may be disciplined for violation of [Kan. Stat. Ann. §] 65-2837(b)(19), "Directly or indirectly giving or receiving any fee, commission, rebate or other compensation for professional services not actually and personally rendered, other than through the legal functioning of lawful professional partnerships, corporations or associations."  As such, a licensee may not split his or her fees for

professional services rendered with a general incorporation (Inc.) or any other unlicensed person.

Doc. 270-35 at 2–3; *see also* Board of Healing Arts of the State of Kansas, Guidelines for the

Imposition of Disciplinary Actions, at 10–11 (Aug. 2008),

http://www.ksbha.org/documents/publications/guidelines_for_HB.pdf. ("KSBHA Guidelines").

The KSBHA Guidelines, however, "do not have the force and effect of law, and they do not

create binding precedent." KSBHA Guidelines at 3.

### *RNM Engages McKesson to Take Over Plaintiffs' Services*

After RNM terminated the 2002 Amended Service Agreement, Mr. Smith continued to

provide services to RNM under the formal consulting agreement that he signed on July 17, 2014.

Some of the services he provided included: negotiating an agreement with another vendor—

McKesson—to assume RNM's billing, collections, and other business operations; transitioning

those services to McKesson; communicating with Capital City Bank about RNM's bank

accounts; and instructing Capital City Bank to limit plaintiffs' access to RNM's bank accounts.

Specifically, on April 8, 2015, David Smith, acting on RNM's behalf, asked McKesson to

provide a proposal "to take over RCM [revenue cycle management] functions from [plaintiffs],

and then proceed with negotiating an agreement." Doc. 244-39 at 1. Mr. Smith's

correspondence noted that although a "negotiated settlement with [plaintiffs] is not completely

out of the question, the group is pushing forward with plans to act unilaterally . . . ." Doc. 244-

39 at 1.

RNM later entered into a Master Services Agreement with PST Services, Inc., a wholly

owned subsidiary of McKesson. Dr. Owen signed the Agreement, dated August 16, 2015, on

September 11, 2015. On August 26, 2015, Ms. Rarrick received an email that she believes was

sent to her inadvertently. It described how RNM was moving its services to McKesson and

away from plaintiffs—information that Ms. Rarrick had not known before.  Ms. Rarrick told

David Horn about the communication.  Plaintiffs filed this lawsuit shortly afterwards—on

September 9, 2015—and asked the court to grant them injunctive relief.

On September 25, 2015, Dr. Owen and David Smith hand-delivered a letter to Jayne

Rarrick.  The letter reported that RNM had engaged McKesson, would no longer accept any

management or other services from plaintiffs, and had instructed Capital City Bank to limit

plaintiffs' access to RNM accounts to inquiries only.  The same day, Mr. Smith asked McKesson

whether it could "cut off the flow of electronic files to Radnet without losing anything."  Doc.

260-37.

### *David Smith No Longer Provides Consulting Services for RNM*

Mr. Smith testified that he has no interest in serving as RNM's Practice Administrator on

a long-term basis.  On December 15, 2015, Mr. Smith sent an email to RNM proposing that the

parties revise his consulting agreement.  The email began:  "As you will recall, our original

agreement was designed to get you through the transition away from RadNet, and contemplated

that [Ms. Rarrick] would be able to take over sooner rather than later."  Doc. 260-22 at 1.  Mr.

Smith proposed that the parties change his consulting agreement to include a one year term, an

option for early termination if RNM hired Ms. Rarrick, and a reduced fee to reflect the reduced

work he was performing.  *Id.*  RNM and Mr. Smith executed an agreement containing these

terms.

Mr. Smith eventually informed RNM that he was no longer interested in continuing his

consulting work.  Afterwards, RNM began looking to hire a permanent practice administrator.

In January 2017, Mr. Smith stopped performing consulting services for RNM.  He then took a

position with another medical practice located in the Kansas City area.  In February 2017, RNM hired a permanent practice administrator.

### III.     Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  When it applies this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the claim' or defense."  *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citing *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."  *Id.* (citing *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but [instead] must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof."  *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986);

*Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 670 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

The court applies this same standard to cross motions for summary judgment. Each party bears the burden of establishing that no genuine issue of material fact exists and that it is entitled, as a matter of law, to the judgment sought by its motion. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). Cross motions for summary judgment "are to be treated separately; the denial of one does not require the grant of another." *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979). But where the cross motions overlap, the court may address the legal arguments together. *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citation omitted).

Summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).

## IV.   Analysis

The parties' summary judgment motions raise many separate issues. The court addresses those issues in the following subsections. The court begins its analysis by considering an issue raised by three of the four competing cross-motions: Are the parties' breach of contract claims premised on contracts that are illegal and, thus, unenforceable under Kansas law?

Both RNM and the Physician Defendants seek summary judgment against plaintiffs' claims, asserting that the parties' contracts are void under Kansas law. Docs. 235, 242. Plaintiffs move for summary judgment against RNM's claims and defenses that the contracts are illegal. Doc. 239. The court considers this question below.

### A. Are the Contracts Illegal and Void Under Kansas Law?

Kansas law governs the court's analysis here. In diversity cases, like this one, the court applies the substantive law of the forum state, including its choice of law rules. *Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1236 n.7 (10th Cir. 2014). In Kansas, when the parties to a contract have entered an agreement that incorporates a choice of law provision, Kansas courts generally apply the law chosen by the parties to control their agreement. *Brenner v. Oppenheimer & Co. Inc.*, 44 P.3d 364, 375 (Kan. 2002). Here, the parties agree on at least one thing. Kansas law governs the 1997 APPI-RNMPA Agreement, the 2002 Amended Service Agreement, and the Physician Employment Agreements because they include Kansas choice-of-law provisions. *See, e.g.*, Doc. 241-1 at 50 (stating in Section 17.1 of the 1997 APPI-RNMPA Agreement that Kansas law governs the Agreement and rights and obligations of the parties); Doc. 270-10 at 50 (stating in Section 12.10 of the 2002 Amended Service Agreement that Kansas law governs "[t]his Agreement and the rights and obligations of the parties hereto"); Doc. 243-9 at 12 (stating in Section 7.9 of the Physician Employment Agreement that "[t]his Agreement shall be interpreted in accordance with and governed by the laws of the State of Kansas"); Doc. 227 at 2 (Pretrial Order § 2 ("The parties agree that the Service Agreement and substantive issues in this case are governed by the law of the state of Kansas.")). The court thus applies Kansas law to determine whether the contracts are illegal and void as a matter of law.

The Kansas Healing Arts Act prohibits any person from engaging in the practice of medicine without a license. Kan. Stat. Ann. § 65-2803. Only individuals can obtain a license to practice medicine; Kansas prohibits corporations from providing medical services or acting through licensed practitioners to provide medical care. *See Early Detection Ctr. v. Wilson*, 811

P.2d 860, 863, 868 (Kan. 1991); *State ex rel. Fatzer v. Zale Jewelry Co.*, 298 P.2d 283, 290 (Kan. 1956).

The Kansas statutes confer jurisdiction on the Kansas State Board of Healing Arts to take disciplinary action against a licensed physician who violates the Kansas Healing Arts Act. Kan. Stat. Ann. § 65-2838(a). Among other things, the KSBHA may impose discipline on a licensed physician who commits acts of "unprofessional or dishonorable conduct." *Id.* § 65-2836(b). "Unprofessional conduct" includes "[a]llowing another person or organization to use the licensee's license to practice the healing arts" or "[d]irectly or indirectly giving or receiving any fee, commission, rebate or other compensation for professional services not actually and personally rendered, other than through the legal functioning of lawful professional partnerships, corporations, limited liability companies or associations." *Id.* § 65-2837(b)(15) & (19).

Although Kansas prohibits general corporations from practicing medicine, the Kansas statutes allow licensed physicians to "incorporate a professional corporation to practice [medicine] by filing articles of incorporation with the secretary of state." *Id.* § 17-2709(a). The KSBHA must issue a "certificate" finding that "each of the incorporators is duly licensed to practice that profession," and the incorporators must file that certificate with the Kansas Secretary of State "prior to issuance of the certificate of incorporation." *Id.* At formation, the Kansas professional corporation may issue shares of its stock only to a "qualified person," which means "[a]ny natural person licensed, registered or certified to practice the same type of profession which any professional corporation is authorized to practice." *Id.* § 17-2707(d)(1) & 17-2712(a). "The issuance or transfer of any shares" of stock that violate the Kansas statutes is "null and void." *Id.*

RNM asserts that the contracts at issue here violate Kansas law because their "practical effect" resulted in plaintiffs' "de facto employment of, and splitting of professional fees with, RNM's physicians . . . ." Doc. 236 at 18. RNM thus contends that the 2002 Amended Service Agreement is unenforceable, and, consequently, plaintiffs cannot hold RNM liable for breaching it. RNM asserts three arguments to support this theory. The court addresses them, in turn, below.

But first, the court considers whether it is appropriate for the court to decide this issue. Plaintiffs assert that it should not. Plaintiffs argue that the parties' 2002 Amended Service Agreement required RNM to follow its provisions for amending any illegalities within the Agreement. Indeed, Section 12.6 specifically provides: "Neither party shall claim or assert illegality as a defense to the enforcement of this Agreement or any provision hereof; instead, any such purported illegality shall be resolved pursuant to the terms of this Section 12.6 and Section 12.9." Doc. 270-10 at 50. Section 12.9 provided for severance of any illegal or unenforceable provision from the Agreement. *Id.* And, Section 12.6 required the parties to amend the Agreement "as necessary to preserve the underlying economic and financial arrangements between [RNM] and [RNMIP] and without substantial economic detriment to either party." *Id.* That section also provided that if amendment is not possible, the parties must follow the termination procedures in Section 10.3(c) and 10.4(b). *Id.*

The parties disagree whether RNM has complied with the termination provisions in the 2002 Amended Service Agreement. But, RNM asserts, the illegal provisions of the 2002 Amended Service Agreement are "so pervasive and material" that amendment or severance was not possible. Doc. 227 at 20 (Pretrial Order § 3.b.). RNM thus argues that the entire Agreement is void under Kansas law. RNM also contends it had no duty to follow the requirements of a

void contract. In other words, RNM contends, its contractual duties under the Agreement cannot override its professional duties under Kansas law to adhere to the requirements of the Kansas Healing Arts Act.

