## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RADIOLOGIX, INC. and RADIOLOGY
AND NUCLEAR MEDICINE IMAGING
PARTNERS, INC.,

        Plaintiffs,

v.

RADIOLOGY AND NUCLEAR
MEDICINE, LLC,

        Defendant.

Case No. 15-4927-DDC-KGS

## MEMORANDUM AND ORDER

This case involves a breach of contract dispute. Plaintiff Radiologix is a national provider of imaging services based in California. Defendant RNM is a Kansas limited liability company and physician-owned radiology practice based in northeast Kansas. Since 1997, plaintiff Radiologix (or one of its predecessors-in-interest) has provided management services to defendant RNM under a long-term management service agreement.

In 2002, plaintiffs and defendant executed an Amended and Restated Service Agreement ("Agreement"). Under this Agreement, plaintiffs agreed to provide certain management services to defendant in exchange for specified fees. The parties agreed to a 40-year term for the Agreement's duration. But, in 2014, defendant terminated the Agreement for cause because, defendant contends, plaintiffs had defaulted materially on their obligations under the Agreement and thus provided cause to terminate.

In response, plaintiffs filed this lawsuit. They assert three claims: (1) breach of contract, (2) conversion, and (3) unjust enrichment. Defendant responded to plaintiffs' Complaint by asserting a Counterclaim for breach of contract. On November 2, 2017, the court denied cross

motions for summary judgment filed by both parties.  Doc 300.  Plaintiffs had moved for summary judgment against defendant's claim that the parties' contracts were void and unenforceable under Kansas law.  Defendant also had moved for summary judgment against plaintiffs' claims, asserting that the parties' contracts violate Kansas law.  The court disagreed with defendant.  Instead, the court found, the undisputed facts demonstrated that the parties' contracts did not violate Kansas's prohibitions against the corporate practice of medicine and illegal fee splitting.  So, the court granted plaintiffs' summary judgment motion against defendant RNM's claims and defenses that the contracts are illegal and unenforceable under Kansas law, and thus provide defendant RNM a valid, legal basis for terminating the parties' management service agreement.  But the court denied plaintiffs' other arguments supporting summary judgment against RNM's breach of contract claim because, it concluded, genuine issues of material fact exist that the trier of fact must decide.  So, the trier of fact will decide the remaining issues at a trial scheduled to begin on March 6, 2018.

Anticipating that trial, plaintiffs have filed a Motion to Exclude Report and Testimony of Gregory M. Kusiak (Doc. 303).  Plaintiffs assert that the court should exclude Mr. Kusiak's opinions because they are:  (1) irrelevant opinions about industry standards and customs; (2) impermissible legal conclusions about the meaning of an unambiguous contract; or (3) subjective opinions about the fairness of the contract at issue in this case.  For these reasons, plaintiffs contend, the court should exclude Mr. Kusiak's expert report and testimony under Fed. R. Evid. 702 because his opinions "will not help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The court agrees.  It thus grants plaintiffs' Motion to Exclude Report and Testimony of Gregory M. Kusiak (Doc. 303).  It explains why, below.

## I.     Factual Background

To support defendant's breach of contract claim against plaintiffs in this lawsuit, defendant has designated Gregory M. Kusiak as an expert witness.  On August 31, 2016, Mr. Kusiak provided a Preliminary Expert Report.  Doc. 304 at 21–25.  It recites that Mr. Kusiak has formed opinions after reviewing documents and contracts at issue in this case.  These preliminary opinions include whether the Service Fee that defendant RMN agreed to pay under the parties' Agreement was "reasonably related" to the services plaintiffs provided.  *Id.* at 23. Mr. Kusiak's opinions also address whether certain provisions in the parties' Agreement are "unusual" or differ from what he believes is "customary" for traditional practice management agreements.  *Id.* at 24–25.  Mr. Kusiak also opines that the Agreement contains several provisions that are "legal 'red flags.'"  *Id.* at 23.  Specifically, his Preliminary Report recites:

> 3.     In my opinion, several provisions in the Service Agreement are legal "red flags."  First, the Service Agreement does not permit RNM to select the individuals who would fill key positions in its practice management, such as the practice manager.  It is customary in the practice management industry for a management company to employ the practice manager, but the physician group should have decisionmaking authority regarding the individual who will fill that position.