It is tempting to reject RNM's position out of hand. After all, RNM and its members negotiated for the very arrangement they now attack as an illegal one, accepted a significant up-front cash payment for agreeing to it, and operated under the arrangement for 17 years. In a way, RNM's current position reminds one of Captain Louis Renault's feigned sense of surprise in the movie classic *Casablanca*.[4]

But Kansas law will not permit the court to approach the problem from that perspective. Indeed, in Kansas, "[w]here the parties enter into an agreement that cannot be enforced, the courts will not aid either party to the prohibited contract and will ordinarily leave the parties where it finds them." *Early Detection Ctr.*, 811 P.2d at 868; *see also Murray v. Brown*, 276 P.2d 344, 345 Syl. ¶ 2 (Kan. 1954) ("No action may be maintained, either a law or equity, to enforce a contract or agreement made in contravention of law."). If RNM is correct that the contracts at issue are illegal and void, Kansas law prohibits plaintiffs from bringing an action to enforce them—including the 2002 Amended Service Agreement's termination provisions. The court thus considers whether the contracts at issue here are void under Kansas law. It begins with RNM's three arguments that the contracts are illegal and void.

---

[4]     In the movie, Vichy Captain Louis Renault enters the café operated by Humphrey Bogart's character in 1941 Casablanca. Capt. Renault orders the café's immediate closure. When asked to explain why, he replies that he is simply "shocked" to have discovered that the café includes a casino and gambling is afoot there. His explanation and feigned expression of surprise is interrupted, however, by a croupier who hands the Captain his recent gambling winnings from that very casino.

### 1. Did the 1997 APPI-RNMPA Agreement's Conversion of RNMPA Stock Violate Kan. Stat. Ann. § 17-2712(a)?

RNM asserts that the 1997 APPI-RNMPA Agreement violated Kansas law in the way it converted RNMPA's shares.[5] RNMPA was a Kansas professional corporation. As explained above, Kan. Stat. Ann. § 17-2712(a) prohibits a professional corporation from issuing shares of stock to anyone other than a "qualified person." And, a "qualified person" is "[a]ny natural person licensed, registered or certified to practice the same type of profession which any professional corporation is authorized to practice." Kan. Stat. Ann. § 17-2707(d)(1). RNM argues that the 1997 APPI-RNMPA Agreement transferred shares of RNMPA stock to APPI in violation of § 17-2712(a) because APPI is not a "qualified person" under Kansas law. Thus, RNM asserts, the stock transfer was "null and void," rendering the 1997 APPI-RNMPA Agreement void and unenforceable. *Id.* § 17-2712(a). RNM also contends that, because Kansas law voids the 1997 APPI-RNMPA Agreement, the 2002 Amended Service Agreement and the Physician Employment Agreements also are void because the 1997 APPI-RNMPA Agreement is a condition precedent to the other two agreements.

Plaintiffs respond to this argument, contending that RNM lacks standing to assert it. Indeed, RNM was not a party to the 1997 APPI-RNMPA Agreement. RNMPA no longer exists and is not a party to this case. Also, none of the former individual physician-members of RNMPA who are parties to this lawsuit has asserted a claim on the physician's own behalf that the 1997 APPI-RNMPA Agreement is illegal. RNM never responded to plaintiffs' standing

---

[5] Plaintiffs assert that RNM has waived this argument because it never asserted that the Agreement was illegal until more than 18 years after the parties executed it. Although RNM's delay here is a significant one, the court will not preclude RNM's argument based on waiver. As explained above, the court cannot "aid either party to an illegal agreement." *Early Detection Ctr.*, 811 P.2d at 867. Also, the Kansas Supreme Court has recognized that "[w]hile it may not always seem an honorable thing to do, a party to an illegal agreement is permitted to set up the illegality as a defense even though the party may be alleging his or her own turpitude." *Id.* So, even if RNM has delayed unfairly, the court will consider its argument of illegality because that is what Kansas law mandates.

argument. The court could treat this omission as a waiver of this issue. *See Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015) (holding that an appellant, who does not respond to an argument in its reply brief, "'waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the appellee'" because the court is not "required to do his work for him and dissect [the appellee's] plausible argument" (quoting *Hardy v. City Optical, Inc.*, 39 F.3d 765, 771 (7th Cir. 1994)).

But, the court also can conclude that RNM has alleged standing sufficiently. "Standing to sue means that a party has a sufficient stake in an otherwise justiciable controversy as to obtain judicial resolution of that controversy." *Varney Business Servs., Inc. v. Pottroff*, 59 P.3d 1003, 1012 (Kan. 2002) (citation omitted); *see also In Re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 362 n.55 (Del. Ch. 2008) (analyzing whether a party had standing to challenge a merger using the Supreme Court's guidance from *Lujan v. Defenders of Wildlife* that the three elements of standing are (1) injury-in-fact, (2) causation, and (3) redressability (citing 504 U.S. 555, 560 (1992)).[6]

Here, RNM has alleged a sufficient injury. It contends that its performance under the 2002 Amended Service Agreement—an agreement that is contingent on the 1997 APPI-RNMPA Agreement—violated Kansas law prohibiting the corporate practice of medicine and fee splitting. This, RNM asserts, imperils it and its physician-members to disciplinary action by the KSBHA. RNM also contends that the 1997 APPI-RNMPA Agreement has caused its injury because it was a condition precedent to the 2002 Amended Service Agreement. Finally, RNM's injury is redressable through a court order rendering the contracts void as a matter of law and

---

[6] Kansas courts have a "long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code." *Kansas Heart Hospital v. Idbeis*, 184 P.3d 866, 878–79 (Kan. 2008).

discharging RNM's obligation to perform them.  The court thus concludes that RNM has alleged

standing sufficient to challenge the validity of the 1997 APPI-RNMPA Agreement.

Nevertheless, the court rejects RNM's argument that the 1997 APPI-RNMPA

Agreement's stock conversion violated Kansas law.  In Kansas, a contract is never presumed

illegal.  *Frazier v. Goudschaal*, 295 P.3d 542, 555 (Kan. 2013).  And, the party asserting

illegality shoulders the burden to show it.  *Id.*  Here, RNM asserts that the 1997 APPI-RNMPA

Agreement transferred shares of a professional corporation's stock in violation of Kan. Stat. Ann.

§ 17-2712(a).  But, the plain language of the agreement fails to support this assertion.[7]

The 1997 APPI-RNMPA Agreement explicitly provided:  "As a result of the Merger and

without any action on the part of the holder thereof, all shares of [RNMPA] Common Stock

issued and outstanding at the Effective Time (excluding shares held by [APPI] pursuant to

Section 2.8(d) hereof) *shall cease to be outstanding and shall be cancelled and retired and shall

cease to exist . . . .*"  Doc. 241-1 at 13 (emphasis added).  Based on this language, the parties

specifically structured the Agreement to cancel all shares of RNMPA stock at the time of the

merger.  So, no shares of RNMPA stock existed for RNMPA to transfer to APPI.  As a

consequence, the Agreement never transferred any shares of RNMPA to APPI in a way that

violated Kan. Stat. Ann. § 17-2712(a).

RNM also argues that language in the Agreement's Recitals shows that RNMPA

improperly transferred its shares of its stock to APPI.  The referenced language provided that

RNMPA would "merge with and into [APPI] upon the terms and conditions set forth herein and

in accordance with the laws of the State of Kansas" and "the outstanding shares of [RNMPA]

Common Stock shall be converted at such time into cash and shares of common stock, par value

---

[7]       "The interpretation and legal effect of a contract is a question of law for the court to decide, not a
jury."  *Wolfe Elec., Inc. v. Duckworth*, 266 P.3d 516, 534 (Kan. 2011) (citation omitted).

$.0001 per share, of [APPI] (the "APP Common Stock") as set forth herein." Doc. 241-1 at 7 (Recitals ¶ D). RNM argues that this provision establishes that the RNMPA physician shareholders exchanged their shares of stock in RNMPA for shares of APPI stock and a cash dividend under the 1997 APPI-RNMPA Agreement. The court disagrees.

It is undisputed, and indisputable, that Kansas law prohibits "issuance or transfer" of a professional corporation's stock to anyone but a "qualified person." Kan. Stat. Ann. § 17-2712(a). And, "[t]he issuance or transfer of any shares" that violate this provision is "null and void." *Id.*; *see also Cent. State Bank v. Albright*, 737 P.2d 65, 69 (Kan. Ct. App. 1987) (holding that "the grant of the security interest in the stock certificate issued by the professional corporation was an attempt to voluntarily transfer the shares to an unqualified person and, according to [§] 17-2712, 'shall be null and void'" (quoting § 17-2712(a))).

But, the Recitals here did not require RNMPA to "issue or transfer" shares to APPI. Instead, the Agreement provided that RNMPA shares "shall be converted" to cash and shares of common stock "as set forth herein." Doc. 241-1 at 7 (Recitals ¶ D). The phrase "as set forth herein" refers to Section 2.8(a) of the Agreement—which, as discussed above, provided the manner for converting the shares of RNMPA Common Stock. And, this section specifically provides, all shares of RNMPA Common Stock "*shall cease to be outstanding and shall be cancelled and retired and shall cease to exist . . . .*" Doc. 241-1 at 13 (emphasis added).

RNM also highlights some language in Section 2.8 that excluded "shares held by [APPI] pursuant to Section 2.8(d) hereof." *Id.* The court sees no significance in this language. Section 2.8(d) provided that each share of APPI Common Stock issued and outstanding at the time of the merger will remain "unchanged and . . . outstanding as a validly issued, fully paid and

nonassessable share of AP Common Stock." *Id.* Section 2.8(d) never refers to RNMPA stock.

It also never provided for transfer or issuance of RNMPA stock that would violate Kansas law.

Finally, RNM invokes Section 2.9(b). It required each RNMPA shareholder to "deliver

to [APPI] at the Closing the certificates representing [RNMPA] Common Stock owned by him,

her or it" and after such delivery, "each Stockholder shall receive in exchange therefor the

Merger Consideration . . . ." *Id.* at 13–14. The procedure described in this section did not

involve a transfer of RNMPA stock to APPI. Instead, and as already described, the Agreement

specifically provided for cancellation of RNMPA stock. It also provides that RNMPA stock will

cease to exist at the time of the merger. *Id.* at 13. As plaintiffs explain, Section 2.9(b) merely

required an RNMPA shareholder to deliver the stock certificates to show proof of his former

ownership to facilitate payment of the Merger Consideration. This provision did not transfer

RNMPA stock to APPI in violation of Kansas law.

The parties also dispute whether the merger of RNMPA—as a professional corporation—

with APPI—a general corporation—violated Kansas law. The Kansas professional corporation

code does not include specific requirements for merger. The Kansas professional corporation

laws "take precedence over any provision of the law regulating general corporations." *Early*

*Detection Ctr.*, 811 P.2d at 865 (citing Kan. Stat. Ann. § 17-2708). But, "the [Kansas] statutory

laws relating to general corporations" also apply to "professional corporations." *Id.*

The Kansas professional corporation laws provide a mechanism for a professional

corporation to elect "to amend its articles of incorporation so as to prohibit its continued

operation under this chapter and to substitute therefor authority for the said corporation to

function as a corporation under the general corporation law." Kan. Stat. Ann. § 17-2717. But,

the Kansas professional corporation laws contain no express provisions governing merger.