> 4.     The next legal "red flag" I identified in the Service Agreement is the handling of the operating and capital budgets in Section 3.5 of the Service Agreement, under which RNM's operating and capital budgets are subject to review, modification, and approval by the Radiologix board of directors, and any disagreement regarding those budgets default to Radiologix and the non-professional members of the Joint Planning Board for decision. It is customary in the practice management industry, and essential for a successful radiology practice, for the medical practice professionals to hold final decision-making authority regarding its budgets.

> . . .

> 6.     Another legal "red flag" is the managed care contracting provision in Section 3.7 of the Service Agreement.  Under that provision, if any of RNM's managed care contracts are determined to "affect" a "contract relationship" with any other group to which Plaintiffs or any of their affiliates provide management

services, then physicians from other practices may vote to approve, disapprove, terminate or amend RNM's managed care contract. This provision that allows outside individuals to make decisions regarding RNM's contracts over RNM's objection is highly unusual and may present a variety of legal problems, including potential antitrust problems.

. . .

11.    The service fee provided for in the Service Agreement is not related to the services Plaintiffs provide under the Service Agreement and is significantly inflated. In my opinion, the only purpose of such a service fee is to provide Plaintiffs with a means to siphon professional revenues from a Kansas medical practice.

*Id.* at 23–25.

On February 6, 2017, Mr. Kusiak completed his Final Expert Report. Doc. 304 at 26–41.

The Final Report removed the references to "legal red flags" that the Preliminary Report

contained. But, otherwise, the Final Report's substance is similar to the Preliminary Report. It

continues to opine that the parties' Agreement "differs from a traditional practice management

agreement in significant and material ways." *Id.* at 27. Mr. Kusiak's Report describes several of

these purported differences:

a.    The Service Agreement prohibits RNM from taking any action or implementing any decision that would have a "material adverse effect" on the amount of Administrator's management fee or Administrator's financial interests.

b.    The Service Agreement requires RNM to consult with non-physicians – the Plaintiffs and non-physician members of the Joint Planning Board – in making decisions to increase or decrease the number of physicians in the practice. The Service Agreement and the Employment Agreements between RNM and its employed radiologists (the "Employment Agreement") also grant Plaintiffs control over aspects of physician employment. Such an arrangement is highly unusual in a practice management contract.

c.    The Service Agreement does not permit RNM to select the individuals who would fill key positions in its practice management, such as the practice manager. It is customary in the practice management industry for a management company to employ the practice manager, but the physician group should have decision-making authority regarding the individual who will fill that position.

d.     RNM's operating and capital budgets are subject to review, modification and approval by the Radiologix board of directors, and any disagreement regarding those budgets default to Radiologix and the non-professional members of the Joint Planning Board for decision.  It is customary in the practice management industry, and essential for a successful radiology practice, for the medical practice professionals to hold final decision-making authority regarding its budgets.

e.     Under § 3.7 of the Service Agreement, if any of RNM's managed care contracts are determined to "affect" a "contract or relationship" with any other group to which Plaintiffs or any of their affiliates provide management services, then physicians from other practices may vote to approve, disapprove, terminate or amend RNM's managed care contract. This provision that allows outside individuals to make decisions regarding RNM's contracts over RNM's objections is highly unusual and may present a variety of legal problems, including potential antitrust problems.

f.     It is highly unusual in the practice management industry for a practice manager to purchase a physician practice's accounts receivable on a daily basis.  It is much more common, and more reflective of an appropriate superior-subordinate relationship, for the ownership of the accounts receivable to remain with the professional practice.   The physician group then pays the practice management company its fee.  Under the Service Agreement, Plaintiffs collect all fees and then pay "retention" to the physician group.