Because "the statutory laws relating to general corporations are applicable to professional corporations" in Kansas, *Early Detection Ctr.*, 811 P.2d at 865, the court considers whether the APPI-RNMPA merger complied with those laws.

Under the Kansas general corporation code, any Kansas corporation may merge into any other corporation of another jurisdiction. Kan. Stat. Ann. § 17-6702 ("Any one or more corporations of this state may merge or consolidate with one or more other corporations of any other state or states of the United States, or of the District of Columbia if the laws of such other jurisdiction permit a corporation of such jurisdiction to merge or consolidate with a corporation of another jurisdiction."). The 1997 APPI-RNMPA Agreement involved a merger of a Kansas corporation and a Delaware corporation. Like the Kansas statute, Delaware law authorizes a Delaware corporation to merge with a Kansas corporation. *See* Del. Code Ann. tit. 8, § 252(a) ("Any 1 or more corporations of this State may merge or consolidate with 1 or more foreign corporations, unless the laws of the jurisdiction or jurisdictions under which such foreign corporation or corporations are organized prohibit such merger or consolidation."). The 1997 APPI-RNMPA Agreement thus complied with these Kansas and Delaware statutes.

The parties expressly referenced these laws in the Agreement. Doc. 241-1 at 12 (first citing Del. Code Ann. tit. 8, § 252(a); then citing Kan. Stat. Ann. § 17-6702). The Agreement required the parties to file Certificates of Merger with the Kansas Secretary of State and the Delaware Secretary of State. And, they did. The court finds that the 1997 APPI-RNMPA Agreement comported with the Kansas and Delaware laws governing merger. And, the court concludes that RNM has not established that the 1997 APPI-RNMPA is illegal or void under Kansas law.

### 2. Did the 2002 Amended Service Agreement Violate Kansas Law Prohibiting General Corporations From Employing Licensed Physicians and Engaging in the Practice of Medicine?

Next, RNM argues that the 2002 Amended Service Agreement violated Kansas law because, it contends, the Agreement created an employment relationship between plaintiffs and RNM's physician-members, allowing plaintiffs to engage in the unauthorized practice of medicine. As already noted, Kansas prohibits corporations—like plaintiffs—from providing medical services or acting through licensed practitioners to provide medical care. *See Early Detection Ctr. v. Wilson*, 811 P.2d 860, 863, 868 (Kan. 1991); *State ex rel. Fatzer v. Zale Jewelry Co.*, 298 P.2d 283, 290 (Kan. 1956).

In *Zale Jewelry*, the Kansas Supreme Court held that a jewelry corporation was employing an optometrist and thus practicing optometry in violation of Kansas law. 298 P.2d at 290. The Kansas Supreme Court examined two leases between the corporation and the optometrist that included provisions allowing the corporation to exercise control over the optometrist's businesses and financial affairs. *Id.* at 288. The corporation argued that the leases established that the parties' relationship simply was one of a lessor and lessee. *Id.* The Kansas Supreme Court ruled to the contrary. *Id.* at 289. It concluded that the leases were a "subterfuge" for illegal optometry practices because the other facts and circumstances of the parties' relationship—such as the way the optometrist operated his business including how he filled his prescriptions and how he advertised—established that the corporation was employing the optometrist and thus engaging in the unauthorized practice of optometry. *Id.*

RNM argues that the 2002 Amended Service Agreement, like the lease agreements in *Zale Jewelry*, merely is a subterfuge for an illegal contractual arrangement involving plaintiffs'

employment of the RNM physician-members and plaintiffs' engagement in the corporate

practice of medicine. For support, RNM relies on non-binding authority from other jurisdictions.

RNM first cites a case from the Western District of Washington, where the court held that

a practice management services corporation was practicing dentistry in violation of

Washington's law against the corporate practice of dentistry through the corporation's various

contracts with orthodontic practice groups and their orthodontists. *See Engst v. OrthAlliance,*

*Inc.*, No. C01-1469C, 2004 WL 7092226, at *8–9 (W.D. Wash. 2004). A Washington statute

prohibited corporations from "'practic[ing] dentistry'" but allowed them to "'furnish[ ]

information or clerical services . . . to any person lawfully engaged in the practice of dentistry.'"

*Id.* at *4 (quoting Wash. Rev. Code § 18.32.675 (2003)). The court rejected the corporation's

argument that it only was providing clerical services because the contracts provided a list of

services that "far exceeded the normal duties of an office manager" and required the corporation

to play a consulting and advisory role to the orthodontic entities "far beyond the proper role of an

office manager." *Id.*

*Engst* also recognized that the corporation had entered into "two direct contractual

relationships with [the individual orthodontists], the purchase and sale agreements and the

personal guaranties in which each [o]rthodontist agreed to be personally liable for the amounts

due to [the corporation] from the [orthodontic practice groups] under the consulting and business

services agreements." *Id.* at *9. The corporation also sought "to enforce, as a third-party

beneficiary, the covenants not to compete entered into between [the individual orthodontists] and

the [orthodontic practice groups] as part of the employment agreements." *Id.* The court found

that these provisions put the corporation "in the position of a virtual employer of [the individual

orthodontists]" and enabled the corporation "to retain a beneficial interest in the profits from the practice of dentistry." *Id.* But *Engst* differs from the facts here in several ways.

First, the summary judgment record contains no evidence that plaintiffs served in a consulting or advisory role to RNM or its member-physicians. To the contrary, the summary judgment facts show that the 2002 Amended Service Agreement required plaintiffs to provide various administrative services to RNM. But, the Agreement specifically disclaimed that plaintiffs were providing services that could be construed as the practice of medicine. Also, unlike *Engst*, the RNM physician-members never entered into any direct contractual relationships with plaintiffs. And, the summary judgment record contains no evidence that any of the RNM physician-members personally guaranteed their own liability to plaintiffs for amounts due from RNM. Similar to *Engst*, plaintiffs seek to enforce their rights as a third-party beneficiary to the RNM physician-member employment agreements. But, this lone fact does not put plaintiffs in the position of a "virtual employer" of the RNM physician-members such that the contracts violate Kansas law.

RNM cites more cases from other jurisdictions concluding that management service agreements violate state statutory prohibitions against the corporate practice of medicine. But the agreements at issue in those cases differ from the Agreement at issue here. And, as one court has observed, such "decisions are all highly dependent on the specific state laws in question" and "do not fall into one clear pattern." *Clower v. Orthalliance, Inc.*, 337 F. Supp. 2d 1322, 1329 (N.D. Ga. 2004).

For instance, in *Clower*, the court analyzed whether three contractual agreements violated Georgia statutes prohibiting the practice of dentistry without a license and forbidding a corporation from practicing dentistry under another's license. *Id.* The court examined the

contracts' plain language and concluded that they "clearly set forth an intent that Plaintiffs have full control over all aspects of orthodontic and other patient care." *Id.* at 1330. The court recited several provisions from the service agreement demonstrating this intent. *Id.* And, the court concluded, "the terms of the contract governing the relationship between the parties make it very clear that [the corporation] did not intend, and in fact did not, employ Plaintiffs to carry out its own corporate practice of orthodontics." The court thus refused to void the contracts for illegality. *Id.*

Similarly, in *Orthodontic Affiliates, P.C. v. OrthAlliance, Inc.*, 210 F. Supp. 2d 1054, 1058 (N.D. Ind. 2002), the court considered whether a management services contract violated Indiana law because it involved a corporation's practice of dentistry through the "exercise [of] control over '[f]inal decisions relating to the employment of dental office personnel.'" *Id.* at 1058 (quoting Ind. Code Ann. § 25-14-1-23). After analyzing the plain language of various provisions in the parties' contract, the court held that the parties' agreement did not require the corporation to practice dentistry. *Id.* at 1060. The court also cited other provisions of the contract that specifically "did not call for the unauthorized practice of dentistry." *Id.* The court thus held that the management services corporation was not engaged in the unlawful practice of dentistry under Indiana law. *Id*.

Likewise, in *OCA v. Christie*, 415 F. Supp. 2d 115, 129 (D. Conn. 2006), the court held that a management service agreement did not violate the Connecticut statute prohibiting unlicensed persons from owning or operating a dental practice. *Id.* at 129. The court recognized that while the management services corporations had "inserted themselves fairly substantially into [the orthodontist's] practice, they have done so only as much as necessary to assist him in the day-to-[day ]operations of his business." *Id.* "Importantly, [the physician] retained exclusive

custody and control over the dental office, as well as the furniture, fixtures and equipment used therein." *Id.* Also, while the corporations' "activities furthered the innocuous purpose of assisting [the orthodontist] with the day-to-day operations of his practice," the parties' agreement left "the professional practice of dentistry firmly in his hands." *Id.* at 129–30. The court found it "difficult to imagine that the legislature, when enacting the Connecticut dental statutes, intended to prohibit the sorts of practices at issue" in the case. *Id.*

Although the parties do not cite and the court has not found any Kansas cases analyzing whether a professional services contract violates Kansas' prohibition against the corporate practice of medicine, the court finds the Indiana, Georgia, and Connecticut cases instructive. Like those cases, the plain language of the 2002 Amended Service Agreement makes clear that the parties never intended for plaintiffs to engage in the corporate practice of medicine or employ the RNM physician-members in violation of Kansas law.

As it must, RNM concedes that several provisions in the 2002 Amended Service Agreement explicitly disclaim any employment relationship between plaintiffs and the RNM physician-members. For example, in Section 2.1, the parties agreed that RNM and RNMIP "intend[ed] to act and perform as independent contractors, and the provisions hereof are not intended to create any partnership, joint venture, agency or employment relationship between the parties." Doc. 270-10 at 11. This section also reserved to RNM "exclusive authority to direct the medical, professional, and ethical aspects of its medical practice." *Id.* And, this section manifests the parties' agreement that plaintiffs "shall neither exercise control or direction over the medical methods, procedures or decisions nor interfere with the physician-patient relationships" of RNM. *Id.* RNM also concedes—again, because it must—that Section 2.2 of the parties' Agreement recites their explicit bargain that plaintiffs could not engage in any

activity that "may be construed or deemed to constitute the practice of medicine and that nothing herein shall be construed as the practice of medicine by [plaintiffs]." *Id.* at 12.

The 2002 Amended Service Agreement contains even more provisions demonstrating the parties' intent to comply with Kansas law. In Section 3.2(a), the parties agreed that plaintiffs had "no authority, directly or indirectly, to perform, and shall not perform, any professional medical function." *Id.* at 13. The parties further agreed that RNM "shall be solely and exclusively in control of all aspects of the practice of medicine" and that "all professional medical services, including, but not limited to, diagnosis, treatment, therapy, the prescription of medicine and drugs, and the supervision and preparation of medical reports shall be the sole responsibility" of RNM. *Id.* at 23. And, the 2002 Amended Service Agreement released plaintiffs from performing any act or service constituting the corporate practice of medicine. *Id.* at 12.