g.     Under the Service Agreement, Plaintiffs treat 100% of RNM's professional fees as their own top-line revenue and treat payments to the physician group as an expense.   This is highly unusual in the practice management industry and has the practical effect of simply inflating Plaintiffs' revenue numbers to make them more attractive for investors.

h.     It is customary in the medical field for a physician or physician practice to set their own fees for services and to hold decision making authority regarding payer contracts.  The Service Agreement vests such decision making authority in Plaintiffs, requiring only "appropriate consultations" with RNM.

*Id.* at 27–29.  Mr. Kusiak also opines that the Agreement gives plaintiffs control over RNM's

practice:

In my opinion, the structure of the Service Agreement, is designed to, and does, give Plaintiffs control over nearly all aspects of RNM's practice.  Such an agreement differs significantly from a traditional management agreement where support is provided to multiple aspects of the practice, but a bright line is drawn between management duties and professional prerogatives.

*Id.* at 29. And, Mr. Kusiak provides several opinions about the Agreement's Service Fee and how he believes the fee is not reasonably related to the services plaintiffs provided. These opinions include:

> 3.    The service fee provided in the Service Agreement is not reasonably related to the services provided by RDLX and RNMIP (collectively "Plaintiffs") in the Service Agreement. The service fee is significantly higher than the value of the services provided.

> 4.    A radiology practice with professional-only billing (no global billing) should expect to pay 6–7% of its collections for professional billing and collection services. In addition to those services, a radiology practice should expect to pay additional amounts for a practice manager. In total, a radiology practice should expect to pay 10% of its collections for billing and management services.

> 5.    The Service Agreement contains provisions under which certain circumstances trigger an obligation of the parties to "meet and confer" to discuss the terms of the Service Agreement and the fees thereunder. Notably, a decision by Plaintiffs to sell the assets of the imaging center that existed at the time of the Acquisition does not trigger such an obligation. Selling the assets of the imaging center would effect a significant change in the relationship of the parties and the obligations of each under the Service Agreement. The fact that this situation does not trigger a meet and confer obligation, in my opinion, is further evidence that the fees under the Service Agreement are not tied to the services provided thereunder.

> 6.    The service fee provided for in the Service Agreement is not related to the services Plaintiffs provide under the Service Agreement and is significantly inflated. In my opinion, the only purpose of such a service fee is to provide Plaintiffs with a means to siphon professional revenues from a Kansas medical practice.

*Id.* at 29–30. After listing his opinions, the remainder of Mr. Kusiak's Final Expert Report explains the reason for his opinions in more detail. Mr. Kusiak first describes the reasons he believes the parties' Agreement "is not a Standard Management Contract." *Id.* at 30–36. He next explains why he believes the Agreement's "Service Fee is Unrelated to the Services Provided." *Id.* at 36–38.

When Mr. Kusiak was deposed in this lawsuit, he affirmed that he formed his opinions by examining documents and contracts at issue in the case.  Doc. 304 at 45 (Kusiak Dep. 169:10–170:15).  Mr. Kusiak conceded that he has not "looked at any of the facts of what actually happened in carrying out or executing" the Agreement.  *Id.* (Kusiak Dep. 169:21–170:1).  Instead, Mr. Kusiak agreed that his "opinions are strictly interpreting the contract in isolation." *Id.* (Kusiak Dep. 170:13–15).

Plaintiffs' motion asks the court to exclude Mr. Kusiak's expert report and testimony under Fed. R. Evid. 702 because, they contend, his opinions "will not help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  The court considers plaintiffs' request in the analysis, below.