RNM tries to distinguish the Indiana and Georgia cases from the facts here because, in those cases, the courts held that the contracts at issue did not authorize the corporation to exercise final control over the licensed professional's hiring decisions. But, RNM contends, the 2002 Amended Service Agreement vests such authority in plaintiffs through the provisions governing the Joint Planning Board. The court disagrees.

Section 5.1 of the 2002 Amended Service Agreement required the parties to "establish" a Joint Planning Board that was "responsible for developing long-term strategic planning objectives and management policies for the overall operation of the Technical Operations" and would "facilitate communication and interaction between [RNMIP] and [RNM]." *Id.* at 26. One of the duties of the Joint Planning Board required it to "advise [RNM]" on various matters including capital improvements and expansion, annual budgets, advertising, patient fees, ancillary services and fees, provider and payor relationships, strategic planning, capital

expenditures, provider hiring, and nonphysician personnel.  *Id.* at 27–28.  On hiring matters, the Agreement requires the Joint Planning Board to "consult with [RNM] to recommend the number and type of" physician and non-physician employees required for efficient operation of RNM. *Id.* at 27–28.  The plain language of the Agreement never conferred final authority on plaintiffs to make hiring decisions.  Instead, the Agreement merely called for the Joint Planning Board (comprised of two RNMIP representatives and up to four RNM representatives) to consult with RNM and make recommendations about the number and type of employees needed to run the operations efficiently.  *Id.* at 26.   And, section 4.1 gave RNM—not plaintiffs—"complete control of and responsibility for the hiring, compensation, supervision, training, evaluation and termination of its Physician Employees" except as set forth in Article V.  *Id.* at 22.

The court also recognizes that section 5.3 of the 2002 Amended Service Agreement provided that RNM could take no action or implement any decision that would "(ii) have a material adverse effect on the amount of [RNMIP's] management fee under Article VII; or (iii) otherwise have a material adverse effect on [RNMIP]'s financial interests under this Agreement" without the approval of both members of the Joint Planning Board appointed by RNMIP.  *Id.* at 28.  In the event of a tie vote of the Joint Planning Board, the Agreement provided that either Radiologix's Board of Directors or a committee designated by Radiologix's Board of Directors and containing at least one RNM representative would make the final determination.  *Id.* Although these provisions vested plaintiffs with some decision-making authority for actions that could affect RNMIP's fees or financial interests, they never gave plaintiffs control over RNM's hiring and firing power.  And, as noted, section 4.1 specifically vested "complete control" of those decision in RNM.  *Id.* at 22.  The court declines RNM's invitation to revise the language of the contract so that its Section 5.3 will confer on plaintiffs sufficient control over RNM's hiring

practices and thus make the 2002 Amended Service Agreement violate Kansas' prohibition against the corporate practice of medicine.[8]

The Physician Employment Agreements also made clear that no employee-employer relationship ever existed between plaintiffs and the RNM physician-members. The parties to each Physician Employment Agreement were RNM and the individual physician-member. Doc. 243-9 at 1. Neither plaintiff was a party to the Agreements. *Id.* The Physician Employment Agreements recite that the physician is employed by and works exclusively for RNM. *Id.* at 2. Also, several times the Agreement reconfirms that the physician works on RNM's behalf at all times. *Id.* at 1–2. And, the Agreements gave RNM authority to set the physician's work hours, compensation, vacation time, liability insurance, and control of medical records. *Id.* at 2–3, 7–8.

RNM asserts that Radiologix—as a third party beneficiary—had the capacity to enforce the Physician Employment Agreements' covenants not to compete. This authority, RNM claims, establishes a de facto employment relationship between plaintiffs and the physician-members in violation of Kansas law. Although the physician employment agreements in *Engst* similarly contained restrictive covenants, the court found a "virtual employ[ment]" relationship based on other facts not present here, including the orthodontists' personal guaranties. *Engst*, 2004 WL 7092226, at *9. Also, even if the covenants not to compete—standing alone—create an unlawful employment relationship between plaintiffs and the physicians, the Physician Employment Agreements contain a severability clause. Doc. 243-9 at 12. The severability clause renders invalid any provision of the Agreement that violates any statute, law, ordinance, or regulation.

---

[8]    As discussed in greater detail below (*see* Part IV.A.3. at p. 69), the contract provides a mechanism for amending or severing provisions that are found to violate any statute, law, or ordinance. *See* Doc. 270-10 at 50. These provisions require the parties to amend or remove any invalid provisions in a way that preserves the rest of their agreement. *Id.* So, even if convinced that the decision-making provisions in Section 5.3 are invalid under Kansas law, the contract requires the parties to sever or amend those provisions. Such a finding of illegality does not make the entire agreement void.

*Id.* This provision also requires that, if any provision is found to violate the law, "[t]he other provisions of this Agreement shall remain in full force and effect, and the invalidity or unenforceability of any provision hereof shall not affect the validity and enforceability of the other provisions of this Agreement." *Id.* So, even if the covenants not to compete put plaintiffs in the position of a "virtual employer" of RNM's physician-members such that the contracts violate Kansas law, that provision is severable from the Physician Employment Agreements. *See Cohen v. Orthalliance New Image, Inc.*, 252 F. Supp. 2d 761, 773–74 (N.D. Ind. 2003) (holding that severability was the preferred form of remedy under Indiana contract law when less than all of a contract's obligations implicate illegality). This severability provision does not render the entire relationship between the parties void under Kansas law.

The summary judgment facts also demonstrate that RNM operated their professional services independently and not under plaintiffs' control. For example, after the imaging centers closed in the spring of 2010, Dr. Allen (RNM's Chairperson) sent a letter to the Topeka physician community confirming RNM's independence from plaintiffs. It read, in pertinent part: "Radiology and Nuclear Medicine has always been, and continues to be, an independent professional corporation, wholly owned and directed by its radiologist members." Doc. 241-15 at 1. Also, several of the RNM physician-members testified that they understood that RNM was their employer.

Finally, RNM argues that a finding that the 2002 Amended Service Agreement is void under Kansas law is consistent with the informal opinion provided by the KSBHA's General Counsel. The court notes that the summary judgment record contains no information about what Ms. Stevens reviewed or relied on when she formed the conclusions recited by her July 13, 2015 letter. Her letter also disclaimed that she could "speak directly on behalf of the Board [of

Healing Arts] itself," that the letter was not "being sent at the direction of the Board itself," and

that she "could not make any guarantees that with respect to how the Board might act" in

response to the information RNM had provided. Doc. 270-17 at 1. Ms. Stevens' one-page letter

merely recites broad conclusions and provides no specific reasons for her opinions. The court

refuses to find that the contracts at issue here are void based on this informal opinion that the

KSBHA—itself—had not directed.

For all these reasons, the court concludes that the 2002 Amended Service Agreement

does not violate Kansas' prohibition against the corporate practice of medicine. The court thus

rejects RNM's argument that this contract is void as a matter of law.

### 3. Did the 2002 Amended Service Agreement's Service Fee Provision Violate Kansas Law Prohibiting Fee-Splitting?

Finally, RNM asserts that the 2002 Amended Service Agreement is void under Kansas

law because the Service Fee it requires RNM to pay RNMIP amounts to illegal fee-splitting.

Under the 2002 Amended Service Agreement and Amendment No. 1, RNM must pay a 15%

Service Fee to RNMIP for the administrative services it agreed to provide under the Agreement.

RNM argues that this Service Fee violates Kansas' prohibition against "[d]irectly or indirectly

giving or receiving any fee, commission, rebate or other compensation for professional services

not actually and personally rendered, other than through the legal functioning of lawful

professional partnerships, corporations, limited liability companies or associations." Kan. Stat.

Ann. § 65-2837(b)(19). Yet again, RNM's argument belies the plain language of the 2002

Amended Service Agreement.

The 2002 Amended Service Agreement specifically provided that the "Service Fee is not

intended to and shall not be interpreted or implied as permitting [RNMIP] to share in [RNM's]

fees for medical services but is acknowledged as the negotiated fair market value compensation

to [RNMIP] considering the scope of services and the business risks assumed by [RNMIP]."

Doc. 270-10.  The Agreement also provided that the "Service Fee" was "negotiated at arms'

length" and "fair, reasonable and consistent with fair market value" in view of the "services

provided and the substantial commitment and effort" by RNMIP to enter the Agreement.  *Id.* at

37; *see also id.* at 6 (stating that the parties had "determined a fair market value for the services

to be rendered by [RNMIP], and based on this fair market value, have developed a procedure for

compensation of [RNMIP].").

     The Kansas Court of Appeals recently held that a percentage-based revenue payment did

not constitute an illegal fee-splitting arrangement under Kansas law.  *Davis v. Judd*, No. 113,933,

2016 WL 7178258, at *10 (Kan. Ct. App. Dec. 9, 2016).  *Davis* involved the sale of an

optometry practice by the widow of a deceased optometrist.  The purchase agreement required

the optometrist buyer to pay the widow a percentage of the practice's yearly gross revenues

through 2015, provided that the revenues exceeded a certain amount.  The optometrist buyer later

refused to make the percentage-based payments, asserting that the agreement constituted illegal

fee-splitting under Kansas law.  The Kansas Court of Appeals rejected the buying optometrist's

argument.  *Id.* at *10.

     *Davis* explained that "the 'purpose of legislation prohibiting the splitting or dividing of a

fee . . . is to protect members of the consuming public; it is not to promote the economic welfare

of optometrists.'"  *Id.* at *10 (quoting *Wy. State Bd. of Exam'rs of Optometry v. Pearle Vision

Ctr., Inc.*, 767 P.2d 969, 973 (Wyo. 1989)).  Applying this rule, the court found no adverse effect

on the public because the "additional consideration payments were not a form of remuneration

for patient referrals."  *Id.*  Instead, the percentage-based revenue payment "simply represents the

parties' agreed upon method for payment of the purchase price involved in the sale of the

practice." *Id.* The court thus found it "implausible that such an arrangement would have any effect on [the optometrist buyer's] ability to provide his patients with the highest degree of optometric care" because "this financial arrangement did not impact the number of patients [the optometrist buyer] examined or treated, or the types of optometric services provided." *Id.*

Likewise, here, the summary judgment record is barren of even one fact showing that the 15% Service Fee affected the public adversely. Indeed, RNM does not object to paying plaintiffs based on patient revenue. It just objects to paying too much of the revenue to plaintiffs. RNM's argument is unavailing. This case involves sophisticated parties who bargained extensively. Their contract specifically acknowledges that it was "negotiated at arms' length" and "fair, reasonable and consistent with fair market value" in view of the "services provided and the substantial commitment and effort" by RNMIP to enter the Agreement. Doc. 270-10 at 37. Thus, the Service Fee simply represents the "parties' agreed upon method for payment" of the administrative services that RNMIP was obligated to provide under the contract. *Davis*, 2016 WL 7178258, at *10.