## II.    Legal Standard

The court has a "gatekeeping obligation" to determine the admissibility of expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)).  When performing this gatekeeping role, the court has broad discretion when deciding whether to admit expert testimony.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996) (quoting *Orth v. Emerson Elec. Co.*, 980 F.2d 632, 637 (10th Cir. 1992)).  The admissibility of expert testimony is governed by Federal Rule of Evidence 702.  It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This court must apply a two-part test to determine admissibility. *Conroy v. Vilsack*, 707 F.3d 1163, 1168 (10th Cir. 2013). First, the court must determine "whether the expert is qualified 'by knowledge, skill, experience, training, or education' to render an opinion." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (quoting Fed. R. Evid. 702). Second, the court "'must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.'" *Id.* (quoting *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006)) (further citations omitted).

To qualify as an expert witness, the witness must possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (internal quotation omitted). To determine whether the expert's testimony is reliable, the court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93.

In *Daubert*, the Supreme Court identified four factors—though not exhaustive-that trial courts may consider when determining reliability of proffered expert testimony under Fed. R. Evid. 702. They are: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4)

general acceptance in the scientific community. *Id.* at 593–94. The Supreme Court has emphasized, however, that these four factors are not a "definitive checklist or test," and that a court's gatekeeping inquiry into reliability "must be tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150.

But in some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundation. *Id.* For such testimony to satisfy the reliability standard, it "must be 'based on actual knowledge, and not mere "subjective belief or unsupported speculation.""" *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Trust v. Alerus Fin., N.A.*, 858 F.3d 1324, 1341–42 (10th Cir. 2017) (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 780 (10th Cir. 1999) (quoting *Daubert*, 509 U.S. at 590)). "When expert opinion 'is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict' and will be excluded." *Id.* at 1342 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)).

"The proponent of expert testimony bears the burden of showing that the testimony is admissible." *Conroy*, 707 F.3d at 1168 (citing *Nacchio*, 555 F.3d at 1241). "[R]ejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee notes. While *Daubert* requires the court to serve as a gatekeeper for expert testimony, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" remain "the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted).

The court has discretion to determine how to perform its gatekeeping function under *Daubert. Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000). "The

most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated." *Id.* (citations omitted).  In this case, the parties do not request a hearing.  And after reviewing the exhibits filed with the motions carefully, the court finds that this review provides a sufficient record to render a decision without a hearing.

### III.    Analysis

Plaintiffs provide three reasons for the court to exclude Mr. Kusiak's expert report and testimony.  First, plaintiffs assert that Mr. Kusiak's opinions about industry standards and customs are irrelevant to the parties' remaining claims and defenses in this lawsuit.  Second, plaintiffs argue that Mr. Kusiak's opinions are impermissible legal conclusions about the meaning of an unambiguous contract.  Finally, plaintiffs contend that Mr. Kusiak cannot testify about the purported "fairness" of the parties' Agreement.  Plaintiffs assert these three reasons render Mr. Kusiak's projected testimony not helpful to the trier of fact.  And thus, plaintiffs contend, the court should exclude them under Fed. R. Evid. 702.  The court considers each of the three reasons, in turn, below.

### A.    Mr. Kusiak's Opinions are Irrelevant to the Remaining Issues in the Case.

Plaintiffs assert that the court should exclude Mr. Kusiak's opinions as irrelevant for three subsidiary reasons.  *First*, plaintiffs argue, to the extent Mr. Kusiak's opinions address the legality of the parties' Agreement, the court already has decided, as a matter of law, that the Agreement does not violate Kansas's prohibition against the corporate practice of medicine or illegal fee splitting.  So, Mr. Kusiak's opinions that the Agreement conferred decision-making authority or control to plaintiffs over defendant RNM's practice and his opinions that the Agreement's Service Fee is not related to the services plaintiffs provided (thus amounting to a means to "siphon" professional revenues from a Kansas medical practice) are not relevant to the

issues remaining for trial.  The court agrees with plaintiffs.  These opinions address the legality

of the Agreement under Kansas law—an issue assigned to the court and, indeed, one that the

court already has decided on summary judgment as a matter of law.[1]  These opinions are not

relevant to the issues remaining for trial—*i.e.*, whether plaintiffs breached the Agreement by

defaulting materially on their obligations or whether defendant breached the Agreement by

terminating the contract without cause.  The court thus concludes that Mr. Kusiak's opinions

about the Agreement's delegation of decision-making authority or control or his opinions about

the Service Fee's relation to the services plaintiffs provided under the Agreement are not helpful

to the trier of fact's ability to decide the remaining issues in the case.