RNM argues that *Davis* differs from the facts here. *Davis* recognized that while Kan. Stat. Ann. § 65-1502(b) prohibits "unlicensed persons from indirectly maintaining an office for the practice of optometry by exerting behind the scenes control or influence over an optometrist's professional judgment," the parties' agreement did not offend this statute because the widow "exerted no control over or influence upon [the optometrist buyer] or his optometry practice." *Id.* at *9. RNM contends that, in contrast, the facts here establish that the 2002 Amended Service Agreement explicitly authorized plaintiffs to exercise unlawful control over RNM. The court rejects this argument for two reasons. First, § 65-1502(b) applies to the practice of optometry in Kansas. RNM cites no similar statute that applies here. And, as

plaintiffs correctly assert, the Kansas Healing Arts Act contains no similar provision. Second, the court already has rejected RNM's argument that the 2002 Amended Service Agreement granted plaintiffs control over RNM's operations or otherwise constituted the illegal corporate practice of medicine in Kansas.

And, even if the 15% Service Fee constituted illegal fee-splitting, this finding would not void the 2002 Amended Service Agreement. Instead, the Agreement contains provisions that require the parties to modify or sever any provisions of the contract that are deemed illegal, invalid, or unenforceable. Doc. 270-10 at 50. RNM responds to this limitation with its own factual assertions about its attempts to discuss amending the agreement with plaintiffs. RNM contends that its proposals to plaintiffs returned nothing but silence. The record on these facts is, at best, a murky one. And, these arguments only create a factual issue about whether the parties have complied with their obligations under the contract or breached their Agreement. Either party's failure to comply with the amendment and severance provisions does not render the entire agreement void under Kansas law.

### 4. Conclusion

For all the above reasons, the court concludes that the summary judgment record contains no genuine dispute of material fact about the legality of the parties' contracts under Kansas law. The court holds as a matter of law that the parties' contracts are valid and enforceable under Kansas law.

The court thus denies RNM's Motion for Summary Judgment (Doc. 235). The court also grants in part plaintiff's Motion for Summary Judgment (Doc. 239). Specifically, it enters judgment as a matter of law against all of RNM's claims and defenses claiming that the parties' contracts are illegal and void under Kansas law.

**B. Are Plaintiffs Entitled to Summary Judgment Against RNM's Claim that It Properly Terminated the 2002 Amended Service Agreement Based on Plaintiffs' Material Defaults?**

Next, the court turns to plaintiffs' second summary judgment issue. Plaintiffs seek judgment as a matter of law against RNM's claim that it properly terminated the 2002 Amended Service Agreement under Section 10.3(b). As described above, Section 10.3(b) allowed RNM to terminate the Agreement if: (1) plaintiffs "defaulted in the performance of any material duty or material obligation imposed upon [them] by this Agreement (a "Material Administrator Default") and such default shall continue for a period of sixty (60) days after written notice thereof has been given to [RNMIP] by [RNM] . . . [;]" and (2) "if and only if, such termination shall have been approved by the affirmative vote of the holders of two-thirds of the interests of the equity holders of [RNM]." Doc. 270-10 at 41. Plaintiffs argue that the summary judgment facts establish that RNM never complied with Section 10.3(b)'s termination requirements. And, so, plaintiffs argue, RNM's termination of the 2002 Amended Service Agreement was improper. Plaintiffs assert four arguments to support their contention that RNM's termination of the 2002 Amended Service Agreement violated Section 10.3(b) as a matter of law.

*First*, plaintiffs argue that RNM never provided proper notice of default. Four years before RNM terminated the Agreement, Dr. Allen sent a letter dated November 26, 2010, to Radiologix's Steven Forthuber. The letter recited that it was "official notice of default in performance of material duties and obligations of the administrator pursuant to Section 10.3(b) of our service agreement with [plaintiffs]." Doc. 241-12 at 2. Also, it described RNM's concerns and dissatisfaction with RNMIP's administrative support following elimination of David Smith's position and Jayne Rarrick's assumption of his duties (in addition to her other responsibilities). The letter also identified 14 "ongoing issues" and asserted that RNM

"expect[ed] [plaintiffs] to fulfill their contractual obligation to provide adequate administrative support for our practice." *Id.* at 2.

Plaintiffs contend that the November 26, 2010 letter did not provide a contractually proper notice of default because it never identified any specific provision in the 2002 Amended Service Agreement that plaintiffs had breached materially. But, as RNM correctly observes, the 2002 Amended Service Agreement contains no agreement requiring RNM to cite a specific section of the parties' contract in a default notice. Instead, the Agreement requires RNM merely to provide written notice of default "in the performance of any material duty or material obligation imposed upon [them] by this Agreement." Doc. 270-10 at 41. The November 26, 2010 letter complained about a lack of administrative support following David Smith's departure. The letter referenced plaintiffs' contractual obligation to provide administrative support for RNM's practice, and it demanded that plaintiffs fulfill those obligations. The letter also asserted that the alleged inadequate administrative support was having a negative effect on RNM's practice. Based on the language of the November 26, 2010 letter, the court cannot conclude, as a matter of law, that RNM failed to satisfy the Agreement's requirements for providing written notice of default.

*Second*, plaintiffs contend that the November 26, 2010 letter was no longer an "active" written notice of default when RNM informed plaintiffs—almost four years later—in an October 6, 2014 letter that it was terminating the parties' Agreement. Plaintiffs assert that the summary judgment facts establish that plaintiffs responded to the November 26, 2010 letter within the contractually required 60 days by providing the necessary administrative support to Jayne Rarrick. The court agrees, but only to a certain extent. The summary judgment record contains admissible evidence capable of supporting a reasonable conclusion that plaintiffs made an effort

to respond to the complaints in the November 26, 2010 letter. For example, Mr. Forthuber convened a conference call with RNMIP executives to discuss RNM's concerns and divide the responsibilities for addressing those concerns. Mr. Forthuber also emailed Dr. Allen on December 23, 2010, explaining how plaintiffs were addressing the concerns described in his November 26, 2010 letter.

Plaintiffs also hired and promoted qualified staff in Topeka to serve under Ms. Rarrick's leadership. Plaintiffs encouraged Ms. Rarrick to delegate her work appropriately. And, plaintiffs hired David Smith as a consultant to help with some of the work. Ms. Rarrick began presenting annual Administrator Reports at the RNM group meetings. In her reports, she referenced specific issues that she and the other Topeka staff were addressing and the administrative support that plaintiffs were dedicating to this effort. This evidence provides ample basis for concluding that plaintiffs attempted to cure the default identified in the November 26, 2010 letter.

But, the summary judgment record is not single-minded on this topic. It also includes several disputes over whether plaintiffs actually resolved RNM's concerns about inadequate administrative support within the required 60 days. For instance, the parties' competing evidence disputes whether these employees provided sufficient *senior* administrative support to replace the void after Mr. Smith's position was eliminated. Also, Dr. Owen (RNM's corporate representative) testified that plaintiffs, after David Smith's departure, never provided adequate support for strategic planning, marketing, budgeting, practice development, or contract negotiation. Ms. Rarrick also testified that, as time went on, she had fewer and fewer conversations with RadNet Management, Inc.

Plaintiffs try to discredit Dr. Owen's deposition testimony—RNM's Rule 30(b)(6) witness—because he incorrectly testified that Radiologix's Todd Skulte never attended any Joint Planning Board meetings. The summary judgment record contains evidence suggesting that Mr. Skulte attended one such meeting between 2010 and 2013. At summary judgment, the court cannot weigh the credibility of this competing evidence. Plaintiffs' invitation to do so merely reinforces that the summary judgment record contains disputed facts on material issues. And, these disputed facts preclude the court from deciding whether plaintiffs cured the defaults identified in RNM's November 26, 2010 letter.

Plaintiffs also contend that RNM's conduct in the four years after sending the notice of default shows that plaintiffs cured RNM's concerns. Certainly, the court understands why a factfinder might find this inference persuasive. The summary judgment record contains no evidence of any other written complaints that RNM made to plaintiffs about a lack of administrative support after RNM sent the November 26, 2010 letter. But, the summary judgment record does include facts that could allow a reasonable trier of fact to conclude that RNM continued to express concerns—albeit orally—about plaintiffs' lack of administrative support.

For example, the parties present conflicting accounts about an April 28, 2011 meeting in Topeka. The parties dispute whether RNM then presented a "list of talking points" that included concerns about plaintiffs' inadequate administrative support. After that meeting, Dr. Allen sent an email to Radiologix's Todd Skulte, confirming that he "sense[d] a sincere commitment by Steve [Forthuber] and [Mr. Skulte] to move forward with support of our practice," and that "we must make the marriage work." Doc. 244-33 at 1. Although a factfinder could view this email to show RNM's commitment to the parties' relationship, it might view the email to suggest that

RNM still was looking for plaintiffs' commitment to provide adequate administrative support going forward. Indeed, Dr. Allen later sent a report to his RNM physician colleagues about the April 28, 2011 meeting. It reported: "There is potential that [plaintiffs] will actually perform for us but we won't know for a number of months if we can really be a partner with them or just a cash cow as we have been in the past. Since the divorce looks to be too expensive for now I am in favor of keeping an open mind and giving them a chance with pressure from our side to perform." Doc. 270-30 at 1.

Also, during RNM's March 29, 2011 Annual Meeting, Dr. Allen specifically stated in his "Year End Review 2010-11" that the "issues related to our relationship with [plaintiffs]" needed to be "resolved" "as soon as possible." Doc. 244-35 at 2. Ms. Rarrick was present at this meeting. Ms. Rarrick and other representatives of plaintiffs also attended RNM's April 3, 2012 Annual Meeting when Dr. Allen gave his "Year End Review 2011-12." Doc. 241-20. Dr. Allen made some comments showing that plaintiffs were addressing the concerns about administrative support. For example, he reported that "Jayne Rarrick [had] transitioned into her new expanded role as administrative head of the group," that "[a]dditional administrative staff" was "added to the accounting department," and that RNM was "moving on within the RadNet affiliation" and "putting this issue to rest." *Id.* at 1. But, Dr. Allen also described "RadNet as a company [that] is focused on their IT business and outpatient imaging center business [on] the East and West coasts with RNM being an anomaly in their business model." *Id.* And, he stated that plaintiffs "seem willing to help us but are also just willing to sit back and collect the management fee without any active effort to figure out how they can help us." *Id.* at 2.

In sum, the court cannot conclude that the summary judgment record establishes as an uncontroverted fact that plaintiffs cured the concerns identified by the November 26, 2010 letter.