        *Second*, plaintiffs assert that Mr. Kusiak's testimony about the "usual" or "customary"

structure of practice management agreements is not relevant to the Agreement that the parties

specifically adopted as their contract.  The court also agrees with this argument.  Our court has

held unequivocally that, "in the absence of an ambiguous contract provision, evidence of

industry custom is simply irrelevant and properly excluded pursuant to Rule 702 and *Daubert*."

*Hutton Contracting Co. v. City of Coffeyville*, No. 02-4130-JAR, 2004 WL 2203449, at *12 (D.

Kan. Sept. 24, 2004) (first citing *Questar Pipeline Co. v. Grynberg*, 201 F.3d 1277, 1288 (10th

---

[1]     Defendant makes the perplexing assertion that its claim "that the fees paid under the Service
Agreement amounted to illegal fee-splitting are still alive in this case."  Doc. 308 at 9.  It's not.

        The court's summary judgment Order explicitly concluded that the Agreement's Service Fee
provision does not violate Kansas's prohibition against fee-splitting.  Doc. 300 at 67–70.  Defendant takes
out of context the court's acknowledgement that "even if the 15% Service Fee constituted illegal-fee
splitting, this finding would not void the 2002 Amended Service Agreement" because the Agreement
includes provisions requiring the parties to modify or sever portions of the contract that are deemed
illegal, invalid, or unenforceable.  *Id.* at 70.  The court's observation in this passage simply provided
another reason for the court to conclude that the Agreement is not void under Kansas law.  But the court's
acknowledgment never left open the issue of fee-splitting.  Instead, the court specifically entered
"judgment as a matter of law against all of RNM's claims and defenses claiming that the parties'
contracts are illegal and void under Kansas law."  *Id.*  So, Mr. Kusiak's opinions about fee-splitting are
not relevant at trial.  These opinions also amount to legal conclusions, and the court excludes them for
that reason as well.  *See supra* Part III.B.

Cir. 2000) (where expert testimony was extrinsic evidence contradicting the plain language of the contract, the testimony was properly stricken); then citing *Emp'rs Reinsurance Corp. v. Mid-Continent Cas. Co.*, 202 F. Supp. 2d 1212, 1217 (D. Kan. 2002)).

Although a court may admit expert testimony about standard industry practices to help a fact-finder interpret an ambiguous contract, *see id.* (citing *Havens v. Safeway Stores*, 678 P.2d 625, 629 (Kan. 1984)), defendant here never asserts that the Agreement at issue here contains any ambiguity. Instead, "where the contract is clear and complete," like the Agreement here is, "it cannot be changed or supplemented by evidence of prevailing industry practice." *Id.* Thus, expert opinion testimony about usual or customary practices in the industry is irrelevant to the issues remaining for trial. *See id.* (excluding proffered expert testimony opining about "the norm" in contracting work and was based on the expert's experience in the "construction contract arena" but not "knowledge of the actual project" at issue in the lawsuit because the expert testimony "focus[ed] not on the Contract, but instead on industry custom").

As plaintiffs argue, the trier of fact must decide in this case whether the parties performed the obligations that the Agreement imposed on them. Whether those obligations differed from the terms found in a "usual" or "customary" practice management contract is not relevant to the dispute here. The parties agreed to the terms of *this* Agreement—not some other agreement that Mr. Kusiak contends is the "usual" or "customary" structure for practice management agreements. Simply, the contract is the contract.