Instead, a reasonable trier of fact could find that plaintiffs never cured the defaults that RNM had raised in its November 26, 2010 letter. A reasonable trier of fact also could conclude the opposite. The court thus rejects plaintiffs' second argument supporting their contention that RNM's termination of the 2002 Amended Service Agreement was improper.

*Third*, plaintiffs assert that the doctrines of waiver and equitable estoppel preclude RNM from terminating the Agreement under Section 10.3(b) based on a notice of default that RNM provided four years earlier. The Kansas Supreme Court recently described the difference between these two doctrines as follows:

> In sum, waiver is the intentional surrender of a right, while estoppel is the legal inability to assert a right. Because the gravamen of a waiver claim is the voluntary relinquishment of a right (or its continued existence), it is possible for a party to inoculate itself against future claims that it has waived a contractual right by including a valid anti-waiver provision in the contract. Estoppel, on the other hand, is a judicial doctrine sounding in equity that effectively draws the sting of an existing legal right by preventing its enforcement. Thus the continued existence of the right itself does not preempt a claim of equitable estoppel.

*Steckline Commc'ns, Inc. v. Journal Broad. Grp. of Kan., Inc.*, 388 P.3d 84, 91 (Kan. 2017) (citations omitted).

RNM asserts in its opposition that Section 12.11 of the 2002 Amended Service Agreement precludes plaintiffs' waiver argument. Section 12.11 included a "No Waiver" provision. It provided:

> No party shall by any act (except by written instrument pursuant to Section 12.3 hereof), delay, indulgence, omission or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any default in or breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of any party hereto, any right, power or privilege hereunder shall operate as a waiver thereof.

Doc. 270-10 at 51.  Plaintiffs seem to concede in their Reply that this provision effectively bars their waiver argument, but, they assert, it does not preclude their equitable estoppel argument. *See* Doc. 281 at 101.

The doctrine of equitable estoppel is "well established" under Kansas law.  *Mut. Life Ins. Co. v. Bernasek*, 682 P.2d 667, 671 (Kan. 1984).  The Kansas Supreme Court has defined the doctrine in this fashion:

> Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct.  A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed.  It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.

*Id.* (quoting *Cosgrove v. Young*, 642 P.2d 75, Syl. ¶ 6 (Kan. 1982)).  Estoppel cannot "arise from facts which are ambiguous and subject to more than one construction."  *Gillespie v. Seymour*, 823 P.2d 782, 789 (Kan. 1991) (citation omitted).  Also, "[a] party may not properly base a claim of estoppel in its favor on its own wrongful act or dereliction of duty, or for acts or omissions induced by its own conduct."  *Id.* (citation omitted).

Importantly, the Kansas Supreme Court has observed that "the type of conduct which is sufficient to give rise to an estoppel generally raises a question of fact unless the facts are stipulated or depend upon the interpretation of unambiguous written documents."  *Brown v. Westerhaus*, 578 P.2d 1102, 1107 (Kan. 1978).  Here, the court cannot determine whether equitable estoppel applies based on stipulated facts.  To the contrary, the summary judgment record presents disputed fact issues that preclude the court from deciding the equitable estoppel issue on summary judgment.

Plaintiffs repeatedly assert that RNM engaged in four years of silence between sending the notice of default to plaintiffs on November 26, 2010 and terminating the parties' Agreement on October 6, 2014. But, referring to RNM's actions in that four year period as "silence" is not consistent with the way the court must approach the summary judgment record, *i.e.*, viewing it in RNM's favor. True, RNM made no other written complaints to plaintiffs about a lack of administrative support after sending the November 26, 2010 letter. And, RNM made several statements to plaintiffs manifesting an intent to move forward with the parties' Agreement that, plaintiffs contend, caused them to believe that the parties had resolved the default issue. But, the summary judgment record also contains evidence of other communications—after RNM sent the November 26, 2010 letter—that the parties exchanged about plaintiffs' efforts to improve their administrative support services. The communications took place by email and during RNM's Annual Meetings. The court already has summarized those disputed facts above. And, for the same reasons already addressed, the court concludes that a reasonable trier of fact could infer from the summary judgment facts that RNM continued to express concerns to plaintiffs about a lack of administrative support after sending the November 26, 2010 letter.

RNM also contends that it didn't make more written complaints to plaintiffs because it had relied on plaintiffs' assurances that it was working to correct RNM's concerns. Indeed, the summary judgment facts show that plaintiffs communicated to RNM about their plan to provide additional administrative support to remedy the concerns expressed in RNM's November 26, 2010 letter. Ms. Rarrick also attended RNM's Annual Meetings where she delivered an annual Administrator Report. Her reports identified the issues that she and other Topeka staff were addressing, and the administrative support that plaintiffs were providing to her and the other Topeka-based staff. Viewing these facts in the light most favorable to RNM, a reasonable

factfinder could infer that RNM never made any additional written complaints because it reasonably relied on plaintiffs' representations that they were working to cure the issues identified in the November 26, 2010 notice of default.

For all these reasons, the court cannot hold, as a matter of law, that RNM is equitably estopped from relying on the November 26, 2010 notice of default to support its termination of the Agreement on October 6, 2014.

*Finally*, plaintiffs assert that RNM never satisfied Section 10.3(b)'s requirement that two-thirds of the interests of RNM's equity holders must approve termination by an affirmative vote. Plaintiffs acknowledge that, in September 2014, Dr. Allen (RNM's Chairperson) signed a document titled "Resolution of Members Pursuant to Special Meeting." Doc. 241-9. But, plaintiffs assert, RNM's corporate representative testified that this vote approved negotiating a termination of the 2002 Amended Service Agreement by paying plaintiffs a settlement fee. Plaintiffs also assert that RNM cannot verify this vote because RNM did not record the individual votes or keep a roll of who voted yes and who voted no on the Resolution. Also, RNM has no minutes, voting records, or attendance records for the September 2014 meeting referenced in the Resolution. Plaintiffs assert that these facts establish that RNM never secured the required two-thirds vote before terminating the parties' Agreement.

But, the summary judgment record also contains facts that controvert plaintiffs' assertion. Indeed, the plain language of the Resolution resolves that "Members holding no less than two-thirds of the issued and outstanding interests of" RNM "desired to terminate" the 2002 Amended Service Agreement. *Id.* at 1. And, while the Resolution authorized RNM's Chairperson to "negotiate a termination and/or settlement fee with [plaintiffs] for an amount not to exceed $4,000,000 in order to fully release Company from any further obligation under the [2002

Amended Service] Agreement," the Resolution also authorized RNM's Management Committee to "work with [RNM] legal counsel to execute and deliver" a "notice of termination" of the 2002 Amended Service Agreement to plaintiffs. *Id.*

The court cannot conclude on this record that the summary judgment facts establish, as a matter of law, that RNM never satisfied Section 10.3(b)'s two-thirds voting requirement before it terminated the parties' Agreement.

For all these reasons, disputed issues of material fact preclude the court from entering summary judgment against RNM's contention that it properly terminated the 2002 Amended Service Agreement under Section 10.3(b). The court thus denies plaintiffs' summary judgment motion on this basis.

**C.  Are Plaintiffs Entitled to Summary Judgment Against RNM's Counterclaim Damages for Breach of Contract?**

Plaintiffs' third summary judgment argument asserts that RNM is not entitled to recover the counterclaim damages it seeks in the Pretrial Order. The Pretrial Order recites that RNM "seek[s] to recoup amounts collected by Plaintiffs under the Service Agreement that exceeded the fair market value of the services that Plaintiffs provided." Doc. 227 at 41.[9] RNM "estimate[s] that Plaintiffs collected approximately $7,186,510.14 in excess service fees from November 2, 2010, through September 25, 2015 (the difference between the 15 percent service fee collected by Plaintiffs from RNM and the fair market value of the services provided, calculated at 7 percent of RNM's professional revenues)." *Id.* at 41–42.

Plaintiffs assert that RNM's damages theory is inconsistent with its pleadings because its Counterclaim never asserts that plaintiffs' Service Fee was excessive. But, the Pretrial Order

---

[9]     Plaintiffs assert that the Pretrial Order's reference to "defendants' damages" is improper because defendant RNM is the lone defendant who has asserted a Counterclaim against plaintiffs. Thus, only RNM can recover any damages. The court agrees.

now supersedes RNM's pleadings.  *See* Fed. R. Civ. P. 16(d) (stating that the Pretrial Order "controls the course of the action unless the court modifies it"); *see also Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1267 (10th Cir. 2007) ("The subsequent pretrial order supercedes the pleadings.").  And, in the Pretrial Order, RNM asserts that plaintiffs breached the 2002 Amended Service Agreement in several ways.  They include:  "[e]liminating the Practice Administrator position for RNM as of October 1, 2010;" "[f]ailing to provide all necessary administrative and legal services that were necessary for RNM to operate efficiently and in compliance with Kansas law;" "[f]ailing to provide adequate administrative leadership;" and "[f]ailing to provide adequate and experienced administrative personnel."  Doc. 227 at 27.  To the extent RNM prevails on any of its breach of contract theories, it can recover the damages claimed for the breach.

Also, plaintiffs argue, RNM cannot recover damages for payments it contends represented an excessive Service Fee because the 2002 Amended Service Agreement expressly required RNM to pay a 15% Service Fee.  The court recognizes that RNM bargained for the 15% Service Fee.  And, plaintiffs correctly assert that RNM cannot use this lawsuit as a means to renegotiate that Service Fee.  Instead, plaintiffs contend, RNM must adhere to the terms of the parties' bargained-for agreement.  But, plaintiffs' argument assumes that plaintiffs committed no breach of the contract.  Here, RNM asserts that plaintiffs breached the 2002 Amended Service Agreement by failing to provide adequate administrative support services as the Agreement obligated plaintiffs to do.  Whether RNM will prevail on its breach of contract claim is undecided currently.  But, if RNM does prevail, it may recover damages for plaintiffs' breach of contract.  RNM calculates those damages by estimating that the value of the services plaintiffs actually provided was worth only a 7% Service Fee instead of the 15% Service Fee that RNM

paid to plaintiffs. Whether this represents an appropriate calculation of RNM's damages is an issue for the trier of fact to decide. The court cannot decide this disputed issue on summary judgment.

Plaintiffs also contend that the parties' Agreement precludes RNM from seeking damages for inadequate services by comparing the price that it paid to the purported fair market value for those services. Instead, plaintiffs assert, RNM should have invoked Section 3.1(b)(i) of the parties' Agreement. This provision allowed RNM to retain replacement services on a temporary basis if plaintiffs had failed to provide services that were "reasonably consistent with commercially available services offered by third party providers of physician practice management services of the type and scope offered by [RNMIP]." Doc. 270-10 at 13. RNM concedes that it never invoked Section 3.1(b)(i) even though it believed plaintiffs were providing inadequate administrative services. But, the parties' contract never obligated RNM to engage replacement services. Instead, the contract provided that RNM was entitled to reimbursement for the reasonable costs and expenses for replacement services—if RNM chose to retain such services. *Id.* Section 3.1(b)(i) also expressly provides that "[n]othing contained in this subsection (b)(i) shall be construed to limit [RNM's] ability to provide notice of a Material Administrator Default pursuant to Section 10.3(b) of this Agreement." *Id.* The court thus concludes that Section 10.3(b) does not preclude RNM's asserted counterclaim damages.