Also, this Agreement may differ significantly from other "usual" or "customary" practice management agreements depending on whether such other agreements included the payment of consideration for entering a long-term management contract. Here, the summary judgment facts established that the physician members and shareholders of the radiology practice management

group received "Merger Consideration" of some $14 million as consideration for entering the

parties' original practice management agreement for a term of 40 years.  Doc. 300 at 8.  So,

testimony about other agreements, none of which are issue in this case and perhaps different

significantly from the Agreement, will serve only to distract and confuse the jury.  The court thus

excludes Mr. Kusiak's opinions about the "usual" or "customary" structure of practice

management agreements.

*Finally*,  plaintiffs assert that Mr. Kusiak's opinion about the Agreement's Service Fee—

*i.e.*, it was higher than the fees usually established in practice management agreements—is not

relevant to defendant's damages claim.  The court agrees Mr. Kusiak's opinions about

defendant's alleged damages are not relevant because, as he concedes, he has no knowledge

about the parties' performance under the Agreement.  Defendant's damages claim "seek[s] to

recoup amounts collected by Plaintiffs under the Service Agreement that exceeded the fair

market value of the services that Plaintiffs provided."  Doc. 227 at 41.  Defendant estimates its

damages as excess services that it paid by using "the difference between the 15 percent service

fee collected by Plaintiffs from RNM [under the Agreement] and the fair market value of the

services provided calculated at 7 percent of RNM's professional revenues[ ]."  *Id.* at 41–42.  But,

Mr. Kusiak concedes, he has no knowledge about the value of the services plaintiffs actually

provided to defendant under the Agreement.  Indeed, Mr. Kusiak testified that he does not know

the facts about how the parties executed the Agreement.  Doc. 304 at 45 (Kusiak Dep. 169:21–

170:1).  Instead, Mr. Kusiak agreed that his "opinions are strictly interpreting the contract in

isolation."  *Id.* (Kusiak Dep. 170:13–15).

Defendant counters, asserting that Mr. Kusiak's testimony about customary service fees

will help the trier of fact evaluate defendant's damages.  Defendant contends that Mr. Kusiak

will provide testimony about the fair market value for basic billing and administrative services—which is what defendant contends it received after 2010.  But defendant never identified Mr. Kusiak as a damages expert.  Instead, Mr. Kusiak testified that he was asked to opine "whether this is a traditional management relationship or how it differs from a traditional management relationship."  Doc. 308-3 at 3 (Kusiak Dep. 39:16–22).  Mr. Kusiak also admitted that he is not a valuation expert and testified that he would not provide valuation opinion testimony in the case.  Doc. 219 at 11 (Kusiak Dep. 142:11–17).  Nor could he provide a valuation of the services that plaintiffs actually provided because he knows no facts about plaintiffs' performance under the Agreement.  Instead, Mr. Kusiak's opinions only address what he believes a radiology practice should pay for practice management services.  Such opinions are irrelevant to the issues that the trier of fact must decide here—*i.e.*, whether the parties satisfied their obligations that they specifically agreed to perform when they entered the Agreement.

### B.  Mr. Kusiak's Opinions Include Improper Legal Conclusions.

Plaintiffs also assert that Mr. Kusiak's opinions include improper legal conclusions.  An "expert's testimony is proper under Rule 702 if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function."  *Specht v. Jensen*, 853 F.2d 805, 809–10 (10th Cir. 1988).  But the court must exclude testimony when "the purpose of testimony is to direct the jury's understanding of the legal standards upon which their verdict must be based."  *Id.* at 810.  "[T]estimony which articulates and applies the relevant law . . . circumvents the jury's decision-making function by telling it how to decide the case."  *Id.* at 808.  So, "[w]hile testimony on *ultimate facts* is authorized under [Federal Rule of Evidence] 704," an expert "may not give opinions on *ultimate issues of law*."  *See id.* at 808 (emphasis added).