For these reasons, the court denies plaintiffs' summary judgment motion against RNM's counterclaim damages for breach of contract.

**D.  Are Plaintiffs Entitled to Summary Judgment Against RNM's Breach of Contract Claim Because RNM's Failed to Exhaust Administrative Remedies?**

Plaintiffs' last summary judgment argument asserts that RNM's failed to exhaust contractually supplied alternative dispute remedies.  This omission, plaintiffs say, bars RNM's breach of contract claim.  The 2002 Amended Service Agreement contained several dispute resolution procedures.  Section 11.1 required the parties to engage in "informal dispute resolution" by submitting any disagreements to the Joint Planning Board for hearing and resolution.  Doc. 270-10 at 47.  If the parties could not resolve the disagreement with informal dispute resolution, then Section 11.2 required the parties to submit the disagreement to arbitration or agree to a dispute resolution procedure other than arbitration.  *Id.*  Plaintiffs assert that they are entitled to summary judgment against RNM's breach of contract claim because RNM never complied with the Agreement's dispute resolution procedures.

Plaintiffs cite two Kansas Court of Appeals cases to support their argument.  But, the facts of those cases differ significantly from the facts here.  In both cases, the court affirmed the trial courts' dismissals of plaintiffs' claims based on a contract's mediation clause.  *See Santana v. Olguin*, 208 P.3d 328, 334–335 (Kan. Ct. App. 2009); *see also Crandall v. Grbic*, 138 P.3d 365, 379 (Kan. Ct. App. 2006).  The mediation clauses at issue in these cases required the parties, before filing suit, to mediate any claim or dispute arising out of the contract.  But, plaintiffs had filed suit without submitting their claims to mediation.  The court thus affirmed dismissal of plaintiffs' claims based on their failure to comply with the mediation clauses.

Here, the Agreement required the parties to engage in dispute resolution procedures to resolve any disagreements.  But, the Agreement contains no provisions requiring the parties to engage in dispute resolution before invoking the Agreement's termination provisions.  Indeed,

the Agreement authorized RNM, in certain circumstances, to terminate the Agreement "in its sole discretion." Doc. 270-10 at 36. Nothing in the contract specifically required RNM to process the disagreement through the Agreement's dispute resolution procedures before terminating the Agreement "in its sole discretion." *Id.*

But, even if the Agreement had required RNM to follow the informal dispute resolution procedures before invoking the termination provisions, the summary judgment record contains disputed facts on this issue. RNM asserts that it attempted to engage in dispute resolution but it was plaintiffs who refused to follow the Agreement's requirements. Indeed, RNM's counsel sent a letter to plaintiffs on March 11, 2015, reporting that the parties had a material dispute that they could not resolve under Section 11.1's informal dispute resolution procedures. Doc. 270-33 at 2. RNM thus invoked Section 11.2 and requested a meeting between the parties to discuss and consider dispute resolution procedures other than arbitration. *Id.* On March 27, 2015, plaintiffs responded. This response demanded that the parties follow the procedures in Section 11.1 because, plaintiffs contended, Section 11.2 did not apply until after the parties have exhausted Section 11.1. Doc. 244-16.

On April 2, 2015, RNM's counsel responded to plaintiffs' March 27, 2015 letter. RNM's counsel's letter asserted that it had "made a good faith request pursuant to Section 11.2 of the Agreement to discuss and consider dispute resolution procedures other than arbitration." Doc. 244-17 at 2. The letter also asserted that that plaintiffs' demand for RNM to follow the 2002 Amended Service Agreement's "Dispute Resolutions" procedure was a "meaningless and time consuming serial process." *Id.* And, the letter characterized plaintiffs' rejection of RNM's efforts to comply with Section 11.2 as "simply further evidence of your continued refusal to deal with RNM in a reasonable and good faith manner." *Id.*

On this record, the court cannot conclude that RNM refused to abide the Agreement's dispute resolution procedure as a matter of law. The court thus denies plaintiffs' summary judgment motion on this basis.

### E. Are the Physician Defendants Entitled to Summary Judgment Against Plaintiff Radiologix's Breach of Contract Claim?

The court now turns to the Physician Defendants' Motion for Summary Judgment. Doc. 242. The Physician Defendants move for summary judgment on plaintiff Radiologix's claim that each Physician Defendant breached the individual Physician Employment Agreements that they signed with RNM. Each Physician Employment Agreement contains a restrictive covenant where the Physician Defendants agreed "not, directly or indirectly . . . [to] divert or take away, or attempt to . . . divert or take away . . . business or clients of . . . [plaintiff Radiologix] . . . or . . . disrupt, damage[,] impair or interfere with the business of . . . [plaintiff Radiologix]." Doc. 243-9 at 6. Plaintiff Radiologix contends that the Physician Defendants have breached their Physician Employment Agreements because they caused defendant RNM to terminate the 2002 Amended Service Agreement, thus diverting or taking away business from plaintiff Radiologix and disrupting, damaging, impairing, and interfering with plaintiff Radiologix's business.

The Physician Defendants assert that the restrictive covenants in the Physician Employment Agreements impose an undue burden on the Physician Defendants. Thus, the Physician Defendants contend, they are unenforceable under Kansas law.

In Kansas, "[a] noncompetition covenant ancillary to an employment contract is valid and enforceable if the restraint is reasonable under the circumstances and not adverse to the public welfare." *Weber v. Tillman*, 913 P.2d 84, 89 (Kan. 1996) (citations omitted). The "driving force" behind Kansas' enforcement of restrictive covenants is the freedom of the parties to contract. *Varney Business Servs., Inc. v. Pottroff*, 59 P.3d 1003, 1015 (Kan. 2002) (citations

omitted).  And, courts should not interfere with parties' freedom to contract lightly.  *Wichita Clinic, P.A. v. Louis*, 185 P.3d 946, 951 (Kan. Ct. App. 2008).  Because "parties have wide discretion in fixing the terms of employment contracts," a court should honor and enforce the contract "when [it] is not illegal or unreasonable."  *Id.* (citations omitted).

When determining reasonableness, Kansas courts strictly construe restrictive covenants.  *Weber*, 913 P.2d at 89.  Kansas courts also consider the following factors when deciding whether a restrictive covenant is a reasonable one:

> (1) Does the covenant protect a legitimate business interest of the employer?  (2) Does the covenant create an undue burden on the employee?  (3) Is the covenant injurious to the public welfare?  (4) Are the time and territorial limitations contained in the covenant reasonable?

*Id.* at 90.  A court must determine reasonableness based on "the particular facts and circumstances of each case."  *Id.*

Here, the Physician Defendants contend that the restrictive covenants place an undue burden on them because they broadly prohibit their ability to act in RNM's best interests.  The Physician Employment Agreements prohibit the Physician Defendants from diverting or taking away business from Radiologix or interfering with Radiologix's business.  But, as members of RNM, the Physician Defendants must make decisions about RNM's management and finances.  And, the Physician Defendants contend, they owe RNM a fiduciary duty to act in RNM's best interests.  The Physician Defendants thus argue that the restrictive covenants force them to make a Hobson's choice in a situation where a vote in RNM's best interest diverts business away from Radiologix—either the Physician Defendants must cast their votes in a way that protects Radiologix's business but risks breaching their fiduciary duties to RNM; or they must cast their votes in a way that protects RNM's best interests but risks exposing them to personal liability under the Physician Employment Agreements.

For this conundrum, Kansas case law provides no clear answer. Typically, Kansas courts have considered whether a restrictive covenant imposes an undue burden on an employee by examining the time and territorial limits the covenant imposes on the employee's ability to work for a competitor. *See*, *e.g.*, *Varney Business Servs., Inc.*, 59 P.3d at 1015–17; *Weber*, 913 P.2d at 90–96; *Wichita Clinic*, 185 P.3d at 951–58. In contrast, here, the court must consider whether the restrictive covenants contained in the Physician Employment Agreements place an undue burden on the Physician Defendants because they hinder their ability, as physician-members of that limited liability company, to act in RNM's best interests. The parties do not cite, and the court has not found, any cases considering similarly perverse facts.

After considering the facts and circumstances of this particular case and the overarching principles guiding Kansas noncompete agreements, the court concludes that the restrictive covenants place an undue burden on the Physician Defendants. The plain language of the restrictive covenants broadly prohibits the Physician Defendants' ability to make decisions about the management and finances of RNM if those decisions subtract from or interfere with Radiologix's business. If the Physician Defendants act in RNM's best interests but those actions divert or take away business from Radiologix, then the Physician Defendants risk incurring individual liability under the Physician Employment Agreements. This imbalance, the court concludes, imposes an undue burden sufficient to violate Kansas law.

Also, the restrictive covenants are inconsistent with the termination provisions in the 2002 Amended Service Agreement—the contract that the Physician Employment Agreements specifically reference on their first page. Doc. 243-9 at 1. The 2002 Amended Service Agreement explicitly contemplates that RNM may terminate the parties' contract if: (1) plaintiffs materially have defaulted on the duties imposed by the Agreement and failed to cure

their default within 60 days after being notified in writing of the default; and (2) two-thirds of RNM's equity holders have voted to approve the Agreement's termination. But, as worded, the Physician Employment Agreements' restrictive covenants effectively prohibit the Physician Defendants from voting to terminate the 2002 Amended Service Agreement under any circumstances. So, even in a situation where Radiologix is not performing its contractual obligations and thus harming RNM's business interests, the Physician Employment Agreements prohibit the Physician Defendants from voting to terminate the parties' Agreement without exposing themselves to individual liability for breaching the Physician Employment Agreements' restrictive covenants. The court agrees that these conflicting provisions place an undue burden on the Physician Defendants and thus violate Kansas law governing restrictive covenants.

In sum, the court concludes that enforcing the Physician Employment Agreements' restrictive covenants as written places an undue burden on the Physician Defendants. The court thus concludes that these provisions are unenforceable as written, and the Physician Defendants are entitled to summary judgment against Radiologix's breach of contract claims against them.