Here, Mr. Kusiak's opinions interpreting various provisions of the Agreement, ones asserting that the Agreement violates the law, are improper legal conclusions. Indeed, Mr. Kusiak's Preliminary Report identified several provisions of the contract that he characterized as "legal red flags" in the way that the Agreement delegated decision-making and control among the parties. Although Mr. Kusiak's Final Report removed the references to "legal red flags," his Report still includes his opinions about the Agreement's provisions that, he contends, improperly delegate control—provisions that he previously had identified as "legal red flags." The court excludes these improper legal conclusions.

Defendant asserts that Mr. Kusiak's opinions are not improper legal conclusion but, instead, permissible expert testimony about business terms and common practices in the radiology industry. To support this argument, defendant relies on *Ji v. Bose Corp.*, 538 F. Supp. 2d 354 (D. Mass. 2008). *Ji* involved a dispute about the contractual effect of two documents that a model signed on the day of a photography shoot. *Id.* at 356. Both parties proffered experts to testify about the contracts at issue. *Id.* The court held admissible the experts' opinions about standard industry practices for models signing releases like the ones at issue in the case. *Id.* at 358, 360. The court also found that the experts' testimony about extraneous evidence would help the jury interpret ambiguous contract terms. *Id.* at 360. But the court prohibited the experts from testifying about the legal effect of each document the model had signed because such opinions amounted to inadmissible legal conclusions. *Id.* at 358, 359. Unlike *Ji*'s experts, Mr. Kusiak's proffered testimony will not help the jury to understand extraneous evidence necessary to interpret ambiguous contract terms. Instead, Mr. Kusiak opines about the legal effect of certain provisions in the Agreement. And, like *Ji*, the court must exclude these opinions because they are improper legal conclusions. *See id. See also Koch v. Koch Indus., Inc.*, 2 F. Supp. 2d

1385, 1400 n.4 (D. Kan. 1998) ("[E]xpert opinion testimony to interpret contract language is inadmissible" unless a need exists "to clarify or define terms of art, science, or trade." (citations and internal quotation marks omitted)).

### C.  Mr. Kusiak Cannot Testify about the Fairness of the Agreement.

Last, to the extent Mr. Kusiak opines that the Agreement was not fair to defendant, such opinions are inadmissible.  *See*, *e.g.*, *Cimarron Feeders v. Bolle*, 17 P.3d 957, 965 (Kan. Ct. App. 2001) (holding that the trial court erred by allowing an expert to testify whether an agreement was fair because "the normal experience possessed by jurors should permit them to determine whether a particular agreement is 'fair' or not.").  Here, two sophisticated parties entered into an Agreement requiring plaintiffs to provide practice management services in exchange for defendant's payment of a Service Fee.  The trier of fact need not decide whether the terms of that Agreement are fair.  Instead, it merely needs to decide whether the parties breached their obligations that Agreement.  Mr. Kusiak's opinions will not help the jury make that determination.

### IV.  Conclusion

The court finds that Mr. Kusiak's Expert Report and proposed testimony consist of opinions that are not helpful to the trier of fact to decide the remaining issues in the case.  Mr. Kusiak's opinions either are irrelevant to the claims and defenses remaining for trial, improper legal conclusions, or inadmissible testimony about the fairness of the parties' Agreement—one that is unambiguous and was entered by sophisticated parties knowingly and voluntarily. Because Mr. Kusiak offers no other expert opinions that are relevant to the issues left for trial, the court excludes his Expert Report and testimony in their entirety.  And for this reason, the court grants plaintiffs' Motion to Exclude.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs Radiologix, Inc.

and Radiology and Nuclear Medicine Imaging Partners, Inc.'s Motion to Exclude Report and

Testimony of Gregory M. Kusiak (Doc. 303) is granted.

**IT IS SO ORDERED.**

**Dated this 26th day of February, 2018, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