The court's holding here does not change its overarching conclusion, above, that the parties' agreements are valid and enforceable under Kansas law. Instead, the court merely holds that Radiologix cannot enforce the portion of the restrictive covenants prohibiting the Physician Defendants from "directly or indirectly . . . divert[ing] or tak[ing] away, or attempt[ing] to . . . divert or take away . . . business or clients of . . . [plaintiff Radiologix] . . . or . . . disrupt[ing], damage[ing,] impair[ing] or interfer[ing] with the business of . . . [plaintiff Radiologix]." Doc. 243-9 at 6. As already explained, the Physician Employment Agreements contain a severability clause. Doc. 243-9 at 12. The severability clause provides that, if any provision is found to

violate the law, "[t]he other provisions of this Agreement shall remain in full force and effect, and the invalidity or unenforceability of any provision hereof shall not affect the validity and enforceability of the other provisions of this Agreement." *Id.* Thus, the unenforceable portion of the restrictive covenants is severable from the Physician Employment Agreements as a whole, and it does not render the entire Agreement void under Kansas law.

Also, Kansas law authorizes courts to modify restrictive covenants to the extent reasonably necessary to make them enforceable and carry out the parties' intentions. *See Puritan-Bennett Corp. v. Richter*, 679 P.2d 206, 210 (Kan. 1984) ("In Kansas, it is well recognized that a restrictive covenant in an employment contract will only be applied to the extent it is reasonably necessary under the facts and circumstances of the particular case."); *see also E. Distrib. Co., Inc. v. Flynn*, 567 P.2d 1371, 1378–79 (Kan. 1977) ("[C]ourts of equity have the power to [modify a restrictive covenant] to the extent reasonably necessary to insure the contemplated protection, to enforce the contract to that extent and to deny enforcement as to the remainder . . . ." (citation and internal quotation marks omitted)).

So, the court's holding here on the enforceability of part of the restrictive covenants does not render the entire Physician Employment Agreements (or any of the other contracts between the parties) void as a matter of law.

### F. Is David Smith Entitled to Summary Judgment Against Plaintiffs' Tortious Interference Claim?

Last, the court considers defendant David Smith's Motion for Summary Judgment. Doc. 237. Mr. Smith asserts that he is entitled to summary judgment against plaintiffs' tortious

inference claims because the summary judgment record contains no evidence of malice that can support a tortious interference claim.[10]  The court agrees.

In Kansas,[11] "a person who, without justification, induces or causes a breach of contract will be answerable for any damages caused thereby." *Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 150 (Kan. 2003).  "A claim for tortious interference with a contractual relationship requires the existence of a valid and enforceable contract at the time of the interference between the plaintiff *and a third party*."  *Macke Laundry Serv. Ltd. P'ship v. Mission Assocs., Ltd.*, 873 P.2d 219, 225 (Kan. Ct. App. 1994) (emphasis added).  An "official of a corporation, acting for the corporation, and within the scope of his or her representation of the corporation, cannot be liable for tortious interference with a contract the corporation could legally act on."  *Diederich v. Yarnevich*, 196 P.3d 411, 418 (Kan. Ct. App. 2008) (citing *Clevenger v. Catholic Soc. Serv. of Archdiocese*, 901 P.2d 529, 533 (Kan. Ct. App. 1995)).  In these situations, "[i]t is the corporation acting," not the director or officer.  *Id.*  But, if "an employee is motivated entirely by personal reasons such as malice or spite or by a desire to accomplish some unlawful purpose and does not have for its purpose the furtherance of the employer's business," that employee acts outside the scope of his employment and can incur liability for tortious interference.  *Williams v. Cmty. Drive-In Theater, Inc.*, 520 P.2d 1296, 1301–02 (Kan. 1974); *see also Battenfeld of Am. Holding, Inc. v. Baird, Kurtz & Dobson*, No. 97-2336-JWL, 1999 WL 232915, at *4 (D. Kan. Feb. 5, 1999) ("Kansas does not recognize a claim for tortious interference with contract against

---

[10]     Mr. Smith also argues that he is entitled to summary judgment because (1) as RNM's agent, he cannot tortiously interfere with his principal's contract, and (2) the summary judgment record contains no evidence that Mr. Smith induced, brought about, or directly contributed to RNM's termination of the 2002 Amended Service Agreement.  Because the court concludes that Mr. Smith is entitled to summary judgment as no genuine issue exists showing that Mr. Smith acted with malice, the court need not address his other two summary judgment arguments.

[11]     The parties agree that plaintiffs' tortious interference claim is governed by Kansas law.  Doc. 227 at 2.

an agent or employee of one of the contracting parties, unless there is some suggestion that the agent or employee was acting in his or her individual capacity or for his or her individual advantage.").

A tortious inference claim under Kansas law, to survive summary judgment, requires proof of malice. *Dickens v. Snodgrass, Dunlap & Co.*, 872 P.2d 252, 257 (Kan. 1994); *Turner v. Halliburton Co.*, 722 P.2d 1106, 1116 (Kan. 1986). The Kansas Pattern Instructions define malice as "a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse." PIK Civ. 4th 103.05. The Kansas Supreme Court also has described malice as "actual evil-mindedness or specific intent to injure." *Turner*, 722 P.2d at 1113 (citation and internal quotation marks omitted).

Although the Kansas Supreme Court has recognized that "the presence or absence of malice are typically questions for the jury," *see Burcham v. Unison Bancorp, Inc.*, 77 P.3d 130, 152 (Kan. 2003), at summary judgment, a court can decide that no triable issue of malice exists if the undisputed material facts support such a finding, *see, e.g., L&M Enters., Inc. v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1288 (10th Cir. 2000) (affirming entry of summary judgment against a tortious interference claim under Kansas law because plaintiff could "not point to specific facts showing malicious conduct by [defendant]"); *Dunn v. First Nat'l Bank of Olathe*, 111 P.3d 1076, 2005 WL 1277949, at *3 (Kan. Ct. App. May 27, 2005) (affirming summary judgment against a tortious interference claim when plaintiff "fail[ed] to demonstrate how [the defendant's] action demonstrates malice"); *Lloyd v. Quorum Health Res., LLC*, 77 P.3d 993, 1002 (Kan. Ct. App. 2003) (affirming summary judgment against a tortious interference claim, concluding that "[a]ny evidence of malice presented by [plaintiff] is mere speculation.").

Here, viewing the facts in the light most favorable to plaintiffs, the summary judgment record presents no triable issue over whether Mr. Smith acted with the requisite malice. The court reaches this conclusion for several reasons.

First, the summary judgment facts establish that RNM began taking steps to terminate the 2002 Amended Service Agreement *before* it hired Mr. Smith to provide outside consulting services. In December 2013, RNM formed a task force to examine its ongoing relationship with plaintiffs; in February 2014, Dr. Meggison reached out to McKesson to inquire about its ability to provide the same services that plaintiffs were providing under the 2002 Amended Service Agreement; and in March 2014, McKesson gave RNM a presentation about its services. But, RNM didn't hire Mr. Smith as an independent contractor until June 2014. RNM's contract with Mr. Smith required, among other things, that he provide an analysis of the financial effect of terminating the Service Agreement, engage in business and operational planning to ensure business continuity in the event RNM terminated the Service Agreement, and provide advice about negotiating tactics and settlement terms and conditions. All of these tasks involve furthering RNM's business and pursuing a strategy that RNM began developing months before it hired Mr. Smith. Nothing shows that this work involved a personal motivation or malice on Mr. Smith's part.

Second, the summary judgment record presents no genuine issue about Mr. Smith's motivations when he was performing his consulting work for RNM. After RNM hired Mr. Smith, he attended meetings with RNM physicians to discuss extracting RNM from its relationship with plaintiffs, he sent an email to the RNM physicians and RNM's counsel with a preliminary analysis of the financial impact of terminating the 2002 Amended Service Agreement, and he attended a "special LLC meeting" where he was scheduled to discuss

potential exit strategies from RNM's relationship with plaintiffs. Later, Mr. Smith helped RNM negotiate an agreement with McKesson to assume RNM's billing, collections, and other business operations. After RNM terminated the 2002 Amended Service Agreement, Mr. Smith helped RNM transition various services from plaintiffs to McKesson, he communicated with Capital City Bank about RNM's bank accounts, and he instructed Capital City Bank to limit plaintiffs' access to RNM's bank accounts. This type of work is what RNM hired Mr. Smith to do—as contemplated by the parties' consulting agreement. Viewing these facts in plaintiffs' favor, nothing in the summary judgment record shows that Mr. Smith acted outside of the scope of his consulting agreement with RNM, or for personal reasons such as malice or spite.

Finally, the summary judgment facts fail to show that Mr. Smith had any motivation to harm plaintiffs in some effort to gain an advantage in his relationship with RNM. Mr. Smith testified that he had no interest in serving as RNM's Practice Administrator on a long-term basis. About a year and a half after RNM hired Mr. Smith as a consultant, the parties revised their agreement to include a one year term, an option for early termination, and a reduced fee to reflect the reduced work that Mr. Smith was performing. Mr. Smith eventually informed RNM that he was no longer interested in continuing his consulting work. He stopped performing consulting work for RNM in January 2017, and he took a position with a different medical practice in Kansas City.

Plaintiffs contend that a jury could infer malice from Mr. Smith's conduct because he purportedly concealed his consulting activities from plaintiffs. But, the summary judgment facts won't tolerate this argument. Although Mr. Smith had performed consulting work for plaintiffs shortly before RNM hired him as a consultant to analyze RNM's relationship with plaintiffs, the summary judgment record contains no evidence that Mr. Smith actively concealed his activities

from plaintiffs. Mr. Smith never offered any information about his consulting agreement with RNM to plaintiffs, but nothing imposed any obligation on him to do so. A jury could not infer concealment from the undisputed facts here that could support a finding of malice on Mr. Smith's part.

In sum, plaintiffs have adduced no submissible evidence from which a reasonable jury could conclude that Mr. Smith acted with malice or spite to make him liable for tortious inference under Kansas law. The court thus grants summary judgment against plaintiffs' tortious interference claim against Mr. Smith.

## V.      Conclusion

For the reasons explained above, the court denies RNM's Motion for Summary Judgment (Doc. 235), grants in part and denies in part plaintiffs' Motion for Summary Judgment (Doc. 239), and grants both defendant David L. Smith and the Physician Defendants' Motions for Summary Judgment (Docs. 237, 242).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Radiology and Nuclear Medicine, LLC's Motion for Summary Judgment (Doc. 235) is denied.

**IT IS FURTHER ORDERED THAT** defendant David L. Smith's Motion for Summary Judgment (Doc. 237) is granted.

**IT IS FURTHER ORDERED THAT** plaintiffs Radiologix, Inc. and Radiology and Nuclear Medicine Imaging Partners, Inc.'s Motion for Summary Judgment (Doc. 239) is granted in part and denied in part, as set forth more fully in this Order.

**IT IS FURTHER ORDERED THAT** the Physician Defendants' Motion for Summary Judgment (Doc. 242) is granted.

**IT IS FURTHER ORDERED THAT** defendant Radiology and Nuclear Medicine,

LLC's Motion to Strike (Doc. 250) is denied.

**IT IS SO ORDERED.**

**Dated this 2nd day of November, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**